# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF INDIANA; STATE OF IOWA; STATE OF LOUISIANA; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF MONTANA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OKLAHOMA; STATE OF RHODE ISLAND; STATE OF TENNESSEE; STATE OF TEXAS; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN; and THE DISTRICT OF COLUMBIA; | **CIVIL ACTION NO.** _____ **FILED *IN CAMERA* AND UNDER SEAL** PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| *ex rel.* [under seal], | |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| [under seal], | |
| Defendants. | March 15, 2013 |

## *QUI TAM* COMPLAINT

# SEALED CASE – DO NOT PUT ON PACER

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF INDIANA; STATE OF IOWA; STATE OF LOUISIANA; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF MONTANA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OKLAHOMA; STATE OF RHODE ISLAND; STATE OF TENNESSEE; STATE OF TEXAS; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN; and THE DISTRICT OF COLUMBIA; *ex rel.* BRIAN BENNETT, <br><br>     Plaintiffs, <br><br> v. <br><br> US WORLDMEDS, LLC; SOLSTICE NEUROSCIENCES, LLC; QUINTILES TRANSNATIONAL CORP.; QUINTILES COMMERCIAL US, INC.; and THE ASSISTANCE FUND, INC., <br>     Defendants. | **CIVIL ACTION NO.** <br>_____ <br><br> **FILED *IN CAMERA* AND UNDER SEAL** <br><br> PURSUANT TO <br> 31 U.S.C. § 3730(b)(2) <br><br><br> **JURY TRIAL DEMANDED** <br><br><br><br><br><br><br><br><br><br> March 15, 2013 |

## FALSE CLAIMS ACT *QUI TAM* COMPLAINT

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................i

NATURE OF THE ACTION ........................................................................1

JURISDICTION AND VENUE ...............................................................17

THE PARTIES ...........................................................................................18

FEDERAL AND STATE LAWS AND REGULATIONS ......................................20

    A.    The Anti-Kickback Laws of the United States and the States ............20

    B.    The Federal and State False Claims Acts ...........................................29

    C.    The Federal Food, Drug and Cosmetic Act.......................................34

    D.    Group Purchasing Organizations ......................................................40

    E.    Co-Payment Assistance Funds ..........................................................44

GOVERNMENT HEALTH INSURANCE PROGRAMS ......................................48

THE RELATOR .......................................................................................59

PRODUCTS MANUFACTURED AND SOLD  BY US WORLDMEDS &
SOLSTICE NEUROSCIENCES ..............................................................63

    A.    MYOBLOC ......................................................................................63

    B.    APOKYN ..........................................................................................69

DEFENDANTS' NATIONAL FRAUD SCHEME TO INDUCE SALES OF
MYOBLOC.............................................................................................74

    A.    Defendants' Improper Marketing of MYOBLOC.............................74

    B.    Defendants' Scheme Involving Medical Practitioners Pushing
MYOBLOC ......................................................................................76

    C.    Defendants' Provision of Kickbacks to Medical Providers to
Induce Prescription of MYOBLOC ...................................................92

US WORLDMEDS INTENTIONALLY OVERTSTATED  THE MYOBLOC ASP ...................................................................................................95

DEFENDANTS' NATIONAL FRAUD SCHEME TO INDUCE SALES OF APOKYN ...................................................................................................100

    A.    US WorldMeds' Plan to Profit From APOKYN ...............................100

        1.    US WorldMeds Promptly Raised the Price of APOKYN by 700% ....................................................................................100

        2.    US WorldMeds & Assistance Fund Conspire to Induce Sales of APOKYN to Medicare Beneficiaries........................101

    B.    The Use of Additional Kickbacks to Induce Prescription of APOKYN ....................................................................................109

        1.    "Circle of Care" Kickbacks to Induce APOKYN Prescriptions & Sales .............................................................110

        2.    Other Kickbacks to Induce APOKYN Prescriptions & Sales ...................................................................................114

DEFENDANTS KNEW THEIR CONDUCT CAUSED FALSE CLAIMS .........138

DEFENDANTS' CONSPIRACY TO OFFER KICKBACKS TO MEDICAL PROVIDERS ...............................................................................................138

CLAIMS SUBMITTED AND DAMAGES CAUSED TO GOVERNMENT HEALTH CARE PROGRAMS ........................................................................139

DEFENDANTS' UNLAWFUL  RETALIATION AGAINST RELATOR............145

CLAIMS FOR RELIEF ..................................................................................147

COUNT I: VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a) ......................................................................................................147

COUNT II: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a) ..........................................................................................148

COUNT III: VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT .......150

COUNT IV: VIOLATION OF THE COLORADO MEDICAID FALSE CLAIMS ACT ........................................................................151

COUNT V: VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT .....153

COUNT VI: VIOLATION OF THE DELAWARE FALSE CLAIMS  AND REPORTING ACT .................................................................................155

COUNT VII: VIOLATION OF THE FLORIDA FALSE CLAIMS ACT ............156

COUNT VIII: VIOLATION OF THE GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT .................................................................................158

COUNT IX: VIOLATION OF THE HAWAII FALSE CLAIMS ACT .................160

COUNT X: VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT ..................................................................161

COUNT XI: VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT ...........................................................163

COUNT XII: VIOLATION OF THE IOWA FALSE CLAIMS ACT ...................164

COUNT XIII: VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW ...................................................166

COUNT XIV: VIOLATION OF THE MARYLAND FALSE HEALTH CLAIMS ACT ........................................................................................167

COUNT XV: VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT ........................................................................................169

COUNT XVI: VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT ........................................................................................170

COUNT XVII: VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT ....172

COUNT XVIII: VIOLATION OF THE MONTANA FALSE CLAIMS ACT ......173

COUNT XIX: VIOLATION OF THE NEVADA FALSE CLAIMS ACT ............175

COUNT XX: VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT .....176

COUNT XXI: VIOLATION OF THE NEW MEXICO MEDICAID FALSE
CLAIMS ACT .................................................................................178

COUNT XXII: VIOLATION OF THE NEW YORK STATE FALSE CLAIMS
ACT .................................................................................................180

COUNT XXIII: VIOLATION OF THE NORTH CAROLINA FALSE
CLAIMS ACT .................................................................................181

COUNT XXIV: VIOLATION OF THE OKLAHOMA MEDICAID FALSE
CLAIMS ACT .................................................................................183

COUNT XXV: VIOLATION OF THE RHODE ISLAND STATE FALSE
CLAIMS ACT .................................................................................184

COUNT XXVI: VIOLATION OF THE TENNESSEE MEDICAID FALSE
CLAIMS ACT .................................................................................186

COUNT XXVII: VIOLATION OF THE TEXAS MEDICAID FRAUD
PREVENTION ACT .........................................................................187

COUNT XXVIII: VIOLATION OF THE VIRGINIA FRAUD AGAINST
TAXPAYERS ACT ...........................................................................189

COUNT XXIX: VIOLATION OF THE WASHINGTON MEDICAID
FRAUD FALSE CLAIMS ACT, ..........................................................191

COUNT XXX: VIOLATION OF THE WISCONSIN FALSE CLAIMS FOR
MEDICAL ASSISTANCE LAW ..........................................................192

COUNT XXXI: VIOLATION OF THE DISTRICT OF COLUMBIA FALSE
CLAIMS ACT .................................................................................194

COUNT XXXII: RETALIATORY DISCHARGE IN VIOLATION OF 31
U.S.C. § 3730(h) .............................................................................195

COUNT XXXIII: BREACH OF EXPRESS AND/OR IMPLIED CONTRACT .196

COUNT XXXIV: WRONGFUL TERMINATION AND RETALIATION IN
VIOLATION OF PUBLIC POLICY AND VIOLATION OF THE
TENNESSEE FALSE CLAIMS ACT ..................................................197

PRAYERS FOR RELIEF ........................................................................197

## NATURE OF THE ACTION

1.      Plaintiff Brian Bennett (hereafter referred to as "Relator") brings this action on behalf of the United States of America against Defendants pursuant to the *Qui Tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-33 ("Federal FCA or "FCA"), and on behalf of the above-captioned states under their respective State False Claims Acts ("State FCAs") (together referred to herein as the "*Qui Tam* Action").  Pursuant to 31 U.S.C. § 3730(b)(2), and comparable provisions in the State FCAs, this *Qui Tam* Action is brought *in camera* and under seal.

2.      Relator also brings, on his own behalf, claims against Defendants Quintiles Commercial US, Inc., in concert with US WorldMeds, LLC ("US WorldMeds") for retaliation against him in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h) and the comparable provisions of the State FCAs and Tennessee law.

3.      Relator is a former employee of Defendant Quintiles Commercial US, Inc., a wholly owned subsidiary of Defendant Quintiles Transnational Holdings Inc., (collectively, "Quintiles").  In the course of his employment for Quintiles, Relator was subcontracted to and served as the National Sales Director for Defendant US WorldMeds pursuant to a contractual arrangement between Quintiles and US WorldMeds.  The allegations of this Complaint arise from the

Relator's first-hand knowledge of the unlawful practices of the Defendants with respect to the drugs MYOBLOC® and APOKYN®.

4.     As more fully described below, MYOBLOC and APOKYN are injectable prescription drugs marketed by Defendant US WorldMeds directly or through its subsidiary, Defendant Solstice Neurosciences, LLC ("Solstice Neurosciences"), through a subcontracted pharmaceutical sales force provided by Defendant Quintiles until December 31, 2012.  As of January 1, 2013, the sales force is directly employed by US WorldMeds.  MYOBLOC is a botulinum toxin and has FDA approval only for the treatment of adults with cervical dystonia, to reduce the severity of abnormal head position and neck pain associated with cervical dystonia.  APOKYN has FDA approval only to treat advanced-stage Parkinson's disease patients experiencing "off-episode" motor symptoms, such as muscle stiffness, slow movements and difficulty starting movements.  APOKYN therapy is a compliment to the Parkinson's patient's oral medicine.

5.     Both MYOBLOC and APOKYN are administered by injection. MYOBLOC is typically administered by a physician in an office, clinic, or hospital.  APOKYN is initially administered in a physician's office, after which a patient or his/her caregiver may inject the drug at home.

6.     At all times relevant to this case, MYOBLOC and APOKYN were marketed to medical providers by Defendants US WorldMeds and Solstice

2

Neurosciences, with assistance from Quintiles.  In addition, Defendants were assisted in the marketing of MYOBLOC by a purported group purchasing organization ("GPO") – Novation LLC ("Novation").  Defendant The Assistance Fund, Inc. ("Assistance Fund"), a purported 501(c)(3) charitable organization funded primarily by pharmaceutical companies, assisted US WorldMeds in marketing APOKYN.  Moreover, as described further herein, the sales force of Defendant US WorldMeds engaged in cross-marketing of MYOBLOC and APOKYN to consumers or purchasers of the other drug.

7.     MYOBLOC is usually purchased by a medical provider from a US WorldMeds-approved distributor.  The medical provider thereafter may seek reimbursement for the drug, often by submission of a claim to federal and state governmental health insurance programs, such as Medicare and Medicaid.

8.     APOKYN is usually supplied to a patient through an approved specialty pharmacy.  The patient will provide the medication to his medical provider for initial injection.  The medical provider thereafter may seek reimbursement for the services related to injecting APOKYN, as well as for providing the patient or his/her caregiver training on how to inject APOKYN. Most often a claim is submitted by the specialty pharmacy on behalf of the patient for the APOKYN medication.  Such claims often are submitted to federal and state health insurance programs, such as Medicare and Medicaid.

3

9.    As a direct, proximate and foreseeable result of Defendants'
fraudulent course of conduct set forth herein and conducted on a national scale,
Defendants knowingly caused the submission of thousands of false or fraudulent
statements, certifications, and claims to government health insurance programs for
the reimbursement of the drugs MYOBLOC (from about September 2010) and
APOKYN (from about January 2012) through September 2012, when Relator was
actively employed by Quintiles.

10.    Moreover, based on information known to the Relator from his
employment, and information he continues to learn about Defendants, the practices
complained of herein are continuing.  As detailed below, Defendants' actions and
omissions have caused many years of improper and illegal billings to the United
States and the above-captioned states.

11.    For the years 2011 and 2012, US WorldMeds' aggregate United States
revenues from MYOBLOC totaled over $16 million per year, with approximately
60% of the sales (about $10 million) relating to Medicare reimbursements and
about 8% of the sales ($1 million) relating to Medicaid reimbursements.

12.    For the year 2012, US WorldMeds' aggregate United States revenues
from the sale of APOKYN totaled over $50 million, with approximately 70% of
those sales (about $35 million) relating to APOKYN Medicare reimbursements and

about 10% of the sales (about $5 million) relating to APOKYN Medicaid reimbursements.

13.    US WorldMeds projects strong sales growth, in light of the continued fraud, anticipating aggregate United States sales in 2013 of more than $17 million for MYOBLOC and more than $65 million for APOKYN.  Medicare is thus expected to reimburse approximately $10 million for MYOBLOC and $46 million for APOKYN in 2013.  Because of the fraud described below, US WorldMeds' projected APOKYN sales are 650% greater than the $9.9 million projected by the previous company marketing APOKYN, costing Medicare nearly $40 million extra.  The dramatic increase in projected revenue for APOKYN takes into account the potential of a substantial reduction in patient base – due to the elevated prices imposed by US WorldMeds – that Lee Warren, the COO of US WorldMeds, calculated could be as great as 70-80%.

14.    As of January 1, 2013, US WorldMeds brought the Quintiles sales team in-house as US WorldMeds employees, in the anticipation of continued growth in MYOBLOC and APOKYN sales, as well as in continuation of the fraudulent practices detailed herein.

15.    By their actions, Defendants have violated several laws, including without limitation, the FCA and the Medicare and Medicaid Patient Protection Act (also known as the "Anti-Kickback Statute" or "AKS").

5

16.    One purpose of the unlawful activities of Defendants Quintiles and

US WorldMeds is to encourage sales of, and to gain market share for, MYOBLOC

(rimabotulinumtoxinB) over other drugs in the botulinum toxin category, such as

from BOTOX® (onabotulinumtoxinA).  Defendants intend to shift prescribers

from BOTOX to MYOBLOC for all manner of treatments, including for

unapproved, off-label uses like treatment of sialorrhea and migraine headaches.

Although MYOBLOC has FDA approval only for treatment of cervical dystonia in

adults, BOTOX and other competitors have broader FDA approvals.

17.    Another purpose of Defendants' unlawful activities is to encourage

sales of, and to gain market share for, MYOBLOC over other drugs in the

botulinum toxin category by providing discounts for purchase of MYOBLOC

through Novation.  Defendant US WorldMeds makes direct cash payments from

US WorldMeds to Novation members that buy MYOBLOC, without reporting such

cash payments as discounts in computing the reportable sales price of MYOBLOC

for purposes of obtaining reimbursement for MYOBLOC from government and

other health care programs, including Medicare and Medicaid.  Consequently, US

WorldMeds has knowingly inflated the Average Sales Price ("ASP") of

MYOBLOC used to determine reimbursement values from federal programs, such

as Medicare, and similarly artificially inflated the MYOBLOC selling price

reported for state programs, such as Medicaid.  All MYOBLOC customers – even

those outside Novation – therefore receive excessive reimbursement for
MYOBLOC because of this aspect of the fraud.

18.     This scheme involving kickbacks from US WorldMeds to Novation
members was also designed to increase the revenues of MYOBLOC purchasers by
providing them a cash kickback on MYOBLOC purchases, so that they were able
to obtain MYOBLOC from a US WorldMeds-approved distributor at a price that
was significantly lower than the price used to calculate the ASP used by
government programs for reimbursing sales of MYOBLOC, which by law is
limited to ASP plus six percent.  US WorldMeds employees presented this
information to potential purchasers of MYOBLOC through various means,
including the use of spreadsheets called "MYOBLOC Cost Calculators," which
computed the additional "profit" that could be made from purchasing MYOBLOC
rather than another botulinum toxin.  *See* Exhbits D, E & F.

19.     Defendants Quintiles and US WorldMeds also conspired to encourage
medical providers to purchase MYOBLOC based on representations of the profits
that providers could realize from submission of inflated MYOBLOC-related claims
to Medicare, including for myriad off-label uses of MYOBLOC.  The conduct
included the seeding of compendia for MYOBLOC with studies funded or
controlled by US WorldMeds to stimulate reimbursement for off-label uses of
MYOBLOC.  These Defendants engaged in such conduct, pressing medical

providers to use MYOBLOC as a substitute for other botulinum toxins, despite

knowledge (included on the MYOBLOC label) that "[u]nits of biological activity

of MYOBLOC cannot be compared or converted into units of any other botulinum

toxin product."  In doing so, they misbranded MYOBLOC by selling it with the

intention it be used for unapproved purposes, the knowledge it would be used for

such purposes, or both.

20.    Moreover, these Defendants further misbranded MYOBLOC by

conspiring to provide specific training to medical providers on how to inject

MYOBLOC for myriad off-label uses, including for highly inappropriate uses that

carry dangerous and potentially severe risks, despite a black box warning that

MYOBLOC can cause life-threatening symptoms in any patient, and particularly in

children.  Efforts in this regard including paying doctors $500 plus a meal (valued

at over $100) to attend US WorldMeds-sponsored meetings, referred to as

Advisory Board Meetings (or "Ad Boards"), where the off-label use data and

reimbursement of MYOBLOC were discussed, as well as paying certain physicians

to visit other physicians (who were also paid by US WorldMeds) in their offices in

order to demonstrate off-label uses of MYOBLOC (referred to as "Injector

Training").

21.    Another purpose of Defendants' unlawful activities was to encourage

sales of, and government reimbursement for, APOKYN at a price that was

artificially inflated by thousands of dollars by Defendant US WorldMeds.  This

more than septupled the cost of APOKYN in the United States in late 2011 – from

$138 to $995 per cartridge – with no basis for such a price increase other than

greed.

22.     Defendants Quintiles and US WorldMeds participated in encouraging

medical providers to overstate the claims for services provided relating to

APOKYN administration so that the providers would achieve higher

reimbursements from Medicare and/or Medicaid, thereby fraudulently increasing

APOKYN sales.  Defendant US WorldMeds also provided services, free-of-charge,

to physicians in order to encourage their use of APOKYN, which constituted

improper kickbacks from US WorldMeds to the physicians in exchange for the

physicians' prescribing APOKYN to their patients.

23.     US WorldMeds, in conspiracy with Assistance Fund, conspired to

implement a plan that ensured that virtually all Medicare patients receiving

APOKYN paid none of the costly co-payments associated with the increased price

of the drug, instead using US WorldMeds' funds channeled through Assistance

Fund to cover APOKYN co-pays regardless of the patient's financial need.  US

WorldMeds was so confident that Assistance Fund would use the earmarked funds

provided by US WorldMeds to fund the Medicare co-payment for APOKYN users,

regardless of their means, that Lee Warren, the COO of US WorldMeds, pushed the

APOKYN sales team to tell doctors that 100% of all out-of-pocket expenses for APOKYN would be covered for every APOKYN user.  US WorldMeds operated a different co-pay assistance program for privately insured APOKYN patients.

24.     To ensure that their plan to fund all co-payments for Government Health Care Program beneficiaries worked, US WorldMeds and Assistance Fund personnel were in constant communication about the patients who would benefit from Assistance Fund's payment of their out-of-pocket expenses, including amounts in the so-called "donut hole" applicable to drug reimbursements falling between the Medicare Part D initial coverage limit and its catastrophic-coverage threshold.  Among other things, US WorldMeds hired a Director of the Assistance Fund, Cindy Padgett, to ensure that there would be close contact between US WorldMeds and Assistance Fund in approving Medicare co-payment assistance for all APOKYN users who were covered by Medicare.

25.     After US WorldMeds inflated the price of APOKYN, an initial prescription of a 30- to 90-day supply of APOKYN, sufficient for a patient's first round of recommended daily dosages, could be anywhere from $30,000 to $90,000 (at $995 per cartridge).  That inflated price would generate a significant out-of-pocket cost to Medicare patients but-for the fact that Assistance Fund used funds provided by US WorldMeds to reimburse those costs for patients, regardless of their financial need, and in a manner wholly inconsistent with Centers for

Medicare & Medicaid Services ("CMS") guidance setting forth the rules that legitimate charitable co-pay assistance programs must follow. US WorldMeds and Assistance Fund knew that the payments from Assistance Fund were kickbacks provided by US WorldMeds in order to sell APOKYN.

26.     As is explained by way of example in this Complaint, Defendants' actions involved, among others, concerted efforts to (a) misbrand MYOBLOC by encouraging medical providers throughout the United States to (i) base their clinical decisions on misinformation, such as presentation of the purported value of MYOBLOC versus other botulinum toxins and/or "special" incentives offered to MYOBLOC purchasers who contracted with Novation, and (ii) to dose patients with MYOBLOC in various unsafe and off-label manners, as well as (b) to cause providers throughout the United States to submit overstated claims relating to APOKYN administration in a fraudulent manner. Defendants also engaged in concerted efforts to encourage patients to acquire APOKYN, and to submit claims to Medicare and Medicaid for APOKYN, based on kickbacks provided through Assistance Fund, which was controlled by US WorldMeds for all intents and purposes relating to the provision of reimbursement of out-of-pocket costs of APOKYN.

27.     Defendants Quintiles and US WorldMeds further pushed the sales of APOKYN through marketing efforts disguised as "educational" meetings between

medical professionals purported to be "Key Opinion Leaders" ("KOL"). These "KOL Meetings" occurred at luxury hotels in Atlanta, Philadelphia and Las Vegas. US WorldMeds chose speakers from among the most significant prescribers of APOKYN, and paid them many thousands of dollars to make presentations on various topics – including how to code minimal supervision of an APOKYN patient in order to obtain higher Medicare reimbursements without being entitled to such amounts. US WorldMeds instructed doctors to use nurses paid for by US WorldMeds to manage the APOKYN initiation so that the doctor could make only "brief" visits with the APOKYN patient, while "continu[ing] to see other patients," and yet claim reimbursement for the entire time-consuming initiation procedure.

28.     These KOL meetings were attended by individuals who were paid to attend them, and who had been invited because US WorldMeds sales representatives (or others affiliated with or paid by US WorldMeds) identified them as providers with capacity to prescribe APOKYN for more patients.

29.     Similarly, Defendants Quintiles and US WorldMeds marketed MYOBLOC through purportedly "educational" meetings called "Ad Boards." US WorldMeds selected Ad Board speakers based on their familiarity with off-label uses of MYOBLOC and paid the speakers many thousands of dollars to promote the use of MYOBLOC for unapproved indications, including sialorrhea, migraine

and other pain disorders.  The Ad Boards did not discuss the only approved use of MYOBLOC – treatment of cervical dystonia.

30.     These Ad Board meetings took place at restaurants around the country, and attendees were paid $500 to attend the free dinner (valued at over $100) and presentation.  Attendees were chosen by US WorldMeds sales representatives based on their potential to purchase greater amounts of MYOBLOC.

31.     US WorldMeds paid individuals thousands of dollars to make office visits to medical providers to give them personal instruction on how to administer MYOBLOC for off-label uses.

32.     In addition, US WorldMeds paid certain physicians for making sales calls, called "KOL visits" to various physicians to convince them to use MYOBLOC and APOKYN, including physicians who were simply chosen through a "cold calling" process based on the location of their offices.

33.     US WorldMeds paid medical providers thousands of dollars to purportedly demonstrate to US WorldMeds sales personnel how APOKYN could be administered.

34.     In addition, US WorldMeds provided nurses, through a program called "Circle of Care," to administer and titrate APOKYN for medical practitioners, who

were encouraged to continue to bill for such services, even though the services were being provided by nurses paid by US WorldMeds.

35.     All of the foregoing payments and incentives were provided to induce sales of MYOBLOC and APOKYN, and to induce related claims to be submitted to Medicare, Medicaid and other governmental health care programs, through the provision of kickbacks in the form of fees, travel, lodging and other inducements.

36.     Defendants' misconduct involved collusion and conspiracy to target medical providers who could provide lucrative business for US WorldMeds through the purchase of MYOBLOC and APOKYN, as well as medical providers who could influence other providers to provide MYOBLOC to, or to prescribe APOKYN for, their patients.

37.     In addition to causing damage to programs such as Medicare and Medicaid, the actions stated herein have also put patient safety and health at risk. MYOBLOC and APOKYN are strong medications:

> a. MYOBLOC can cause a number of problems including "asthenia, generalized muscle weakness, diplopia, blurred vision, ptosis, dysphagia, dysphonia, dysarthria, urinary incontinence, and breathing difficulties. These symptoms have been reported hours to weeks after injection. Swallowing and breathing difficulties can

be life threatening and there have been reports of death." *See* MYOBLOC Black Box Warning.

b. APOKYN can cause various side effects, including severe nausea and vomiting (for which another medicine called Tigan® is typically required), lower blood pressure, dizziness, fainting, and hallucinations.

38.　These actions in pressing off-label use of MYOBLOC and in encouraging medical doctors to minimize contact with APOKYN patients are contrary to appropriate medical practice and represent a departure from the care permitted and expected from a medical professional.  They are also evidence of misbranding and kickbacks.

39.　Defendants' misconduct continues to this day, and will continue for the foreseeable future.

40.　From 2010 through the present, Defendants have engaged in a scheme to defraud the United States and the above-captioned Plaintiff States by knowingly submitting and/or causing to be submitted false and/or fraudulent claims, knowingly making, using, and/or causing to be made or used false statements and records material to such claims, retaining and/or concealing overpayments from government health insurance programs, and conspiring to do so.

41.     The Federal FCA provides that any person who engages in such conduct is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government. The FCA permits persons (known as "relators") having information regarding such conduct against the government to bring an action on behalf of the government and to share in any recovery.  The complaint must be filed under seal, without service on the defendants.  The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.  The Plaintiff States' FCAs contain comparable provisions.

42.     Pursuant to the Federal and State FCAs, Relator seeks to recover on behalf of the United States and the States named in this Complaint, damages and civil penalties arising from Defendants' defrauding of Medicare, Medicaid, CHAMPUS/TRICARE, the Federal Employees Health Benefit Plan, and other government funded health insurance programs, as detailed below.  In addition, Relator seeks to recover damages for himself personally resulting from Defendant Quintile's (acting in concert with US WorldMeds) unlawful retaliation and termination of his employment in violation of the FCA and other laws.

43.     Information about Defendants' illegal conduct is detailed further in the paragraphs below.

## JURISDICTION AND VENUE

44.     This Court has jurisdiction over this action under the False Claims Act

("FCA") causes of action pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§

3732(a), 3730.  Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction

on this Court for state-law claims that arise under the same transactions or

occurrences as the action brought under 31 U.S.C. § 3730.

45.     Venue is appropriate as to the Defendants in that the Defendants can

be found, reside and/or transact business in this judicial district, and/or acts

proscribed by 31 U.S.C. § 3729 have been committed by the Defendants in this

judicial district.  Therefore, venue is proper within the meaning of 28 U.S.C.

§ 1391(b) & (c), and 31 U.S.C. § 3732(a).

46.     This Court has personal jurisdiction over each Defendant pursuant to

31 U.S.C. § 3732(a), which authorizes nationwide service of process, because each

Defendant can be found in, resides in, transacts business in and/or has committed

the alleged acts throughout the United States, including in Connecticut, which is in

the District of Connecticut.

47.     Under 31 U.S.C. § 3730(e)(4)(A) (and the comparable provision of

the State FCAs), there has been no statutorily relevant public disclosure with

respect to this Complaint.  Even to the extent there has been any such public

disclosure, Relator is an original source as defined by the FCA in 31 U.S.C. §

3730(e)(4)(B) and in comparable provisions of the State FCAs.  Relator has made

voluntary disclosures to the United States and the above-captioned Plaintiff States

prior to the filing of this lawsuit pursuant to 31 U.S.C. § 3730(b)(2) and similar

provisions in the State FCAs.

## THE PARTIES

48.     The real parties in interest to the FCA *Qui Tam* claims herein are the

sovereign governments of the United States of America, as well as those States

listed above, by virtue of the State FCAs.  Accordingly, at this time, Relator is

pursuing his cause of action on behalf of the United States and the named States on

the FCA *Qui Tam* claims set forth herein pursuant to 31 U.S.C. § 3730(c)(3), and

comparable provisions of the State FCAs.  He is pursuing his wrongful termination

and retaliation claims on behalf of himself personally.

49.     Relator Brian Bennett is a citizen of the United States of America.  He

is a resident of Tennessee, and a former employee of Defendant Quintiles, working

with Defendant US WorldMeds, pursuant to a contract between Quintiles and US

WorldMeds.  He brings this *Qui Tam* action based upon direct and independent

information obtained during the period of his active employment at Quintiles from

September 2010 to September 2012, at which time his employment at Quintiles

was terminated, with US WorldMeds' assent, in retaliation for his expression of

concern about Defendants' conduct as detailed herein.

18

50.     Defendants Quintiles Commercial US, Inc., is a privately-held company formed on July 1, 1997, as a Delaware corporation.  Quintiles describes itself, with related entities, on its website (www.quintiles.com) as "the world's leading biopharmaceutical service provider."  Quintiles conducts business throughout the United States (including in Connecticut) and the Quintiles family of companies conducts business globally.  The principal place of business of Quintiles is Durham, North Carolina.  Quintiles claims to "have helped develop or commercialize all of the top 50 best-selling drugs on the market."  Among the services Quintiles provides is "Biopharmaceutical Sales & Marketing," which includes provision of "Pharma Contract Sales" services through, for example, provision of an outsourced sales force.

51.     Defendant US WorldMeds, LLC ("US WorldMeds") is a privately-owned company formed on March 23, 2001 as a Delaware Limited Liability Company, with headquarters in Louisville, Kentucky.  It is a subsidiary of a holding company known as US WorldMeds Holdings, LLC, also a Delaware company.  Beginning on or around August 9, 2010, US WorldMeds contracted with Quintiles to provide an outsourced sales force to market MYOBLOC and, after its acquisition in December 2011, APOKYN.  In or around December 2011 and 2012, US WorldMeds provided cash payments to Assistance Fund for purposes of selling

APOKYN.  US WorldMeds does business throughout the United States, including in Connecticut.

52.     Defendant Solstice Neurosciences, LLC ("Solstice Neurosciences"), is a wholly owned subsidiary of US WorldMeds, LLC, with headquarters in Louisville, Kentucky.  It became related to US WorldMeds when US WorldMeds acquired predecessor Solstice Neurosciences Inc. (and its product MYOBLOC) in August 2010 for $35.7 million in a merger transaction.  Solstice Neurosciences, with and through its parent company US WorldMeds, conducts business in Connecticut.

53.     Defendant The Assistance Fund, Inc. ("Assistance Fund") is registered as an Internal Revenue Code Section 501(c)(3) charitable organization.  It is a Delaware corporation, with headquarters in Orlando, Florida.  Assistance Fund assists US WorldMeds with the provision of APOKYN to patients throughout the United States, including in Connecticut.

## FEDERAL AND STATE LAWS AND REGULATIONS

### A.     The Anti-Kickback Laws of the United States and the States

54.     The Medicare and Medicaid Patient Protection Act, also known as the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupts medical decision-making and can result in the provision of

goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of the federal health care programs, Congress enacted a prohibition against the payment of kickbacks in any form. The Anti-Kickback Statute was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the medicare and medicaid programs." H.R. Rep. No. 92-231, at 90 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5093.

55.    In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony, with a penalty of $25,000 and/or five years in jail. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, § 241(b) & (c), 86 Stat. 1329, 1419; 42 U.S.C. § 1320a-7b(b). In doing so, Congress noted that the purpose of the Anti-Kickback Statute was to combat fraud and abuse in medical settings that "cheats taxpayers who must ultimately bear the financial burden of misuse of funds . . . diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and] erodes the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill

the obligations of their medical assistance programs."  H.R. Rep. No. 95-393(II),

at 44, *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047.

56.    In 1987, Congress again strengthened the Anti-Kickback Statute to

ensure that kickbacks masquerading as legitimate transactions did not evade its

reach.  *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-

142, 91 Stat. 1200 (1977); Medicare and Medicaid Patient and Program Protection

Act of 1987, Pub. L. No. 100-93, 101 Stat. 680.

57.    In 1996, Congress expanded the Anti-Kickback Statute to reach

claims involving all "[f]ederal health care programs," defined as "any plan or

program that provides health benefits, whether directly, through insurance, or

otherwise, which is funded directly, in whole or in part, by the United States

Government (other than the health insurance program under chapter 89 of title 5,

United States Code)."  Health Insurance Portability and Accountability Act of

1996, Pub. L. No. 104-191, § 204(a)(7), 110 Stat. 1936, 1999-2000 (adding 42

U.S.C § 1320a-7b(f)).

58.    In 2010, Congress clarified two important issues regarding the

application of the Anti-Kickback Statute.  First, Congress clarified that any "claim

that includes items or services resulting from a violation of this section constitutes

a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31,

United States Code" – *i.e.*, the False Claims Act ("FCA"), 31 U.S.C § 3729.

Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 468, 759 (2010) (adding 42 U.S.C. § 1320a-7b(g)).  Second, Congress clarified that, "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."  *Id.*  § 6402(f)(2) (adding 42 U.S.C. § 1320a-7b(h)).

59.    The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program, which includes any State health program or health program funded in part by the federal government.  42 U.S.C. §§ 1320a-7b(b), -7b(f).

60.    The statute provides, in pertinent part:

> (b) Illegal remunerations
>
> * * *
>
> > (2)    Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
> >
> > > (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or
> > >
> > > (B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing or ordering any

23

> good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

61.    In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)), and penalties in the amount of three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

62.    Concern about improper drug marketing practices prompted the Inspector General of the Department of Health and Human Services the ("HHS OIG") to issue a Special Fraud Alert in 1994 concerning prescription drug marketing practices that violated the Anti-Kickback Statute. *See* Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65372, 65376 (Dec. 19, 1994).

63.    In May 2003, the HHS OIG published further guidance on marketing practices which may constitute kickbacks known as the "OIG Compliance Program Guidance for Pharmaceutical Manufacturers," 68 Fed. Reg. 23731 (May 5, 2003) (the "OIG Guidelines"). The Guidelines address, inter alia, the conflicts that may

arise when a pharmaceutical manufacturer provides educational or research

funding to "entities in a position to make or influence referrals."  *Id.* at 23735.

As a general rule, educational grants should be made without conditions or

restrictions, otherwise the arrangement becomes a forbidden quid pro quo

relationship:

> Manufacturers should take steps to ensure that neither they, nor their representatives, are using these activities to channel improper remuneration to physicians or others in a position to generate business for the manufacturer or to influence or control the content of the program.

*Id.* at 23738.

64.     The Anti-Kickback Statute not only prohibits outright bribes and

rebate schemes, but also prohibits any payment or other remuneration by a drug

company to a physician or other person which has as one of its purposes the

inducement of the physician to write prescriptions for the company's

pharmaceutical products or the inducement of the physician to influence or

recommend the prescribing of the product.

65.     Remuneration includes the provision of "services for free or for other

than fair market value."  42 U.S.C § 1320a-7a(i)(6).  *See United States ex rel.*

*Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011) (citing

*United States ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267 (D. Mass.

2010)); *see also* Medicare and State Health Care Programs: Fraud and Abuse; OIG

Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July 29, 1991)

("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to

cover the transferring of anything of value in any form or manner whatsoever.").

66.     Compliance with the Anti-Kickback Statute is a precondition to

participation as a health care provider under a Government Health Care Program,

including Medicare and the state Medicaid programs.  *See, e.g., United States ex*

*rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 312 (3d Cir. 2011) (citing 42

C.F.R. § 413.24(f)(4)(iv)).

67.     Moreover, compliance with the Anti-Kickback Statute is a

precondition of payment for drug claims administered by physicians for which

Medicare or Medicaid reimbursement is sought.  Violation of the preconditions in

statutes, regulations, and provider agreements for payment from or participation in

government programs may form the basis for a FCA claim where there is an

underlying course of fraudulent conduct.  *See United States ex rel. Hutcheson v.*

*Blackstone Med., Inc.*, 647 F.3d 377 (1st Cir. 2011) (Medicare and Anti-Kickback

Act); *State of New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011) (Medicaid and

the Anti-Kickback Act); *see also United States ex rel. Westmoreland v. Amgen, Inc.*,

812 F. Supp. 2d 39, 54 (D. Mass. 2011) (collecting cases).

68.     A Medicare claim must be only for reasonable and necessary services.

Under 42 U.S.C. § 1395y(a)(1)(A), "no payment may be made [under the

Medicare statute] for any expenses incurred for items or services … which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury."

69.     Therefore, every Medicare claim is an implicit certification that the underlying services were reasonable and necessary.  The Second Circuit has held that, "[s]ince § 1395y(a)(1)(A) *expressly* prohibits payment if a provider fails to comply with its terms, defendants' submission of the claim forms implicitly certifies compliance with its provision."  *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 701 (2d Cir. 2001); *see also Ebeid ex rel. United States. v. Lungwitz*, 616 F.3d 993, 996 (9th Cir. 2010); *United States ex rel. Smith v. Yale Univ*., 415 F. Supp. 2d 58, 98 (D. Conn. 2006); *In re Cardiac Devices Qui Tam Litig*., 221 F.R.D. 318, 335, 345-47 (D. Conn. 2004); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc*., 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000); *United States ex rel. Kappenman v. Compassionate Care Hospice of the Midwest, L.L.C.*, No. CIV. 09-4039-KES, 2012 WL 602315 (D.S.D. Feb. 23, 2012).

70.     Kickbacks are, by definition, not reasonable and necessary for the diagnosis or treatment of illness or injury, which is a prerequisite for payment of any claim by Medicare and other governmental health programs.

71.     Further, federal law makes clear that violation of the Anti-Kickback Statute can support False Claims Act liability.  *See* 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section

constitutes a false or fraudulent claim for purposes of [the False Claims Act]."); *see also United States ex rel. Wilkins,* 659 F.3d at 313 (reversing dismissal because the "amended complaint meets the implied false certification standards for liability as they alleged that appellees received payment from the federal health insurance programs despite their knowing violation of the AKS"); *United States ex rel. Hutcheson, supra; State of New York*, supra; *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc*., 423 F.3d 1256, 1259 (11th Cir. 2005) (affirming denial of dismissal, because "[w]hen a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the Act, for its submission of those false claims . . . .").

72.    Many of the named Plaintiff States also have anti-kickback laws similar to the AKS, which apply to medical providers and entities participating in their Medicaid programs.  *See*, *e.g.*, California, Cal. Welf. & Inst. Code § 14107.2; Delaware, Del. Code. Ann. tit. 31, § 1005; Florida, Fla. Stat. Ann. § 409.920(2)(a)(5); Illinois, 305 Ill. Comp. Stat. Ann. 5/8A-3; Louisiana, La. Rev. Stat. Ann. § 46:438.2; Massachusetts, Mass. Gen. Laws Ann. ch. 118E, § 41; Michigan, Mich. Comp. Laws Ann. § 400.604; New York, N.Y. Soc. Serv. Law § 366-d; and Virginia, Va. Code Ann. § 32.1-315.

73.     Violations of the federal or state AKS laws can subject the perpetrator to liability under the federal and state FCAs, for example, for causing the submission of false or fraudulent claims or for making a false or fraudulent statement or record material to a false or fraudulent claim. *See, e.g.*, PPACA, supra, amending the federal AKS, 42 U.S.C. §1320a-7b to add new subsections (g) and (h) (items or services resulting from a violation of the AKS constitute false or fraudulent claims for purposes of the federal FCA and no actual knowledge of this section or specific intent to commit a violation of this section is required); *Hutcheson*, *supra*; *Westmoreland*, *supra*.

## B.     The Federal and State False Claims Acts

74.     The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

75.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil

29

monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

76.     The FCA, 31 U.S.C. § 3729(a)(1)(B), provides that any person who "knowingly" makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

77.     The FCA, 31 U.S.C. § 3729(a)(1)(C)), makes any person, who conspires to commit a violation of the FCA, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

78.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property" which "is made to a contractor, grantee, or other recipient" if the United States Government provides "any portion of the money or property" which is "requested or demanded," or if the Government "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested."  31 U.S.C. § 3729(b)(2).

79.     The FCA, 31 U.S.C. § 3729(b)(1) provides that "(1) the terms

'knowing' and 'knowingly' – (A) mean that a person, with respect to information –

(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the

truth or falsity of the information; or (iii) acts in reckless disregard of the truth or

falsity of the information; and (B) require no proof of specific intent to defraud."

80.     The FCA, 31 U.S.C. § 3729(b)(4) provides that "(4) the term

'material' means having a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property."

81.     The FCA, 31 U.S.C. § 3729(b)(3), defines an "obligation"

to pay as "an established duty, whether or not fixed, arising from an express or

implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-

based or similar relationship, from statute or regulation, or from the retention of

any overpayment."  Moreover, in the health care context, such as Medicare and

Medicaid, the term "obligation" is further defined as: "Any overpayment retained

by a person after the deadline for reporting and returning the overpayment . . . is an

obligation (as defined [in the FCA])," and an overpayment must be reported "[b]y

the later of . . . 60 days after the date on which the overpayment was identified . . .

or the date any corresponding cost report is due, if applicable."  Patient Protection

and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(d)-(e), 124 Stat.

119, 755 (codified at 42 U.S.C. § 1128J9(d)).  *See also* 42 U.S.C. § 1320a-7k(d).

31

82.     Furthermore, the FCA, 31 U.S.C. § 3730(h), provides relief to employees who have been retaliated against in their employment because of lawful acts done by the employee in furtherance of efforts to stop one or more violations of the FCA.  Such retaliation may include discharge, demotion, suspension, threats, harassment or any other type of discrimination in the terms and conditions of employment.  The employee is entitled to all relief necessary to make that employee whole, including reinstatement, two times back pay, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorney's fees.

83.     Additionally, many states have passed False Claims Act legislation, which in most instances closely tracks the Federal FCA.  The State False Claims Act apply, inter alia, to the state portion of Medicaid losses caused by false Medicaid claims to the jointly federal-state funded Medicaid program and failure to report and return any overpayments therefrom.  Defendants' acts alleged herein also constitute violations of the California False Claims, Cal. Govt. Code § 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. 25.5-4-303.5 *et seq.*; the Connecticut False Claims Legislation, 2009 Ct. P.A. 5 (2009 Ct. HB 7005); the Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, § 1201 *et seq.*; the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*; the Georgia Taxpayer Protection False Claims Act, O.G.C.A. 23-3-121, *et seq.*; the

Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1, *et seq.*; the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, *et seq.*; the Iowa False Claims Act, 2010 Acts, Ch. 1031 § 685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Tit. 46 § 437.1 *et seq.*; the Maryland False Health Claims Act, Maryland Laws Ch. 4 (S.B. 279) 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12 § 5A *et seq.*; the Michigan Medicaid False Claims Act, 2008 P.A. 421, 400.602 *et seq.*; the Minnesota False Claims Act, Minn. Sess. Laws, S.F. No. 2082, Ch. 101 § 24 *et seq.*; the Montana False Claims Act, Mont. Code Ann. § 17-8-403(1) *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. 357.010, *et seq.*; the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1, *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-4 *et seq.*; the New York False Claims Act, N.Y St. Fin. Law § 187, *et seq.*; the North Carolina State False Claims Act, N.C. Sess. Law 2010-96 § 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053, *et seq.*; the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-1, *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq.*; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*; the Washington State Medicaid Fraud False Claims Act, 2012 c. 241 § 214,

RCW 74.66.005 *et seq.*; the Wisconsin False Claims for Medical Assistance Law,

2007 Wis. Act 20 § 20.931 *et seq.*; and the District of Columbia False Claims Act,

D.C. Code § 2-308.03 *et seq.*  Each of the statutes listed above contains *Qui Tam*

provisions governing, inter alia, a relator's right to claim a share of the State's

recovery.

84.     Relator seeks to recover damages and civil penalties in the name of

the United States of America and the named States, arising from the false or

fraudulent statements and claims for payment made or caused by Defendants to the

United States and the above-listed States and other violations of the federal and

state FCAs.

### C.     The Federal Food, Drug and Cosmetic Act

85.     The Federal Food, Drug and Cosmetic Act ("FFDCA") prohibits the

distribution of new pharmaceutical drugs in interstate commerce unless the Food

and Drug Administration ("FDA") has determined that the drug is safe and

effective for its intended use.  21 U.S.C. § 355 (a) & (d).  An approved drug may

be prescribed by doctors for uses other than those approved by the FDA, but

manufacturers are prohibited from marketing or promoting the drug for such

unapproved or "off-label" uses.  21 U.S.C. § 331(d).  If the manufacturer intends to

promote the drug for a new unapproved use, the drug must be resubmitted to the

FDA for testing and approval (or the manufacturer must obtain an exemption

therefrom) and the promotional materials must meet certain statutory requirements. 21 U.S.C. § 360aaa, *et seq.*

86.     Whether a drug is FDA-approved for a particular use is a key factor in whether a prescription of the drug is reimbursed under Government Health Care Programs.  For example, reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs."  42 U.S.C. § 1396b(i)(10)(A). Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication."  *Id.* §1396r-8(k)(3).  A medically accepted indication includes a use "which is approved under the Federal Food, Drug, and Cosmetic Act" or which is included in a specified drug compendia.  *Id.* §1396r-8(k)(6).  There is a single exception, not relevant to this Complaint, whereby in certain circumstances Medicaid will reimburse the prescription of certain single-source or multi-source innovator drugs for an "off-label" use where the individual State has determined, inter alia, that the drug is essential to the health of beneficiaries. 42 U.S.C. § 1396r-8(a)(3).

87.     The Federal Food, Drug, and Cosmetic Act also prohibits, and provides criminal penalties for, the dissemination of certain written information to health care providers regarding the safety, effectiveness, or benefit of the use of a drug that is not described in the FDA approved labeling of the drug.  21 U.S.C. §§ 331(z), 333(a)(1)-(2), 360aaa.  A manufacturer may disseminate information on

a new use of a drug only if it meets the specific requirements set forth in 21 U.S.C.

§ 360aaa(b) which include:

> (1)(A) in the case of a drug, there is in effect for the drug an application filed under subsection (b) or (j) or section 355 of this title or a biologics license issued under section 262 of title 42;

> (2) the information meets the requirements of section 360aaa-1 of this title;

> (3) the information to be disseminated is not derived from clinical research conducted by another manufacturer or if it were derived from research conducted by another manufacturer, the manufacturer disseminating the information has the permission of such other manufacturer to make the dissemination;

> (4) the manufacturer has, 60 days before such dissemination, submitted to the Secretary – (A) a copy of the information to be disseminated; and (B) any clinical trial information the manufacturer has relating to the safety or effectiveness of the new use, any reports of clinical experience pertinent to the safety of the new use, and a summary of such information;

> (5) the manufacturer has complied with the requirements of section 360aaa-3 of this title (relating to a supplemental application for such use);

> (6) the manufacturer includes along with the information to be disseminated under this subsection – (A) a prominently displayed statement that discloses – (i) that the information concerns a use of a drug or device that has not been approved or cleared by the Food and Drug Administration; (ii) if applicable, that the information is being disseminated at the expense of the manufacturer;  (iii) if applicable, the name of any authors of the information who are employees of, consultants to, or have received compensation from, the manufacturer, or who have a significant financial interest in the manufacturer; (iv) the official labeling for the drug or device and all updates with respect to the labeling; (v) if applicable, a statement that there are products or treatments that have been approved or cleared for the use that is the

subject of the information being disseminated pursuant to subsection (a)(1) of this section; and (vi) the identification of any person that has provided funding for the conduct of a study relating to the new use of a drug or devise for which such information is being disseminated; and (B) a bibliography of other articles from a scientific reference publication or scientific or medical journal that have been previously published about the use of the drug or device covered by the information disseminated (unless the information already includes such bibliography).

88. In addition, a manufacturer may disseminate written information on a new use of a drug only if the information is about a clinical investigation with respect to the drug and is contained in an article published in a scientific or medical journal, which is peer-reviewed by experts, or in a reference publication. 21 U.S.C. § 360aaa-1 states in part:

(a) Authorized information [–] A manufacturer may disseminate information under section 360aaa of this title on a new use only if the information –

(1) is in the form of an unabridged –

(A) reprint or copy of an article, peer-reviewed by experts qualified by scientific training or experience to evaluate the safety or effectiveness of the drug or device involved, which was published in a scientific or medical journal (as defined in section 360aaa-5(5) of this title), which is about a clinical investigation with respect to the drug or device, and which would be considered to be scientifically sound by such experts; or

(B) reference publication, described in subsection (b) of this section, that includes information about a clinical investigation with respect to the drug or device that would be considered to be scientifically sound by experts qualified by scientific training or experience to evaluate the safety or effectiveness of the drug or device that is the subject of such a clinical investigation . . . .

37

89.     The FDCA and its implementing regulations further treat drug "price lists" as "labeling" subject to FDA restrictions.  *See* 21 U.S.C. § 321(k) & (m); 21 C.F.R. § 202.1(a)(l), (2).  These restrictions require price lists to conform to the regulations on labeling, *see* 21 C.F.R. § 201.100(d), or else fit within certain exemptions therefrom, *see* 21 C.F.R. §§ 200.200 & 201.100(f).  It is therefore illegal for a drug manufacturer to market a drug using a price list that does not meet these requirements.

90.     The FFDCA makes "misbranding," and the "introduction into interstate commerce" of a misbranded drug, illegal.  21 U.S.C.  § 331(a) & (b).  A drug is misbranded if any of 26 statutory conditions is met, including as relevant here, that "[a] drug . . . shall be deemed to be misbranded . . . [u]nless its labeling bears . . . adequate directions for use."  21 U.S.C. § 352(f)(1).

91.     The FDA defines the phrase "adequate directions for use" to mean "directions under which the layman can use a drug safely and for the purposes for which it is intended."  21 CFR § 201.5.  For prescription drugs, the "layman" standard is superseded by specific regulation requiring that the "[l]abeling on or within the package from which the drug is to be dispensed bears adequate information for its use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed

38

by law to administer the drug can use the drug safely and for the purposes for which it is intended, including all purposes for which it is advertised or represented." 21 CFR § 201.100(c)(1) (defining labeling adequate to satisfy 21 U.S.C § 352(f) for prescription drugs); *see United States v. Evers*, 643 F.2d 1043, 1051 (5th Cir. 1981).

92.     The intended purpose of a drug (for which the label must be adequate) "refer[s] to the objective intent of the persons legally responsible for the labeling of [the] drugs." 21 CFR § 201.128 (defining "intended uses" and related language). Evidence of objective intent may be shown by "labeling claims, advertising matter, or oral or written statements by such persons *or their representatives*." *Id.* (emphasis added). Additionally, the objective intent of the persons legally responsible for labeling the drug may be shown by "the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised." *Id.* Courts have agreed that the off-label use of a drug lacks "adequate information for use" in the label, and thus the intent for a drug to be put to off-label use is sufficient to support a misbranding conviction. *See United States v. Caronia*, 703 F.3d 149, 154 (2d Cir. 2012) ("The government has repeatedly prosecuted—and obtained convictions against—pharmaceutical companies and their representatives for misbranding based on their off-label promotion.") (collecting cases).

### D.    Group Purchasing Organizations

93.    Group purchasing organizations (GPOs) are buying consortiums or associations of hospitals, clinics, doctors, and healthcare organizations that are designed to leverage the aggregate purchasing power of members and thereby increase their ability to negotiate contract terms with various suppliers of drugs, medical devices, and other goods and services.  GPOs negotiate such acquisitions, but do not typically purchase anything from the suppliers.  Once a contract is in place, the member hospitals and healthcare organizations can make purchases under it.  *See*, *e.g.*, Daniel R. Levinson, Department of Health and Human Services, Office of Inspector General ("OIG") Report: Review of Revenue from Vendors at Three Group Purchasing Organizations and Their Members (A-05-03-00074)," (Jan. 19, 2005), https://oig.hhs.gov/oas/reports/regions5/50300074.pdf; *see also* 42 C.F.R § 1001.952(j)(2).

94.    The term "group purchasing organization" is defined at 21 CFR § 203.3 as follows:

> § 203.3   Definitions.
>
> . . .
>
> (o) *Group purchasing organization* means any entity established, maintained, and operated for the purchase of prescription drugs for distribution exclusively to its members with such membership consisting solely of hospitals and health care entities bound by written contract with the entity.

95.     GPOs act as agents for their members, and they may be compensated through "administrative" or "service" fees from the vendors or suppliers.  These fees are paid by the vendors or suppliers to the GPO in exchange for administrative services and the ability to sell through the GPO to its members.  *See* OIG Report, *supra*.  Typically, the fees are calculated as a small percentage, generally less than 3%, of the revenue generated under the GPO contract.  *Id.* at 4.

96.     The Anti-Kickback Statute provides certain exemptions (known as "safe harbors") to exclude certain conduct from its ambit, as long as the involved parties have complied with all the conditions of the safe harbor.  One such safe harbor involves GPO administrative fees.

97.     Regulations promulgated by the HHS OIG limit this "safe harbor" by imposing standards for the written agreement between the GPO and its members.  *See* 42 C.F.R. § 1001.952(j).  A GPO may invoke the "safe harbor" if:

     a. The GPO's written agreement with each individual or entity purchasing items or services states either that:

         i. each participating vendor will pay a fee to the GPO of 3 percent or less of the purchase price of the goods or services provided by that vendor; or

         ii. each vendor will pay a specified amount, or if not known, a maximum amount, expressed either as a fixed sum or a fixed

> percentage of the value of the purchases by the members of the group; and

b. The GPO must disclose to the entities who are health care providers in writing at least annually the amount received from each vendor with respect to purchases made by or on behalf of the entity. *See id.*

98.    Parties to a GPO arrangement cannot obtain safe harbor protection by entering into a contract that complies with the written agreement requirement of a safe harbor and appears, on paper, to meet all of the other safe harbor requirements, but that does not reflect the actual arrangement between the parties. *See generally* 42 C.F.R. § 414.804(a)(2)(i), (ii) (fees must be "bona fide" to be excluded from average sales price calculations).

99.    Administrative or service fees charged by GPOs and paid to them by vendors are material to Medicare's calculation of the "average selling price" ("ASP") at which a covered drug is reimbursed.

100.    Beginning on January 1, 2005, Medicare Part B reimbursement for drugs, such as MYOBLOC, in the physician office, clinic, or hospital setting was based on a formula calculated as ASP plus six percent (ASP + 6%). The regulations governing ASP were promulgated in 2004. *See* 42 C.F.R. § 414.800. In calculating ASP, a manufacturer such as US WorldMeds must deduct "price

concessions," but "bona fide service fees" are not considered a concession.  *See* 42

C.F.R. § 414.804(a)(2).

> *Bona fide service fees* means fees paid by a manufacturer to an entity, that represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug.

*See id.*

101.   Fees paid directly from a manufacturer such as Solstice Neuroscience

or US WorldMeds to a purchaser of a drug (*e.g.*, MYOBLOC) – bypassing the

GPO altogether – are not "bona fide service fees."

102.   When a manufacturer submits information regarding ASP to CMS

(which it is required to do on a quarterly basis), the manufacturer's CEO, CFO, or

Authorizing Official must certify that "the reported Average Sales Prices were

calculated accurately and that all information and statements made in this

submission are true, complete, and current to the best of my knowledge and belief

and are made in good faith.  I understand that information contained in this

submission may be used for Medicare reimbursement purposes."  Medicare

Program; Manufacturer Submission of Manufacturers' Average Sales Price (ASP)

Data for Medicare Part B Drugs and Biologicals, 69 Fed. Reg. 17935-01, 17941

(Addendum B) (Apr. 6, 2011) (to be codified at 42 C.F.R. pt. 414); *see also* 42

C.F.R. § 414.804(a)(6).

### E.    Co-Payment Assistance Funds

103.    Drug manufacturers and other organizations have established funds

that assist certain patients with medical costs, including the cost of co-payments on

certain medications.

104.    In the case of Medicare and Medicaid beneficiaries, including

Medicare Part D beneficiaries, provision of co-payment assistance is subject to

federal law, including the Anti-Kickback Statute, which makes it a criminal offense

knowingly and willfully to offer, pay, solicit, or receive any remuneration to induce

or reward referrals of items or services reimbursable by a Federal health care

program.  For purposes of the Anti-Kickback Statute, "remuneration" includes the

transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in

kind.

105.    The Anti-Kickback Statute has been interpreted to cover any

arrangement where one purpose of the remuneration was to obtain money for the

referral of services or to induce further referrals.  *See United States v. McClatchey*,

217 F.3d 823, 835 (10th Cir. 2000).

106.   Claims submitted for payment by Medicare and/or Medicaid that relate to a violation of the Anti-Kickback Statute are false claims under the False Claims Act.

107.   Longstanding HHS OIG guidance makes clear that participants in the pharmaceutical industry may contribute to programs that provide charitable assistance for medical costs, such as drug co-payments, provided that such contributions are made to independent, bona fide charitable assistance programs.

108.   By contrast, the HHS OIG also has made it clear that, "for purposes of an anti-kickback analysis, we would not consider a charitable foundation (or similar entity) formed, funded or controlled by a manufacturer or any of its affiliates (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) to be a bona fide, independent charity, because interposition of the entity would not sever the nexus between the patient subsidies and the manufacturer."  Publication of OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623-03, 70624 n.3 (Nov. 22, 2005).

109.   Manufacturer or distributor subsidization of "cost-sharing amounts (directly or indirectly through a PAP [Patient Assistance Program]) incurred by Part D beneficiaries for the manufacturer's product . . . would implicate the anti-

45

kickback statute and pose a substantial risk of program and patient fraud and abuse.  Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (i.e., the subsidy) to beneficiaries to use its product."  *Id.* at 70625.

110.   Further, "[w]here a manufacturer [or distributor] PAP offers subsidies tied to the use of the manufacturer's products (often expensive drugs used by patients with chronic illnesses), the subsidies present all of the usual risks of fraud and abuse associated with kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing beneficiaries' incentives to locate and use less expensive, equally effective drugs."  *Id.*

111.   Of particular concern to the HHS OIG was the concern that "a manufacturer [or distributor] might use beneficiary cost-sharing subsidies, which help beneficiaries meet their TrOOP [true out of pocket costs] requirement, to increase the number of beneficiaries using the manufacturer's product who reach the catastrophic benefit in any given coverage year and to hasten the point during the coverage year at which beneficiaries reach the catastrophic benefit" provided under Medicare Part D.  *Id.* at 70625-26.  This directly affects Medicare and "is of particular import because Medicare will make cost-based payments during the catastrophic coverage benefit."  *Id.* at 70626.

46

112.   It is known that many issues of Medicare abuse arise under such circumstances, including that manufacturer or distributor subsidies can "shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices." *Id.*  Moreover, so long as the manufacturer's or distributor's sales price exceeds its marginal variable costs plus the amount of the cost-sharing assistance, the seller makes a profit.  *See id.*  This creates a recognized situation where "pharmaceutical manufacturers [or distributors] may seek improperly to maximize these profits by creating sham 'independent' charities to operate PAPs; by colluding with independent charity programs to ensure that the manufacturer's contributions only or primarily benefit patients using its products . . . ; or by manipulating financial need or other eligibility criteria to maximize the number of beneficiaries qualifying for cost-sharing subsidies." *Id.*

113.   Accordingly, a manufacturer's or distributor's subsidization of Medicare Part D beneficiaries' TrOOPs "would be squarely prohibited by the [Anti Kickback] statute, because the manufacturer would be giving something of value (i.e., the subsidy) to beneficiaries to use its product." *Id.* at 70625.

114.   OIG Guidance therefore provides that pharmaceutical manufacturers and distributors may only "donate to bona fide independent charity PAPs, provided appropriate safeguards exist." *Id.*  The conditions that must be met include that:

> (i) Neither the pharmaceutical manufacturer nor any affiliate of the manufacturer (including, without limitation, any employee, agent,

officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) exerts any direct or indirect influence or control over the charity or the subsidy program;

(ii) The charity awards assistance in a truly independent manner that severs any link between the pharmaceutical manufacturer's funding and the beneficiary (i.e., the assistance provided to the beneficiary cannot be attributed to the donating pharmaceutical manufacturer);

(iii) The charity awards assistance without regard to the pharmaceutical manufacturer's interests and without regard to the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

(iv) The charity provides assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner; and

(v) The pharmaceutical manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products.

*Id.* at 70626 & n.16.

115.   "Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer [or distributor] to patients and must not impermissibly influence beneficiaries' drug choices." *Id.* at 70627.

## **GOVERNMENT HEALTH INSURANCE PROGRAMS**

116.   The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C.

48

§§ 1395, *et seq.*, (hereinafter "Medicare"), is a health insurance program administered by the Government of the United States that is funded by taxpayer revenue.  Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

117.   Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, prescription drugs, and durable medical equipment to persons over sixty five (65) years of age, and for certain others that qualify under the terms and conditions of the Medicare Program.

118.   Payments made under the Medicare Program include payment for certain prescription drugs used during treatment at an appropriate medical facility and otherwise, as well as certain injectable drugs and drugs used in conjunction with the treatment of patients with cancer and chronic kidney disease.

119.   Pursuant to the Medicare Prescription Drug Improvement and Modernization Act of 2003, effective January 1, 2006, Medicare Part D took effect, extending prescription drug coverage to all Medicare eligible persons who choose to participate in Part D.

120.   The terms of Medicare Part D coverage can vary from plan to plan, but are generally as follows.  *See* 42 U.S.C § 1395w-102; Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefits

Program for Contract Year 2012 and Other Changes, 76 Fed. Reg. 21432-01 (Apr.

15, 2011) (amending 42 C.F.R §423.104).

121.    Medicare Part D requires beneficiaries to pay a monthly premium and

a deductible – these vary annually:

| Year | 2010 | 2011 | 2012 | 2013 |
|------|------|------|------|------|
| Avg. Premium | $33 | $36 | $34 | $39 |
| Deductible Cap | $310 | $310 | $320 | $325 |

122.    After the patient meets the deductible, his/her Medicare Part D plan

covers a portion of prescription costs (approximately 75%) until the cumulative

cost of the patient's prescriptions exceeds the "initial coverage limit" – this limit

also varies annually, but is on average:

| Year | 2010 | 2011 | 2012 | 2013 |
|------|------|------|------|------|
| Initial Coverage Limit | $2,830 | $2,840 | $2,930 | $2,970 |

123.    Between the initial coverage limit and an "out-of-pocket threshold" –

a coverage gap colloquially referred to as the "donut hole" – the patient must pay

more.  Before 2011, the patient had to pay 100% of prescription costs in the

coverage gap.  Beginning in 2011, the payment structure began a shift toward

reducing to 25% the patient's share of prescription costs in the coverage gap,

between 2011 and 2020.  The amounts for 2011 through 2013 are:

| Year | Brand Name | Generic |
|------|------------|---------|
| 2011 | 50% | 93% |
| 2012 | 50% | 86% |
| 2013 | 47.5% | 79% |

124.   A patient exits the coverage gap when her cumulative prescription costs exceed the out-of-pocket threshold – the total includes costs incurred before the initial coverage limit, 100% of brand-name drug costs incurred after the limit, and the patient's share of generic drug costs after the limit.  The out-of-pocket threshold varies by year:

| Year | 2010 | 2011 | 2012 | 2013 |
|------|------|------|------|------|
| OOP Threshold | $4,550 | $4,550 | $4,700 | $4,750 |

125.   After the out-of-pocket threshold, the patient pays only the greater of $2 to $5 or 5% coinsurance on all remaining prescription costs.

126.   Medicare Part B covers office visits and the cost of most injectable drugs administered in the physician office setting.  In that case, the physician will collect all payments for the drug and related office procedure or visit, unless a specialty pharmacy supplies the drug (in which case the specialty pharmacy bills the payer for the drug, and the physician only bills for the administration service). Office visits are coded based on the level of services provided by the physician, ranging from 1 to 5.  A Level 1 office visit involves a minimal presenting problem

51

that may not require the presence of a physician and typically only takes 5 minutes, whereas a Level 5 office visit involves a comprehensive medical history and examination, with medical decision making of high complexity.  APOKYN initiation visits are typically billed at Level 3 or 4, which level of reimbursement requires that the visit involve a relatively detailed medical history or examination and medical decision making of low to moderate complexity.

127.   Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. § 1395u.  In this capacity, the carriers act on behalf of CMS.

128.   The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer revenue.  The Medicaid Program is overseen by the United States Department of Health and Human Services and CMS.

129.   Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to, among others, financially needy individuals that qualify for Medicaid.  The States directly pay providers, with the States obtaining the federal share of the payment from

accounts which draw on the United States Treasury.  42 C.F.R. §§ 430.0-430.30 (1994).

130.   The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired and deceased members.  The program is administered by the Department of Defense and funded by the Federal Government.  CHAMPUS pays for, among other items and services, prescription drugs for its beneficiaries.

131.   The federal government, through its Departments of Defense and Veterans Affairs, maintains and operates medical facilities including hospitals, and receives and uses federal funds to purchase prescription drugs for patients treated at such facilities and otherwise.  In addition, under the Public Health Service Act, the Section 340B Drug Pricing Program, and the Veterans Health Care Act of 1992, the federal government directly or indirectly provides funds to certain other federal agencies and to state and local facilities and programs, including to non-profit disproportionate share hospitals ("DSH").  *See generally* 38 U.S.C. § 8126.

132.   The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, prescription drugs for its beneficiaries.

(Together these programs described herein, and any other government funded healthcare programs, shall be referred to as "Federal Health Care Programs" or "Government Health Care Programs").

133.   Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement.  The most basic requirement for reimbursement eligibility under Medicare, Medicaid and other Government Health Care Programs is that the service provided must be reasonable and medically necessary.  *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. §§ 1396, *et seq.*; 42 C.F.R. §§ 410.50(a), 411.15, 411.406(a); *United States v. Rutgard*, 116 F.3d 1270, 1275 (9th Cir. 1997) (holding that TRICARE and the Railroad Retirement Health Insurance Program plan follow the same rules and regulations as Medicare, citing, *e.g.*, 32 C.F.R. § 199.4(a)(1)(i)). Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider. For example, the requisite level of medical necessity may not be met where a party contends that a particular procedure was deleterious or performed solely for profit. *United States ex rel. Kneepkins*, 115 F. Supp. 2d at 41-42 (procedures chosen solely for defendants' economic gain are not "medically necessary" as required by claim submission form).  Health care providers are obligated to assure that services or items ordered or provided to patients will be provided "economically and only

when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care", and "will be supported by evidence of medical necessity and quality . . . ."  42 U.S.C. § 1320c-5(a)(1)-(3).

134.   Each of the Government Health Care Programs requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the Anti-Kickback Statute and with other federal laws governing the provision of health care services in the United States.  That agreement represents an ongoing obligation, and the provider must notify the government of any change in information or certifications provided.

135.   In other words, if a provider tells CMS or its agent that it provided goods or services that (1) were in violation of the Anti-Kickback Statute, (2) were not medically unnecessary, (3) were performed solely for the profit of the provider, and/or (4) violated another relevant law, CMS will not pay the claim.

136.   CMS will also not pay a claim relating to reimbursement for goods or services that were not actually provided.

137.   Physicians and hospitals enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program.  As part of that agreement, without which the hospitals and physicians may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A, at 48 (for institutional providers); Form CMS-855I, at 25 (for physicians and non-physician practitioners) (excerpts attached hereto as Exhibits A & B, respectively).

138.   The "Certification Statement" that the physicians and non-physician practitioners must sign also contains the following provisions and requirements inter alia, for "initial and continuous enrollment in the Medicare program," and instructs that by signing the Certification Statement, the provider "agree[s] to adhere to all of the requirements listed therein."  Exhibit B, at 25.

139.   Further, it states:  "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program.  In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." *Id*.

140.   By signing the "Certification Statement," the provider certifies, inter alia, the following:

1.  I have read the contents of this application, and the information contained herein is true, correct, and complete.  If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare [program immediately].

. . .

3.  I have read and understand the Penalties for Falsifying Information … I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare … may be punished by criminal, civil, or administrative penalties including but not limited to, the denial or revocation of Medicare billing privileges, and/or imposition of fines, civil damages, and/or imprisonment. . . .

8.  I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Id*.

141.    The certifications made by the medical provider in the Provider Agreement, which are mandatory for Medicare enrollment, expressly create a continuing duty to comply with the conditions of participation in and payment by the Medicare program.  In particular:

a.  Prior to signing the Agreement, the provider is advised of the criminal, civil, and administrative penalties "for deliberately furnishing false information in this application to gain or maintain enrollment in the Medicare program."  *Id*. at 23; and

b.  Among those penalties are criminal sanctions for fraud,

concealment and "any trick, scheme or device" or scheme to

defraud, any false or fraudulent statement or representation or "any

false writing or document", violations of the FCA, civil penalties

for billing for a medical or other item or services that the provider

knows or should know was not provided as claimed.  *Id.*

"Remedies include compensatory and punitive damages,

restitution, and recovery of the amount of the unjust profit." *Id.*

142.  When a provider submits a claim for payment, he or she does so

subject to and under the terms of its certification to the United States that the

services for which payment is sought were delivered in accordance with federal

law, to include without limitation the Anti-Kickback Statue.

143.  In the case of Medicaid, each State's Medicaid Program's applicable

certifications also incorporate relevant state law.

144.  Medicare Part D also predicates payment on compliance with the

False Claims Act and Anti-Kickback Statute.  Under Medicare Part D, which

follows a private-market model, patients receive coverage from a Medicare Part D

plan sponsor ("Sponsor") that contracts with various pharmacies from which

patients can obtain their prescriptions.  After a pharmacy fills a patient's

prescription, the patient's Sponsor reimburses the pharmacy and submits a claim to

CMS in order to be reimbursed by Medicare.  *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 594 F. Supp. 2d 945, 948-49 (N.D. Ill. 2009), *aff'd*, 629 F.3d 697 (7th Cir. 2011) (citing 42 U.S.C. § 1395w-115).  To operate as a Sponsor, the entity must agree by contract with CMS to "to comply with . . .  Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. §§ 3729, *et seq.*), and the Anti-Kickback Statute (section 1128B(b) of the Act)."  42 C.F.R. § 423.505(h)(1); *see also U.S. ex rel. Wilkins*, 659 F.3d at 312; *United States ex rel. Spay v. CVS Caremark Corp.*, --- F. Supp. 2d ----, Civ. A. No. 09-4672, 2012 WL 6645537, at *2 (E.D. Pa. Dec. 20, 2012).  Similarly, all of the Sponsor's contracts with downstream subcontractors – like pharmacies – must "contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions."  *Spay*, 2012 WL 6645537, at *2 (citing 42 C.F.R. § 423.505(i)(4)(iv)); *see also* 42 C.F.R § 423.505(i)(4)(iv) .

## THE RELATOR

145.   Relator Brian Bennett has more than 25 years of experience in the life sciences field.  Mr. Bennett obtained a Bachelor's Degree in marketing from the University of Tennessee by 1980.  Following a five-year tenure as general manager of Capital Systems, Mr. Bennett began his career in life sciences as a professional sales representative with Boehringer Ingelheim Pharmaceuticals in 1985.

146.   In 1989, Mr. Bennett went to work for Amgen as a Professional Sales Representative.  In 1999, Mr. Bennett was promoted to a District Manager.  In 2003, Mr. Bennett was promoted to Senior Marketing Manager for Amgen.  From December 2011 to November 2003, Mr. Bennett reported to George Esgro, who was Senior National Sales Director for Amgen from December 2001 to August 2005.

147.   In June 2004, Mr. Bennett left Amgen to become Regional Account Manager for OSI Pharmaceuticals.  In February 2006, Mr. Bennett transitioned to the position of Division Manager for Genentech.

148.   In August 2010, George Esgro, who then worked for Quintiles, contacted Mr. Bennett about coming to work at Quintiles.  Mr. Bennett accepted a position there, and in September 2010, he became the National Sales Director for the US WorldMeds contract sales team provided by Quintiles.

149.   Quintiles' contract for provision of a sales force to US WorldMeds was primarily negotiated by George Esgro and Neil Ferguson.  The Authorization to Proceed dated August 9, 2010 was signed by H. Lee Warren, Jr., the COO of US WorldMeds and Neil Ferguson, the VP, Head of Commercial Sales of Quintiles.

150.   George Esgro has held several positions at Quintiles, including Senior Director Commercial Sales for Quintiles Transnational Corporation, which is a

related entity of Quintiles Inc., based in Durham, North Carolina, as well as Vice President for Global Business Development.

151.   George Esgro has a financial interest in US WorldMeds, through the provision of funding in excess of $100,000 for US WorldMeds, and he had that interest at the time that US WorldMeds contracted with Quintiles to provide its sales force.  George Esgro participated in the negotiations of US WorldMeds to purchase Solstice Neurosciences, by attending those negotiations with Lee Warren, the Chief Operating Officer of US WorldMeds.  George Esgro is also friends with Lee Warren and George Esgro's cousin, Glenn Esgro, joined US WorldMeds as its Vice President of Managed Markets.

152.   The contract between Quintiles and US WorldMeds set forth the full arrangements between Quintiles and US WorldMeds, and thus specified that George Esgro would not be involved with operational issues at US WorldMeds, aside from his role in managing the contract staff provided to US WorldMeds.

153.   Despite that the contract, George Esgro was intimately involved in every significant aspect of US WorldMeds' operations.  His influence extended beyond the contract sales force to include the oversight of personnel decisions and the management of the US WorldMeds medical affairs division, which was nominally distinct from sales and was comprised of US WorldMeds employees.

Moreover, he participated in strategic decision-making and the management of US WorldMeds, including the organization of the Ad Board meetings.

154.   In his capacity as National Sales Director, Relator was involved with managing and overseeing the sales force assigned by Quintiles to US WorldMeds. In that position, he witnessed firsthand the activities described in this Complaint.

155.   Under the terms of the contract between US WorldMeds and Quintiles, the relator served as the Project Leader, with responsibility regarding recruiting and hiring of sales representatives, functioning as the primary link between US WorldMeds and Quintiles for operational and HR needs, preparing reports for US WorldMeds, participating in sales meetings, and other functions.

156.   As detailed below, while in the employ of Defendant Quintiles, and working with the sales force assigned to US WorldMeds, Relator personally observed Defendants' unlawful practices, and was privy to meetings, conversations, and other internal communications, including at the management and headquarters levels of the companies.

157.   Among other things, in the regular course of his employment, Relator had access to e-mail and internal documents and data that describe, document, and reflect the conduct discussed herein.  Relator also had many interactions with managers, employees, sales representatives, physicians, hospital representatives,

and other third parties relating to Defendants' business practices on a national

level.

158.   During his employment, Relator endeavored to inform Defendants

that they should not participate in various activities discussed in this Complaint,

and those efforts led to his termination.

## PRODUCTS MANUFACTURED AND SOLD
## BY US WORLDMEDS & SOLSTICE NEUROSCIENCES

159.   Defendants US WorldMeds and Solstice Neurosciences sell

MYOBLOC and APOKYN, but US WorldMeds did not research or develop either

drug.  US WorldMeds gained the rights to market MYOBLOC in 2010 following

the acquisition of Solstice Neurosciences for $35.7 million, and it acquired the

rights to market APOKYN in the United States in late 2011 from Britannia

Pharmaceuticals.

### A.    MYOBLOC

160.   MYOBLOC is an injectable prescription drug manufactured by

Defendant US WorldMeds and/or Defendant Solstice Neurosciences.  It is the only

FDA-approved Type B botulinum toxin.  In contrast, competing FDA-approved

botlinum toxins are Type A (BOTOX, DYSPORT®, XEOMIN®).  In addition to

their brand names, the FDA requires all botulinum toxins to have an "established

drug name" to distinguish them from each other and avoid potentially fatal

confusion between the dosing of the different products – the established drug name of MYOBLOC is rimabotulinumtoxinB.

161.   On or about December 8, 2000, the FDA approved MYOBLOC for use in the United States for the treatment of cervical dystonia.  Cervical dystonia, also called spasmodic torticollis, "is a painful condition in which [the] neck muscles contract involuntarily, causing [the] head to twist or turn to one side."  *See* Mayo Clinic, http://www.mayoclinic.com/health/spasmodic-torticollis/DS00836 (definition of "Cervical dystonia") (last visited Mar. 11, 2013).  The only approved indication and usage on the MYOBLOC label remains "the treatment of adults with cervical dystonia to reduce the severity of abnormal head position and neck pain associated with cervical dystonia."

162.   In February 2008, the FDA warned the public and health care providers of reports of systemic adverse reactions, including respiratory compromise and death, following the use of MYOBLOC for both FDA-approved and unapproved uses.  At the time, MYOBLOC's label warned of adverse reactions occurring in regions near the site of injection but limited the warning of systemic adverse effects to patients with neuromuscular disorders.

163.   After investigating the accumulating evidence of systemic risks in other patients, the FDA concluded in April 2009 that MYOBLOC required stronger warnings regarding the risk of the toxin spreading from the injection site to cause

systemic harm and possibly death.  The FDA required MYOBLOC's manufacturer

to enhance the label's warnings, add a "black-box warning" at the top of the label,

and implement a Risk Evaluation and Mitigation Strategy ("REMS").

164.    The black-box warning reads:

> Postmarketing reports indicate that the effects of MYOBLOC and all
> botulinum toxin products may spread from the area of injection to
> produce symptoms consistent with botulinum toxin effects.  These
> may include asthenia, generalized muscle weakness, diplopia, blurred
> vision, ptosis, dysphagia, dysphonia, dysarthria, urinary incontinence,
> and breathing difficulties.  These symptoms have been reported hours
> to weeks after injection.  Swallowing and breathing difficulties can be
> life threatening and there have been reports of death.  The risk of
> symptoms is probably greatest in children treated for spasticity but
> symptoms can also occur in adults treated for spasticity and other
> conditions, particularly in those patients who have underlying
> conditions that would predispose them to these symptoms.  In
> unapproved uses, including spasticity in children and adults, and in
> approved indications, cases of spread of effect have occurred at doses
> comparable to those used to treat cervical dystonia and at lower doses.

*See* FDA-approved Labeling 7/31/09 (emphasis added).

165.    The FDA required the black-box warning because of the evidence of

adverse reactions "so serious in proportion to the potential benefit from the drug

. . . that it is essential that [they] be considered in assessing the risks and benefits of

using [MYOBLOC]."  FDA Response to Citizen Petition at 14.  The FDA

highlighted in its public comments on the new labeling requirements and REMS

that the most serious reports of complications came after unapproved uses of

botulinum toxins, especially in the treatment of pediatric cerebral palsy and adult muscle spasticity.

166.   The REMS requirement reflected the FDA's conclusion that educating patients and healthcare providers of the risks of MYOBLOC was "necessary to ensure that the benefits of the drug outweigh the risks of the drug."  21 USC § 355-1(a)(1).  The REMS included the use of a Medication Guide, a communication plan and periodic assessments of the plan's efficacy.

167.   The purpose of the REMS was to (1) "minimize the risks of medication errors related to the lack of interchangeability of MYOBLOC units with those of licensed botulinum toxins of other manufacturers," and (2) "inform prescribers and patients about the potential occurrence of spread of toxin effect beyond the injection site."  In addition to concerns about the potentially fatal complications documented after botulinum toxin treatments, the FDA strenuously emphasized that dosing measurements of botulinum toxins could not be interchanged.  The FDA determined that medication errors, including overdosing and underdosing, could occur and had occurred because of the potential for healthcare providers to substitute botulinum toxin products.  The REMS ended in June 2012, but the Medication Guide remains part of the approved labeling for MYOBLOC.

168.   The FDA required a Medication Guide because it found "serious and significant public health concerns" and "serious risks (relative to benefits) of which patients should be made aware."  FDA Response to Citizen Petition at 17; *see also* 21 C.F.R. § 208.1.  The Medication Guide warns patients that the "most important information [they] should know about MYOBLOC" is that it can "cause serious side effects that can be life threatening."  It also warns that "it is not known whether *MYOBLOC* is safe or effective in children," or for "other types of muscle spasms" than cervical dystonia.

169.   The communication plan required the manufacturer of MYOBLOC to mail a copy of the new labeling and Medication Guide to all neurologists and physiatrists, along with a "Dear Healthcare Professional" letter ("DHCP Letter"). The DHCP Letter explained the risks of MYOBLOC, emphasizing that even routine administration of the drug can cause potentially fatal dysphagia (difficulty swallowing) and respiratory failure.  It also explained that the FDA had required MYOBLOC to adopt a new nonproprietary name to avoid confusion between the various botulinum toxins – as noted above, MYOBLOC's nonproprietary name is rimabotulinumtoxinB.  The DHCP Letter explained to doctors that "units of biological activity of MYOBLOC cannot be compared to nor converted into units of any other botulinum toxin product."

170.   In addition to the DHCP Letter, the FDA issued several press releases and alerts to the public and healthcare professionals explaining the dangers of MYOBLOC and the new labeling requirements.

171.   To date, safety and efficacy still have not been established for treatment of conditions other than cervical dystonia, and MYOBLOC is not approved for other uses, or in dosages different from those approved in the label.

172.   Moreover, although MYOBLOC is a toxin that is similar to BOTOX (onabotulinumptoxinA), the MYOBLOC label specifically cautions that "[t]he potency Units of MYOBLOC are specific to the preparation and assay method utilized.  They are not interchangeable with other preparations of botulinum toxin product and, therefore, units of biological activity of MYOBLOC cannot be compared to or converted into units of any other botulinum toxin product assessed with any other specific assay method."  As of June 2012, the Medication Guide is not required, but this information is included in the MYOBLOC product label.

173.   Despite this, US WorldMeds pressured the representatives selling MYOBLOC to tell medical providers that a conversion rate of 50:1 could be used to convert patients from Botox to MYOBLOC (*e.g.*, the medication of a patient using 100 units of Botox would convert to 5000 units of MYOBLOC).

174.   MYOBLOC is provided as a clear and colorless to light-yellow sterile injectable solution in single use 3.5-mL glass vials.  Each single-use vial of

formulated MYOBLOC contains suspended in solution 5,000 Units of botulinum

toxin Type B per milliliter.  The FDA-approved starting dose is 2500-5000 Units

for the treatment of cervical dystonia.

175.   Physicians who prescribe MYOBLOC usually provide the injection in

the medical office, and submit claims for MYOBLOC using the several National

Drug Code ("NDC") numbers for MYOBLOC depending on the dosage; these

NDCs are attached hereto as Exhibit C.  Medical providers who administer

MYOBLOC on an outpatient basis use procedure codes shown on Exhibit C.

**B.    APOKYN**

176.   APOKYN is an apomorphine hydrochloride injection.  In 2005, it was

approved by the FDA for use in treating acute, intermittent hypomobility or "off"

episodes in patients with advanced Parkinson's disease symptoms present in

Parkinson's disease patients.  US WorldMeds acquired the rights to market

APOKYN in the United States in 2011.

177.   The APOKYN packages insert states:

> DOSAGE AND ADMINISTRATION: The prescribed dose of
> APOKYN should always be expressed in mL to avoid confusion and
> doses greater than 0.6 mL (6 mg) are not recommended. Patients and
> caregivers must receive detailed instructions in the preparation and
> injection of doses, with particular attention paid to the correct use of
> the dosing pen (*see* PRECAUTIONS: Information for Patients).

178.   APOKYN is indicated for subcutaneous administration only.

APOKYN should not be initiated without use of a concomitant antiemetic (see

69

WARNINGS: Nausea and Vomiting).  Most antiemetic experience is with

trimethobenzamide and this should generally be used.  Trimethobenzamide (300

mg tid orally) should be started three days prior to the initial dose of apomorphine

and continued at least during the first two months of therapy.  Based on reports of

profound hypotension and loss of consciousness when apomorphine was

administered with ondansetron, the concomitant use of apomorphine with drugs of

the 5HT3 antagonist class (including, for example, ondansetron, granisetron,

dolasetron, palonosetron, and alosetron) is contraindicated (*see*

CONTRAINDICATIONS).

179.   The dose of APOKYN must be titrated on the basis of effectiveness

and tolerance, starting at 0.2 mL (2 mg) and up to a maximum recommended dose

of 0.6 mL (6 mg) as follows:

> a. Patients in an "off" state should be given a 0.2 mL (2 mg) test dose
>
> in a setting where blood pressure can be closely monitored by
>
> medical personnel.  Both supine and standing blood pressure
>
> should be checked predose and at 20, 40, and 60 minutes post-
>
> dose.  Patients who develop clinically significant orthostatic
>
> hypotension in response to this test dose of apomorphine should
>
> not be considered candidates for treatment with APOKYN.

b.  If the patient tolerates the 0.2 mL (2 mg) dose, and responds, the starting dose should be 0.2 mL (2 mg) used on an as needed basis to treat existing "off" episodes.  If needed, the dose can be increased in 0.1 mL (1 mg) increments every few days on an outpatient basis.

c.  Beyond this, the general principle guiding dosing (described in detail below) is to determine a dose (0.3 mL or 0.4 mL) that the patient will tolerate as a test dose under monitored conditions, and then begin an outpatient dosing trial (periodically assessing both efficacy and tolerability) using a dose 0.1 mL (1 mg) lower than the tolerated test dose.

d.  For patients who tolerate the test dose of 0.2 mL (2 mg) but achieve no response, a dose of 0.4 mL (4 mg) may be administered at the next observed "off" period, but no sooner than 2 hours after the initial test dose of 0.2 mL (2 mg).  Both supine and standing blood pressure should be checked pre-dose and at 20, 40, and 60 minutes post dose.  If the patient tolerates a test dose of 0.4 mL (4 mg) the starting dose should be 0.3 mL (3 mg) used on an as needed basis to treat existing "off" episodes.

e.  If needed, the dose can be increased in 0.1 mL (1 mg) increments every few days on an outpatient basis.  If a patient does not tolerate a test dose of 0.4 mL (4 mg), a test dose of 0.3 mL (3 mg) may be administered during a separate "off" period, no sooner than 2 hours after the test dose of 0.4 mL (4 mg).  Both supine and standing blood pressure should be checked pre-dose and at 20, 40, and 60 minutes post dose.  If the patient tolerates the 0.3 mL (3 mg) test dose, the starting dose should be 0.2 mL (2 mg) used on an as needed basis to treat existing "off" episodes.  If needed, and the 0.2 mL (2 mg) dose is tolerated, the dose can be increased to 0.3 mL (3 mg) after a few days.  In such a patient, the dose should ordinarily not be increased to 0.4 mL (4 mg) on an out-patient basis.

180.   Most patients studied in the apomorphine development program responded to 0.3 mL to 0.6 mL (3 mg to 6 mg).  There is no evidence from controlled trials that doses greater than 0.6 mL (6 mg) give an increased effect and these doses are not recommended.  The average frequency of dosing was three times per day in the development program, and there is limited experience with single doses greater than 0.6 mL (6 mg), dosing more than five times per day and with total daily doses greater than 2.0 mL (20 mg).

181.   If a single dose of apomorphine is ineffective for a particular "off" period, a second dose should not be given for that "off" episode.  The efficacy of a second dose for a single "off" episode has not been systematically studied and the safety of redosing has not been characterized.

182.   Patients who have a significant interruption in therapy (more than a week) should be restarted on a 0.2 mL (2 mg) dose and gradually titrated to effect.

183.   When dosing patients with mild and moderate hepatic impairment, caution should be exercised due to the increased Cmax and AUC in these patients (*see* CLINICAL PHARMACOLOGY and PRECAUTIONS).  For patients with mild and moderate renal impairment, the testing dose and subsequently the starting dose should be reduced to 0.1 mL (1 mg) (*see* CLINICAL PHARMACOLOGY and PRECAUTIONS).

184.   APOKYN can have serious side effects.  For example, severe nausea and vomiting can be expected from apomorphine.  In addition, APOKYN is a dopamine antagonist, which means that it can cause hypotension, orthostatic hypotension, and syncope, both in the initial treatment and over long-term treatment.  It must be administered subcutaneously, not intravenously, or serious adverse events may occur.

185.   APOKYN reduces resting systolic and diastolic blood pressure and has the potential to exacerbate coronary (and cerebral) ischemia.  Therefore,

73

medical practitioners must exercise caution when prescribing APOKYN for patients with known cardiovascular and cerebrovascular disease.

## DEFENDANTS' NATIONAL FRAUD SCHEME TO INDUCE SALES OF MYOBLOC

### A.    Defendants' Improper Marketing of MYOBLOC

186.   US WorldMeds engaged in a multifaceted scheme of kickbacks and misbranding to increase sales of MYOBLOC, including knowing sales for off-label purposes, in complete disregard for federal and state law.  US WorldMeds and Solstice Neurosciences are unfettered by any internal compliance department, without even the most cursory review of corporate or subcontractor conduct for compliance with federal and state laws, and without any legal advice to validate the MYOBLOC marketing strategy.

187.   MYOBLOC was distributed by US WorldMeds, through the sales force provided by Quintiles during the time Relator was employed by Quintiles. At the time his employment was terminated, US WorldMeds was in the process of bringing the Quintiles employees in-house at US WorldMeds to continue selling MYOBLOC (and APOKYN) as US WorldMeds employees.  Relator is aware that the previous sales practices have continued since US WorldMeds absorbed the sales staff previously provided by Quintiles, effective January 1, 2013.

188.   The only FDA-approved, on-label, use of MYOBLOC is for the treatment of cervical dystonia in adults.

189.   The limited approval of MYOBLOC contrasts with myriad treatments that are approved for other botulinum toxins, such as BOTOX, which include treatment in adults of (1) overactive bladder; (2) urinary incontinence; (3) migraine headaches; (4) upper limb spasticity; (5) cervical dystonia; (6) severe axillary hyperhidrosis; (7) blepharospasm associated with dystonia; (8) strabismus.

190.   MYOBLOC has limited approval for treatment of cervical dystonia because there are considerable side effects possible with use of MYOBLOC. Moreover, it would cost US WorldMeds an estimated $20 million to obtain FDA approval of MYOBLOC for treatment of other indications.  As a result, US WorldMeds deliberately determined to sell MYOBLOC as effective for the same uses as are approved for Botox, despite the fact that there is no established conversion for Botox doses to MYOBLOC doses.

191.   Defendant US WorldMeds, in conspiracy with and assisted by Defendant Quintiles, implemented a scheme to circumvent the approved uses and labeling of MYOBLOC in order to induce increased prescription and sales of MYOBLOC through various illegal means, including the provision of kickbacks to medical providers.  Defendants US WorldMeds and Quintiles also engaged in marketing efforts so egregious that they led to misbranding MYOBLOC, are evidence of misbranding MYOBLOC, or both.

**B.      Defendants' Scheme Involving Medical Practitioners Pushing MYOBLOC**

192.   The scheme to induce prescription of MYOBLOC depended on the active participation of various medical practitioners who were paid by US WorldMeds to present information about unapproved uses of MYOBLOC in order to encourage additional use of MYOBLOC.

193.   Promoting the unapproved use of MYOBLOC to treat sialorrhea, especially by doctors prescribing APOKYN, was a cornerstone of US WorldMeds' strategy for growing MYOBLOC sales.  For example, the February 2012 marketing plan for MYOBLOC identifies one of the ways to maximize the effectiveness of the sales team as creating synergy with APOKYN prescribers to help to grow EBITA for MYOBLOC.

194.   Accordingly, one of the "Key Initiatives" in an April 18, 2012 presentation to US WorldMeds shareholders was increased sales of MYOBLOC for the unapproved treatment of sialorrhea.

195.   The efforts made toward this "Key Initiative" were tracked as a critical point of US WorldMeds' success.  A National Sales Meeting in 2012 and a Management Meeting on September 26, 2012 both included a presentation by Henry van den Berg, the VP of Medical Affairs of US WorldMeds, on the success of the "experience of building synergy" by "leverage[ing] MYOBLOC relationships to get them to prescribe APOKYN" and by "rais[ing] sialorrhea

awareness among APOKYN users" who could make off-label use of MYOBLOC to treat it.

196.   US WorldMeds sales representatives, provided by Quintiles, were warned that they would lose their jobs if they did not support the initiative to push MYOBLOC off-label use.  For example, at the National Sales meeting in July 2012, Lee Warren told the US WorldMeds sales team that each representative needed to go out and "teach doctors how to make money," or they would lose their jobs and be replaced by Mr. Warren.

197.   US WorldMeds also provided monetary incentives to doctors who used MYOBLOC for off-label indications, to induce them to teach others to use MYOBLOC off-label.  US WorldMeds further rewarded heavy prescribers of MYOBLOC by paying them to speak at meetings called "Ad Boards" where they explained and promoted unapproved uses of MYOBLOC to other doctors.  US WorldMeds chose the speakers based on their experience with unapproved uses of MYOBLOC, and the participants on the basis of their potential to purchase more MYOBLOC.

198.   At the MYOBLOC Ad Boards, over the course of dinner at a restaurant, the speaker (or speakers) presented data and experience only regarding unapproved uses of MYOBLOC.  After the presentation, US WorldMeds personnel, including Henry van den Berg (VP of Medical Affairs) and Robert

Chinnapongse, M.D. (Senior Medical Director), facilitated a question-and-answer session to elicit from the attending doctors the information about unapproved uses of MYOBLOC that seemed most compelling to them and what further information might persuade them to prescribe MYOBLOC more frequently, so that US WorldMeds could continually expand its efforts to push the off-label use of MYOBLOC.

199.   At least one presenter, Dr. Maria "Vikki" Alvarez (hereinafter "Dr. Vikki Alvarez"), also taught attendees how to stretch the diagnosis of cervical dystonia in order to obtain reimbursement for treatment of migraines and other pain indications.  Dr. Vikki Alvarez suggested that because headache pain could originate in the neck, a migraine headache could be given a secondary diagnosis of cervical dystonia and submitted for Medicare and other reimbursement despite the lack of approval for such use.  US WorldMeds sales representatives adopted this tactic; for example, Noa Archibald in Dallas, TX, encouraged her customers to find primary and secondary diagnoses of cervical dystonia to treat.

200.   Further, the Ad Boards were also attended by reimbursement professionals from US WorldMeds, including Cal Murray, Brian Broihier, Cindy Padgett and Glenn Esgro, who attended in order to provide information to attendees about how to obtain reimbursement for the administration of MYOBLOC.

201.   US WorldMeds paid Ad Board speakers up to $4,500 per presentation and paid participants $500 for attending the free dinners, which were valued at over $100 per person.

202.   The Ad Board presentations focused solely on off-label uses of MYOBLOC.  Topics presented at Ad Boards included: (1) the unapproved treatment of migraines – presented by Dr Patrick M. Grogan, Dr. Vikki Alvarez, Dr. Laxman Bahroo; (2) the unapproved treatment of other pain disorders – presented by Dr. Grogan, Dr. Vikki Alvarez, Dr. Bahroo; and (3) the unapproved treatment of sialorrhea, especially in Parkinson's patients – presented by Dr. Mark F. Lew, Dr. Vikki Alvarez, Dr. Fernando L. Pagan.

203.   Ad Boards occurred throughout the country, including: Portland, OR, on October 27, 2011; Washington, D.C., on November 8, 2011; New York City, NY, on November 10, 2011; Dallas, TX, on December 1, 2011; Chicago, IL, on December 8, 2011; Cincinnati, OH, on January 11, 2012; San Francisco, CA, on January 12, 2012; Beverly Hills, CA, on February 15, 2012; St. Louis, MO, on February 23, 2012; Tampa, FL, on March 19, 2012; Philadelphia, PA, March 28, 2012; Boston, MA, on March 29, 2012; New Orleans, LA, on April 24, 2012; Louisville, KY, on June 6, 2012; Cleveland, OH, June 7, 2012; Minneapolis, MN, on June 28, 2012; Orlando, FL on October 4, 2012; Houston, TX, on November 1, 2012; and Atlanta, GA, on November 16, 2012.

204. The following tables summarize attendance at a representative sample of Ad Boards:

| Portland Ad Board October 27, 2011 | Washington, D.C. Ad Board November 8, 2011 | New York City Ad Board November 10, 2011 | Dallas Ad Board December 1, 2011 |
|---|---|---|---|
| *Speaker* | *Speakers* | *Speakers* | *Speakers* |
| Dr. Patrick Hogan | Dr. Laxman Bahroo | Dr. Laxman Bahroo | Dr. Laxman Bahroo |
|  | Dr. Fernando Pagan | Dr. Fernando Pagan | Dr. Vikki Alvarez |
| *Attendees* | *Attendees* | *Attendees* | *Attendees* |
| Deborah Syna | Michael Valente | Paul Cesar | Waleed El-feky |
| Paul Jacobsen | Zoltan Mari | Winona Tse | Richard Dewey |
| Anne Hamburg | Steven Lo | Chaim Mandelbaum | Padraig Eoin O'Sulleabhain |
| Matthew Brodsky | Mark Klaiman | Dmitry Nesen | Chandramoul Iyer |
| Chris Ginnochio | Sassan Hassassian | Yekyung Kong | Lorraine Rudder |
| Susan Scmitt | Mahan Chehrenama | Elena Davidova | Valery Lipenko |
| Vladmir Fiks | Alok Gopal | Rikki Racela | Shanan Munoz |
|  | George van Osten | Zianka Fallil | Furu Motgi |
|  | Eric Sklar | Isaiah Florence | Gary Ogin |
|  |  | Cynthia Roberto | Madhavi Thomas |
|  |  | Sandy Ching |  |
|  |  | Jason Honaker |  |

| Chicago Ad Board December 8, 2011 | Cincinnati Ad Board January 11, 2012 | San Francisco Ad Board January 12, 2012 | Beverly Hills Ad Board February 15, 2012 | St. Louis Ad Board February 23, 2012 |
|---|---|---|---|---|
| *Speakers* | *Speakers* | *Speaker* | *Speakers* | *Speakers* |
| Dr. Laxman Bahroo | Dr. Patrick Grogan | Dr. Patrick Hogan | Dr. Vikki Alvarez | Dr. Mark Lew |
| Dr. Fernando Pagan | Dr. Laxman Bahroo |  | Dr. Mark Lew | Dr. Laxman Bahroo |
| *Attendees* | *Attendees* | *Attendees* | *Attendees* | *Attendees* |
| Christina Marciniak | Maureen Li | Malcolm Lawton | Allan Wu | Susan Criswell |
| Michael Rezak | Brian Maddux | Neng Huang | Ronald Andiman | Pratap Chand |
| Tao Xie | Colin Zadikoff | Joseph Lacy | Cameron Adams | Ghazala Hayat |
| Yelena Tumashova | Alberto Espay | Mechel Henry | Rodrigo Rodriguez | `Stanley Iyaduri |
|  | Zhijun Guo | Georgi Mikaladze | Jennifer Hui | Wegdan Andrews |
|  | Lisa Mannix |  | Regina Berkovich | Sherry Ma |
|  | James Beegan |  | Ziyad Ayyoub | Anne T. Christopher |
|  |  |  | Nirav Patel | Lee Temple |
|  |  |  | Charles Gordon | Max Benzaquen |
|  |  |  | Barry Chi | James Sturm |
|  |  |  | Mechel Henry | Kathy Vogt |
|  |  |  | Brigitte Prinzivalli Rolfe | Omar Malik |
|  |  |  | Jimmie Kung | Lynette Santos |
|  |  |  | Jerome Lisk |  |

| Tampa Ad Board March 19, 2012 | Philadelphia Ad Board March 28, 2012 | Boston Ad Board March 29, 2012 | New Orleans Ad Board April 24, 2012 | Louisville Ad Board June 6, 2012 |
|---|---|---|---|---|
| *Speakers* | *Speakers* | *Speakers* | *Speakers* | *Speaker* |
| Dr. Patrick Grogan | Dr. Fernando Pagan | Dr. Fernando Pagan | Dr. Fernando Pagan | Dr. Laxman Bahroo |
| Dr. Vikki Alvarez | Dr. Laxman Bahroo | Dr. Laxman Bahroo | Dr. Laxman Bahroo |  |
| *Attendees* | *Attendees* | *Attendees* | *Attendees* | *Attendees* |
| Marie Carmer Wilson | Mitchell Paulin | Daniel Tannenbaum | Edward DAbrowski | Darryl Kaelin |
| Nina Tsakadze | Rohini Kumar | Shabbir Abbasi | Carlayne Jackson | Mohammed Alsorogi |
| Rossitza Chichkova | Joseph Campellone | Slavenka Kam-Hansen | Manoj Malhotra | Rukmaiah Bhupalam |
| Kavita Kalidas | David Lee | Bonnie Hersh | Zoltan Mari | Laura Jacks |
| Sanjay Yathiraj | Roy Lerman | Christopher Stowe |  | Alexander Digenis |
| Julio Cantero | Scott Davidorff | Diana Apetauerova |  |  |
| Ronald Aung-Din | Leonard Kamen | Patricia Hebert |  |  |
| Leonie Van Passel | Michael Saulino | Angela Haliburda |  |  |
|  | Rao Najbhushan |  |  |  |
|  | Mamta Verma |  |  |  |

| Cleveland Ad Board<br>June 7, 2012 | Minneapolis Ad Board<br>June 28, 2012 |
|---|---|
| *Speakes* | *Speakers* |
| Dr. Laxman Bahroo | Dr. Fernando Pagan |
| *Attendees* | Dr. Laxman Bahroo |
| Jospeh Rudolph | *Attendees* |
| Ilia Itin | Gormley Gormley |
| David Riley | Syed Sharkan |
| Karla Madalin | Elena Poluhkin |
| Amir Mazhari | Murali Krisnamurthy |
| Mamon Maiteh | Gurdish Bedi |
| Norton Winer | |
| Debrabata Gosh | |
| Stewart Tepper | |

205.   In addition to the Ad Boards, US WorldMeds personnel also directly promoted off-label uses of MYOBLOC to boost sales.  For example, US WorldMeds Vice President of Medical Affairs, Henry van den Berg, oversaw sales initiatives and encouraged US WorldMeds sales representatives to push MYOBLOC for controlling sialorrhea in Parkinson's patients also using APOKYN.  Mr. van den Berg is not licensed to practice medicine in the United States, but has misrepresented himself as an "M.D." – including on the US WorldMeds website – in the United States to in order to increase his credibility to various audiences.

206.   In addition to paying Dr. Vikki Alvarez for making Ad Board presentations, US WorldMeds hired her under contract for two days of work per week with the sales team, at a rate of $2,000 per day plus expenses.  US WorldMeds thus paid Dr. Vikki Alvarez to travel with US WorldMeds sales representatives throughout the country explaining off-label uses of MYOBLOC to sales targets.  During one such trip, on August 6-7, 2012, she teamed with sales

81

representative Andy Tuley to visit doctors in Beverly Hills, CA, where they promoted unapproved uses of MYOBLOC, especially treatment of sialorrhea, to Dr. Natan Shaolin and Dr. Guven Uzun.  As another example, Dr. Vikki Alvarez flew to Evansville, IL, on September 14, 2012, to instruct one of Lee Warren's girlfriends, a physician, on the unapproved use of MYOBLOC to treat headaches, using free samples provided by Lee Warren.

207.   Dr. Vikki Alvarez was used as a tool to reach doctors who would not see sales representatives alone.  For example, Trish Tapia, the US WorldMeds sales representative in Buffalo, NY, planned in Q1 2012 to use Dr. Vikki Alvarez as an additional resource at Mt. Sinai Hospital, because pharmaceutical sales representatives were not allowed to have physical access to the doctors at Mt. Sinai.  She also planned to use Dr. Vikki Alvarez to impress Dr. Gary P. Thomas and Dr. Chaim Mandelbaum at Comprehensive Pain Management.  Similarly, the plan of action in Q1 2011 for Moss Rehab in Philadelphia was to utilize US WorldMeds medical science liaisons (including Dr. Vikki Alvarez) during field rides and luncheons.

208.   Noa Archibald the US WorldMeds sales representative in Dallas, TX, used dinners with doctors, attended by medical affairs personnel like Robert Chinnapongse, M.D. (Senior Director, Medical Affairs) and Dr. Vikki Alvarez, to strengthen her relationship with the customers as part of her Q1 2012 sales plan of

action.  She used the strategy with, for example, Dr. William Hwang of the Southern Neurorehab Institute and Dr. Daragh Heitzman of Texas Neurology.

209.   Nicole Ewald, a sales representative in San Antonio, TX, sought to use Dr. Vikki Alvarez and other medical affairs resources to increase her sales with the Austin Diagnostic Association, the Rehabilitation Group, and the Phoenix Medical Association in Q1 2012.

210.   US WorldMeds also undertook concerted efforts to push approval of off-label uses of MYOBLOC on various formularies so that Medicare reimbursement would become clearer, for those physicians who were not comfortable submitting miscoded Medicare claims to obtain coverage for MYOBLOC.  For example, one of US WorldMeds' speakers – Dr. Stuart Isaacson – advised Mr. van den Berg in August 2012 that getting sialorrhea approval in Florida was a "big opportunity" that would lead to Dr. Isaacson alone injecting 2-3 additional patients daily with MYOBLOC.

211.   Subsequently, on September 6, 2012, Mr. van den Berg and Cindy Padgett met with Dr. Daniel Kantor – a paid US WorldMeds consultant – to develop a strategy by which Dr. Kantor would be compensated to influence the expansion of Medicare reimbursement of unapproved MYOBLOC uses in Florida. Specifically, Mr. van den Berg and Dr. Kantor discussed how to cause First Coast

Service Options, Inc. to reimburse for the unapproved treatment of sialorrhea with MYOBLOC.

212.   The same day, September 6, 2012, Mr. van den Berg met with Dr. Robert A. Hauser, a Florida physician who used APOKYN with patients, to promote his use of MYOBLOC to treat sialorrhea in Parkinson's patients, as part of a strategy documented in the US WorldMeds regional sales representative's Q3 2012 sales plan of action.  Dr. Hauser generally refused to see pharmaceutical sales representatives, but based on the concerted efforts of US WorldMeds and Mr. van den Berg, which included soliciting Dr. Hauser by offering him involvement in a paid "trial" of treating sialorrhea with MYOBLOC, he agreed to meet with Mr. van den Berg.  As a result of US WorldMeds' targeted efforts to influence Dr. Hauser, he agreed to petition for MYOBLOC to be added to the formulary for sialorrhea treatment in Florida.

213.   Similarly, Mr. van den Berg also met in September 2012 with Dr. Kevin Klos in an attempt to shift him from BOTOX to MYOBLOC for the treatment of sialorrhea, as well as for cervical dystonia, spasticity and headache. To induce Dr. Klos to switch to MYOBLOC, US WorldMeds also paid him thousands of dollars to participate in the "Phase IV" trial of APOKYN, despite his low number of APOKYN patients.  This purported trial was a sham that merely paid doctors thousands of dollars per patient to start up to ten patients on

APOKYN for one week of treatment, and then return a form regarding the results of the treatment.  The participating doctors did nothing above the standard care of a patient on APOKYN to warrant their lucrative payment from US WorldMeds, and the response form was typically complete by office staff rather than the doctor.

214.   There are numerous examples where US WorldMeds sales representatives employed the strategy orchestrated by Mr. van den Berg and Lee Warren to "leverage" the business of APOKYN prescribers to include off-label use of MYOBLOC.  For example, Keith Polston, the US WorldMeds sales representative in Cincinnati, OH (promoted to Regional Sales Director, as of October 2012), planned in 2012 to leverage the APOKYN prescriptions written by Dr. Brian Maddux to get Dr. Maddux to purchase MYOBLOC.

215.   More generally, off-label treatment of sialorrhea was recognized as a driving factor in many MYOBLOC sales accounts.  For example, Scott McAndrew, the US WorldMeds sales representative in Raleigh, N.C., identified the increase in sales to the North Carolina Baptist/Wake Forest Hospital as attributable to Dr. Mustafa Siddiqui's use of MYOBLOC to treat sialorrhea.  Mr. McAndrew's plan of action for Q1 2012 included the commitment to continue to pursue Dr. Siddiqui.  Conversely, Mr. McAndrew attributed reduced sales at other locations to doctors treating sialorrhea less with MYOBLOC – specifically, Dr. Vu Nguyen at Carolinas Rehabilitation, Dr. Sanjay S. Iyer at CMC Neurology, and Dr. William C.

Van Ness at the Pain & Rehab Institute.  Dr. Iyer and Dr. Van Ness specifically identified the lack of Medicare coverage for sialorrhea treatment as their reason for reduced order volume.  Mr. McAndrew also attributed low sales at Asheville Neurology to the fact that only one doctor (Dr. James Patton) was using MYOBLOC, and "mostly for Medicare sialorrhea patients."

216.   US WorldMeds also made research grants to physicians advancing unapproved uses of MYOBLOC.  For example, Dr. Vikki Alvarez and Dr. Patrick Grogan (who are now married to each other) received funding from US WorldMeds for the publication of articles on the unapproved use of MYOBLOC to treat pain indications.

217.   US WorldMeds also solicited bids from third-party vendors (*e.g.*, Projects in Knowledge, Inc. and Vindico) to develop a continuing medical education web program to teach doctors about the unapproved use of MYOBLOC for treating sialorrhea.

218.   US WorldMeds was aware that the efforts to sell MYOBLOC for off-label purposes were succeeding and that MYOBLOC was most popular for off-label treatments:  Henry van den Berg presented the results of a survey confirming these findings at the July 2012 National Sales Meeting.  The survey results included:

a. Fewer than half – 43.5% – of the respondent-doctors' patients on MYBLOC received it for treatment of cervical dystonia. The majority of patients were being treated off-label:

  i. 24.3% of respondents' patients on MYOBLOC were being treated for spasticity.

  ii. 17.8% of respondents' patients on MYOBLOC were being treated for sialorrhea.

  iii. 5.6% of respondents' patients on MYOBLOC were being treated for migraine.

  iv. 8.9% of respondents' patients on MYOBLOC were being treated for other pain conditions.

b. Three percent of respondents never even prescribed MYOBLOC for treatment of cervical dystonia at all, and those that did only planned to use it with 16.8% of their patients over the next 12 months. In contrast, the respondent doctors were far more likely to use MYOBLOC for an off-label treatment:

  i. 85.7% of respondents used MYOBLOC to treat spasticity, and planned to use it for 15.5% of their spasticity patients over the next 12 months.

     ii.  74.3% of respondents used MYOBLOC to treat migraine, and planned to use it for 13.2% of their migraine patients over the next 12 months.

     iii.  34.3% of respondents used MYOBLOC to treat sialorrhea, and planned to use it for 48.4% of their spasticity patients over the next 12 months.

c.  And, with regard to new (toxin naive) patients, the respondents planned to use MYOBLOC most often to treat sialorrhea (44% of new patients), versus only 13.9% of new cervical dystonia patients. Respondents were nearly as likely to treat a new patient off-label for spasticity (12.8%) or migraine (12.4%) as cervical dystonia.

219.  In addition to the foregoing, there is ample evidence that US WorldMeds sales representatives knew that specific doctors and practices were placing orders for MYOBLOC for the purpose of treating unapproved indications. For example:

a.  US WorldMeds was aware that in Q1 2012 the doctors of Sunrise Neurology (Dr. Harvey Schwartz, Dr. Paul Ginsburg, Dr. Barry Cutler, and Dr. Mayur Maniar) were interested in the unapproved use of MYOBLOC to treat sialorrhea, and that Dr. Cutler had placed his first order of MYOBLOC for that purpose.

b. US WorldMeds was aware that in Q1 2012 the doctors of Neuroscience Consultants in Florida (Dr. Brad Herskowitz, Dr. Paul Damski, Dr. Javier Lopez, Dr. Victor Barredo, and Dr. Carlos Gacia-Rivera) prescribed MYOBLOC for unapproved uses, and in fact the account's sales representative noted in his quarterly plan the need to "get Dr. Herskowitz in touch with Dr. Chinnapongse [a US WorldMeds employee] to discuss dosing for off-label."

c. Keith Polston, the US WorldMeds sales representative in Cincinnati, OH, was aware that the Center for Pain Relief (Cincinnati) purchased hundreds of MYOBLOC vials annually, and knew that the practice had experienced reimbursement issues from prescribing MYOBLOC for unapproved purposes.

d. Tammy Williams, the US WorldMeds sales representative in Cleveland, OH, was aware that her customer, Dr. Richard M. Trosch, "only uses MYOBLOC off label," because he prefers BOTOX for cervical dystonia.  She identified Dr. Trosch as a candidate to attend the Michigan Ad Board.  She also identified Dr. Nilofer Nisar, who used MYOBLOC for the unapproved treatment of migraines, as a promising Ad Board attendee.  Ms. Williams

further recognized that Dr. David E. Riley and Dr. Steven Gunzler

prescribed MYOBLOC "more for off label" use.

e.  US WorldMeds was also aware that Penn Hospital used

MYOBLOC for a variety of unapproved treatments, including

sialorrhea.

f.  US WorldMeds sales representative Lisa Borden was aware that

Dr. Mathew Brodsky at the Oregon Health Science University used

MYOBLOC primarily for the unapproved treatment of sialorrhea.

g.  US WorldMeds sales representative for Dallas, TX, Noa Archibald,

knew that the doctors at Texoma Neurology – Dr. Baharathy

Sundaram and Dr. Mohammad Al-Rifai – used MYOBLOC only

for unapproved treatments.  Similarly, she knew that Dr. Nabila El

Zind only used MYOBLOC for unapproved indications.

220.   US WorldMeds sales representatives also worked closely with US

WorldMeds "medical affairs" personnel (also known as "medical sciences

liaisons") to sell MYOBLOC for the purpose of treating unapproved indications.

For example, US World Meds used purported "clinical trials" to market off-label

uses of MYOBLOC.  These efforts included:

a.  The Q3 2012 plan of action for sales to the Cleveland Clinic

(Florida) was to approach Dr. Nestor Galves there about

participating in a paid trial involving the use of MYOBLOC to treat sialorrhea.

b. Trish Tapia, the sales representative in Buffalo, N.Y., planned to increase sales at the New York Pain Center in Q1 2012 by involving them in a clinical trial using MYOBLOC to treat migraines.

c. When Tammy Williams was unable to make contact with the doctors at Henry Ford Health System, she planned to utilize US WorldMeds medical science liaisons to attempt to gain practice access.

d. Ms. Williams also planned to build a relationship between US WorldMeds and the University of Michigan Hospital by connecting the doctors there with US WorldMeds medical science liaisons, because, as a pharmaceutical sales representative, she had no physical access to the doctors.

e. Because Penn Hospital had a strict policy against sales representative access to staff, the US WorldMeds sales representative planned to "build value and promote partnering with Penn" by offering participation in clinical trials and invitations to

Ad Boards to "build relationships with all key toxin injectors" affiliated with the hospital.

    f.  The US WorldMeds sales representative in Seattle, WA, Lisa Borden, used paid US WorldMeds consultant Dr. Bahroo to gain access to the Evergreen Medical Center, which only allows access to physician speakers.

221.  Similarly, sales representatives would connect doctors with US WorldMeds medical affairs personnel for the purpose of promoting off-label use of MYOBLOC.  For example, the US WorldMeds sales plan of action for convincing Dr. Herskowitz at the Neuroscience Consultants (Florida) to use MYOBLOC for off-label indications was to put him in touch with paid US WorldMeds employee Dr. Chinnapongse "to discuss dosing for off-label."

### C.    Defendants' Provision of Kickbacks to Medical Providers to Induce Prescription of MYOBLOC

222.  Defendants engaged in various other methods to induce medical providers throughout the country to prescribe MYOBLOC for off-label uses.  As one example, Lee Warren personally instigated a program to provide free samples of MYOBLOC to various medical professionals throughout the country, including dentists, so that they would expand their use of MYOBLOC for various off-label indications.  Given that the provision of samples of medicines such as MYOBLOC should be controlled, Glenn Esgro (VP of Managed Markets) was required to

approve Mr. Warren's provision of free samples.  Glenn Esgro had expressed

concern about Mr. Warren's activities in providing MYOBLOC samples, including

that samples were provided to individuals who are not MDs.  Nevertheless, Mr.

Warren was permitted to, and did, send samples of MYOBLOC out broadly in

order to encourage off-label use of MYOBLOC.

223.   US WorldMeds also provided compensation to both "trainer" and

"trainee" in a program of "Injector Trainings."  A paid consultant, such as Dr. Vikki

Alvarez or Dr. Bahroo, would either travel to the office of the trainee doctor or host

the trainee doctor in their own office to "demonstrate" how to inject MYOBLOC

for off-label uses.  The compensation for Injector Training sessions was in addition

to other compensation provided to the US WorldMeds consultants.  A list of such

Injector Trainings follows:

| Injector Trainings | | | | |
|---|---|---|---|---|
| Date | Trainee | Trainer | Location | Sales Rep |
| 1/6/11 | Dr. Natarajan | Dr. Laxman Bahroo | Dr. Laxman Bahroo's Office: Vienna, VA | Sue Crutcher |
| 9/15/2011 | Dr. Irving Wolfe | Dr. Arthur Itkin | Dr. Itkin's Office: Palos Heights, IL | Steve Sweem |
| 10/13/11 | Dr. Samuel Siddiqui | Dr. Vikki Alvarez | Dr. Siddiqui's Office | Cal Murray |
| 10/24/11 | Dr. Frank Lopez | Dr. Laxman Bahroo | Dr. Laxman Bahroo's Office: Vienna, VA | Cal Murray |
| 10/24/11 | Dr. Michael Molter | Dr. Laxman Bahroo | Dr. Laxman Bahroo's Office: Vienna, VA | Cal Murray |
| 10/27/11 | Dr. Shereen Chang | Dr. Arthur Itkin | Dr. Itkin's Office: Palos Heights, IL | Steve Sweem |
| 11/1/11 | Dr. Sherry Ma | Dr.Fernando Pagan | Dr. Pagans office | Cal Murray |
| 10/27/2011 | Megan Raddatz | Dr. Arthur Itkin | Dr. Itkin's Office: Palos Heights, IL | Steve Sweem |
| 1/13/12 | Dr. Attas Boutrous | Dr. Martin Taylor | Dr. Martin Taylor's Office: New Albany, OH | Rachel Royer |
| 2/3/12 | Dr. Aamir Siddiqui | Dr. Vikki Alvarez | Dr. Aamir Siddiqui's Office: San Antonia, TX | Nicole Ewald |
| 2/13/12 | Dr. Stanley Iyadurai | Dr. Vikki Alvarez | Dr. Vikki Alvarez's Office: San Antonia, TX | Sue Crutcher |
| 4/4/12 | Dr. Badulak | Dr. Laxman Bahroo | Dr. Laxman Bahroo's Office: Vienna, VA | Frank Medici |
| 4/4/12 | Dr. Feldman | Dr. Laxman Bahroo | Dr. Laxman Bahroo's Office: Vienna, VA | Frank Medici |

| 5/4/12 | Dr. Boyd Dwyer | Dr. Laxman Bahroo | Dr. Laxman Bahroo's Office: Georgetown, DC | Stephanie Tedesco |
| 5/4/12 | Dr. Susan Schmitt | Dr. Patrick Hogan | Dr. Patrick Hogan's Office: Tacoma, WA | Lisa Borden |
| 5/23/12 | Dr. Deepak Tikku | Dr. Laxman Bahroo | Dr. Laxman Bahroo's Office: Vienna, VA | Dianna Sedqwik |
| 5/29/12 | Dr. William Brelsford and 3 others | Dr. Vikki Alvarez | Dr. William Brelsford's Office: Tyler, TX | Noa Archibald |
| 6/5/12 | Dt. Attas Boutrous | Dr. Vikki Alvarez | Dr. Boutrous' Office: San Antonio, TX | Rachel Royer |
| 10/5/12 | Dr. Nicholas Nammour | Dr. Vikki Alvarez | Dr. Vikki Alvarez's Office: San Antonia, TX | Dawn Thompson |

224.   US WorldMeds also held "reimbursement roundtables" where attendees would be instructed on how to obtain reimbursement for off-label use of MYOBLOC.  A list of such meetings follows:

| Reimbursement Roundtables | | | | | |
|---|---|---|---|---|---|
| Date | # Attendees | Location | Speaker | US WorldMeds Reimbursement Attendee | Sales Rep Attendee |
| 11/28/11 | 6 | Portland City Grill: Portland, OR | Ceylan Gul | Cal Murray | Lisa Borden |
| 11/28/11 | 3 | Oregon Health Sciences University: Portland, OR | Ceylan Gul | Cal Murray | Lisa Borden |
| 11/30/11 | 4 | The Capital Grille: Chevy Chase, MD | Stacie Gatchlian | Sean Flanders | Stephanie Tedesco |
| 12/01/11 | 9 | Ruth's Chris Steak House: Mobile, AL | Deanna Gill | Cal Murray | Jenea Atkins |
| 12/01/11 | 8 | Ruth's Chris Steak House: Anaheim, CA | Milda Kaitz | n/a | Peter Tsai |
| 12/13/11 | 2 | The Grove Grill: Memphis, TN | Milda Kaitz | Brian Broihier | Sue Crutcher |
| 12/14/11 | 0 | Arcodoro & Pomodoro: Dallas, TX | Ceylan Gul | Brian Broihier | Noa Archibald |
| 12/15/11 | 3 | Bernardin's: Winston-Salem, NC | Ceylan Gul | Cal Murray | David McAndrew |
| 12/15/11 | 6 | Cameron's Steakhouse: Birmingham, MI | Stacie Gatchlian | Sean Flanders | Bridget Wackerly |
| 01/17/12 | 6 | Fleming's Prime Steakhouse: West Hartford, CT | Alberto Vigo | Cal Murray | Chris Hennessey |
| 01/18/12 | 5 | McCormick & Schmick's: Cincinnati, OH | Milda Kaitz | Cal Murray | Ray Ashley |
| 01/19/12 | 8 | Lilly's: Louisville, KY | Milda Kaitz | Lee Warren & Henry Van den Burg | Ray Ashley |
| 01/19/12 | 10 | Brio: Denver, CO | Ceylan Gul | Brian Broihier | Michelle Payne |
| 01/24/12 | 9 | Wheaton Franciscian: Franklin, WI | Deanna Gill | Brian Broihier | Rachel Royer |
| 01/24/12 | 5 | Fleming's Prime Steakhouse: Brookfield, WI | Deanna Gill | Brian Broihier | Rachel Royer |
| 01/24/12 | 4 | Angelo's 677 Prime: Albany, NY | Ceylan Gul | Sean Flanders | Trisha Tapia |
| 01/25/12 | 3 | McCormick & Schmick's: Beavercreek, OH | Milda Kaitz | Brian Broihier | Keith Polston |
| 01/25/12 | 6 | Saratoga Steaks: Syracuse, NY | Ceylan Gul | Sean Flanders | Trisha Tapia |
| 01/26/12 | 3 | Lacroix and the Rittenhouse: Philadelphia, PA | Ceylan Gul | Sean Flanders | Frank Medici |

| 01/26/12 | 19 | Eddie Merlots: Columbus, OH | Milda Kaitz | Brian Broihier | Keith Polston |
| 01/31/12 | 4 | Pittsburgh Blue Steakhouse: Edina, MN | Jessica Higgins | Brian Broihier | Rachel Royer |
| 01/31/12 | 6 | Chequers Seafood: Atlanta, GA | Melissa Mulchahey | Cal Murray | John Scott |
| 02/08/12 | 8 | The Chart House: Melbourne, FL | Alberto Vigo | Brian Broihier | Dianna Sedgwick |
| 02/09/12 | 9 | Café L'Europe: Sarasota, FL | Alberto Vigo | Brian Broihier | Dianna Sedgwick |
| 02/20/12 | 5 | Devon Seafood Grill: Harrisburg, PA | Deanna Gill | Brian Broihier | Frank Medici |
| 02/21/12 | 4 | Ruth's Chris Steakhouse: Virginia Beach, VA | Ceylan Gul | Brian Broihier | Stephanie Tedesco |
| 02/23/12 | 6 | Indochine: Tacoma, WA | Milda Kaitz | Brian Broihier | Lisa Borden |
| 03/01/12 | 20 | Hotel ZaZa: Dalas, TX | Ceylan Gul | Brian Broihier | Noa Achibald |
| 03/07/12 | 2 | Maggiano's: St. Louis, MO | Deanna Gill | Brian Broihier | Sue Crutcher |
| 04/12/12 | 9 | Ruths Chris Steakhouse: Providence, RI | Jessica Higgins | n/a | Chris Hennessey |

225.    As the foregoing demonstrates, Defendants misbranded MYOBLOC because they sold it with the intention that it be used for unapproved treatments, with the knowledge that it would be used for unapproved treatments, or both.

## US WORLDMEDS INTENTIONALLY OVERSTATED THE MYOBLOC ASP

226.    Novation, an entity that purports to be a GPO with members that include hospitals and physician clinics, is affiliated with certain hospitals and physicians that purchase MYOBLOC from Defendants US WorldMeds and Solstice Neurosciences.

227.    US WorldMeds, by agreement with Novation, developed a scheme under which each Novation member who purchased MYOBLOC would receive 3% of the amount spent on MYOBLOC directly back from US WorldMeds.  This 3% kickback to MYOBLOC purchasers was in addition to a 7.2% price discount

provided through Novation, which by itself was the highest price discount any buyer received.

228.   The discounted price offered through Novation, plus the 3% cash kickback, ensured that the price offered Novation customers for MYOBLOC would be less than the price of any other botulinum toxin, particularly Botox.  Lee Warren developed a spreadsheet, referred to as the "Cost Calculator," for sales representatives to use to demonstrate the savings from purchasing MYOBLOC through the Novation contract versus a competing botulinum toxin.  *See* Exhibit D attached.  Every sales representative had the spreadsheet on their computer and used it to show customers how much additional profit they could make by accounting for the combined 3% kickback and 7.2% discount.  Novation also posted the Cost Calculator on its website.  US WorldMeds used similar cost calculators with other customers, including calculators targeting Medicare patients and VA hospitals.  *See* Exhibits E & F attached.

229.   US WorldMeds and Novation agreed to use the cost advantage versus Botox as a selling point to get Novation members to buy MYOBLOC, and recognized that the advantage arose not only from the "best contract price" on MYOBLOC but also from Novation's agreement to "return adm[inistrative] fees to purchasers."

230.   Specifically, they identified $50 million in Novation hospital spend on Botox that could be shifted to the MYOBLOC contract, and agreed to coordinate efforts to sell MYOBLOC.

231.   To ensure that Novation members received that pricing information (and knew that they would receive 3% of the sales price back from US WorldMeds), US WorldMeds sales representatives used spreadsheets (like Exhibit D) to demonstrate and quantify the profits that Novation members would earn by replacing all their botulinum toxin prescriptions with MYOBLOC, despite the serious safety issues and medical risks posed by substituting MYOBLOC for other medications.

232.   US WorldMeds fraudulently called the 3% kickback paid to Novation members on MYOBLOC purchases an "administrative fee" to Novation, and falsely claimed that the payment met the OIG "safe harbor" for exclusion from the computation of the quarterly Average Sales Price ("ASP") of MYOBLOC that US WorldMeds certified to CMS.  To the contrary, US WorldMeds understood the "administrative fee" for Novation members as a benefit directly "payable to members," in addition to the "best MYOBLOC price in the nation with over 7% discount to WAC."

233.   US WorldMeds' fraudulent treatment of the 3% kickback to Novation members on MYOBLOC purchases was deliberate and knowing, as

contemporaneous documents demonstrate that US WorldMeds was well-aware that such a payment would not meet the OIG "safe harbor" and was an additional return to Novation members, not a *bona fide* administrative fee.

234.   US WorldMeds payments to MYOBLOC purchasers who were Novation members should have been included in US WorldMeds' ASP calculations for MYOBLOC, which were reported to CMS pursuant to 42 CFR § 414.804.  US WorldMeds' payments to Novation members were not "[b]ona fide service fees," as defined by 42 C.F.R. § 414.802, and should have been included as a price concession, pursuant to 42 C.F.R. § 414.804(a)(2), in calculating the ASP for MYOBLOC.  US WorldMeds' failure to include these payments in its ASP calculations for MYOBLOC caused the quarterly ASP for MYOBLOC to be overstated as reported, and certified, to CMS.

235.   US WorldMeds failed to include the payments to Novation customers who purchased MYOBLOC in the relevant ASP computations in order to avoid reducing the ASP, as it was critical to MYOBLOC marketing efforts that MYOBLOC remain a more "profitable" medication for prescribing physicians than any other botulinum toxin, despite the significant risks presented by the unapproved uses that US WorldMeds and Quintiles encouraged.  Moreover, Relator is aware that US WorldMeds was trying to offer additional discounts to

Novation customers, above and beyond the 3% kickback and discounted price, through separate bilateral contracts sweetening the price further for large accounts.

236.   The failure of US WorldMeds to include these payments in its MYOBLOC ASP calculations inflated the reported ASP for MYOBLOC.  As a result, the Government Health Care Programs were harmed as follows:  (1) State Medicaid Programs that utilize the ASP reimbursement methodology, which is the mandated reimbursement methodology utilized by the Medicare program beginning in 2005, overpaid for MYOBLOC claims (including as to any federal funding for payment of those claims); (2) State Medicaid and Federal Medicare Programs overpaid for dually-eligible Medicare/Medicaid beneficiaries; and (3) other Government Health Care Programs, including Medicare, which used the ASP reimbursement methodology (the mandated reimbursement methodology utilized by the Medicare program beginning in 2005), overpaid for MYOBLOC claims. All MYOBLOC claims were overpaid – not just those of Novation members – because the inflated ASP applied to all claims for MYOBLOC.

237.   In addition, every MYOBLOC purchase made by a Novation customer was tainted by an illegal kickback from US WorldMeds that improperly overstated the ASP for MYOBLOC and rendered any related claim false.

<u>**DEFENDANTS' NATIONAL FRAUD SCHEME TO**</u>
<u>**INDUCE SALES OF APOKYN**</u>

**A.     US WorldMeds' Plan to Profit From APOKYN**

238.   Again, without any regard for state or federal law and without legal advice or internal compliance review, US WorldMeds and Solstice Neurosciences developed a marketing strategy for APOKYN founded on illegal kickbacks.

**1.     US WorldMeds Promptly Raised the Price**
**of APOKYN by 700%**

239.   At the time that US WorldMeds acquired the rights to market APOKYN in the United States, annual revenue for APOKYN was $9,500,000 and the price for a dose of APOKYN was approximately $138 per cartridge.  Shortly after acquiring the right to market APOKYN in the United States, US WorldMeds raised the price of a cartridge of APOKYN to $995 (over seven times the original cost), for no legitimate economic reason.  US WorldMeds projects revenue from the inflated price to reach $65 million in 2013.

240.   US WorldMeds was driven by a desire to extract additional profits from the sale of each dose of APOKYN, with the intention that the insurers of patients then on the drug, including Medicare and Medicaid, cover the additional cost.

241.   To that end, the price increase that took effect at January 1, 2012, was tied to an effort by US WorldMeds to ensure that the cost of the first APOKYN sold to any patient in 2012 would be high enough to consume the applicable

deductible.  Thus, for example, US WorldMeds intended that the cost of the first APOKYN dose sold to a Medicare patient in 2012 be high enough that it would trigger the patient's entire TrOOP, including the donut hole.

242.   Further, US WorldMeds conspired to ensure co-pay assistance to every APOKYN user, in order to make them indifferent to the price increase and to maximize their use of APOKYN, ultimately increasing the costs to insurers, including Government Health Care Programs.

## 2.   US WorldMeds & Assistance Fund Conspire to Induce Sales of APOKYN to Medicare Beneficiaries

243.   Defendant Assistance Fund conspired with and facilitated kickbacks to Medicare and Medicaid beneficiaries in order to fund the TrOOP so that those beneficiaries – and their medical providers – would have no incentive to complain about the sudden and unjustified increase in the cost of APOKYN.

244.   The cost of APOKYN after January 2012 caused patients' co-payments, or TrOOP, to increase significantly.  As a result, US WorldMeds determined to cover co-payments, directly through a Patient Assistance Program ("PAP") that US WorldMeds established in December 2011 for patients with nongovernmental health plans, and in conjunction with Defendant Assistance Fund to ensure that co-payments for APOKYN recipients participating in Governmental Health Care Programs, such as Medicare and Medicaid, would be covered.

245.   To that end, US WorldMeds provided Assistance Fund with at least $750,000 in late 2011, which US WorldMeds recorded as a tax-deductible charitable contribution.  Thereafter, throughout 2012, each time that US WorldMeds received information through Health Connections about a potential APOKYN patient who was covered by Medicare or Medicaid, the information about that patient would be provided to Assistance Fund so that the patient's TrOOP, including the Medicare donut hole, could be paid by Assistance Fund with US WorldMeds' funds.

246.   In addition, in December 2011, every individual known to be receiving APOKYN as of that date was contacted by Health Connections (an organization that interfaced with the specialty pharmacies that provided APOKYN to patients), as well as Circle of Care nurses paid for and directed by US WorldMeds, to let each patient know that copayment assistance was available for future APOKYN prescriptions from US WorldMeds PAP and, for Medicare and Medicaid beneficiaries, from Assistance Fund.  This communication was directed by US WorldMeds in order to encourage individuals covered by Medicare and Medicaid to continue to purchase APOKYN in 2012, even as US WorldMeds inflated the price of APOKYN by more than 700%, and to encourage those individuals to acquire sufficient APOKYN through their pharmacies so that

Assistance Fund could provide funds to cover their TrOOP at the beginning of 2012, including the Medicare donut hole amount.

247.   US WorldMeds provided a bonus to Circle of Care nurses who were able to obtain completed paperwork from patients to continue their APOKYN prescriptions.

248.   US WorldMeds and the Circle of Care nurses employed by US WorldMeds could be assured that Assistance Fund would cover the deductible for virtually every Medicare and Medicaid eligible patient because of the close working relationship between US WorldMeds and Assistance Fund.  US WorldMeds and Assistance Fund exchanged specific, individualized information about each such APOKYN patient on numerous occasions, including weekly conference calls between US WorldMeds and Assistance Fund representatives, including Glenn Esgro, Cindy Padgett (first as an employee of Assistance Fund, then as Director Reimbursement for US WorldMeds), Lee Warren, Cal Murray, Brian Bennett and Emily Becker.

249.   Moreover, Assistance Fund understood from OIG guidance (including the OIG Opinion Letters attached hereto as Exhibits G and H, respectively, which are posted on Assistance Fund's website) that it was required to be independent from drug manufacturers and had to follow specific financial guidelines in providing payment assistance to patients, including those using APOKYN.  *See*

Exhibit G (OIG Advisory Opinion No. 10-07 (issued May 26, 2010)); Exhibit H (Notice of Modification of OIG Advisory Opinion No. 10-07 (issued May 19, 2011)).

250.   Indeed, Assistance Fund appears to have obtained the later OIG Opinion letter (Exhibit G) in order to expand Assistance Fund's original scope to providing funding for additional diseases, such as Parkinson's disease.  As that guidance makes clear, Assistance Fund represented that it would be wholly independent from any drug manufacturer and that it would follow specific financial guidelines in awarding patient assistance – and the OIG's opinion that Assistance Fund's assistance would avoid being a kickback under the Anti Kickback Statute was specifically conditioned on the truth of those representations.

251.   Assistance Fund did not, in fact, follow the OIG guidance in funding co-payment assistance for APOKYN to Medicare beneficiaries.  Assistance Fund personnel were in constant communication with US WorldMeds about the funding status of such patients.  Among others, Glenn Esgro, US WorldMeds VP of Managed Markets, communicated with Assistance Fund on a regular basis, as did Cindy Padgett, US WorldMeds Senior Director of Reimbursement.  Ms. Padgett was particularly familiar with personnel at Assistance Fund, as she came to work for US WorldMeds from Assistance Fund.  Lee Warren also communicated directly with Assistance Fund.

252.   Relator has personal knowledge of these communications between US WorldMeds and Assistance Fund.  In his presence, Lee Warren had numerous conversations with Cindy Padgett about why the money US WorldMeds had provided to Assistance Fund was not being spent quickly enough.

253.   The purpose of the communications between US WorldMeds and Assistance Fund was to ensure that every potential APOKYN patient eligible for Medicare (or any other Government Health Care Program) would receive a co-payment, or TrOOP subsidy, from the funds US WorldMeds had provided to Assistance Fund.  To that end, Assistance Fund approved virtually every application for such assistance that it received through US WorldMeds, regardless of the financial condition or other circumstances of the patient, and Assistance Fund personnel communicated directly with US WorldMeds personnel to confirm such coverage.

254.   The working relationship between US WorldMeds and Assistance Fund was so close that on the rare occasion that Assistance Fund questioned whether it could provide assistance to a particular patient, Relator observed that the issue became a major concern at US WorldMeds, leading to numerous communications to convince Assistance Fund to provide the coverage.  US WorldMeds vigorously pursued co-pay assistance for every potential APOKYN

patient, because Lee Warren said every six months a patient was "on drug" was worth $70,000 to US WorldMeds.

255.   For example, in September 2012, US WorldMeds contacted Assistance Fund on behalf of a patient of Dr. Steven Lo, who had been denied assistance because he did not meet any reasonable criteria for coverage by Assistance Fund.  Cindy Padgett, formerly an Assistance Fund employee, directed Jacqui Zurawski (with Health Connections) on September 6, 2012 to contact Assistance Fund to push for the patient to be considered "under hardship," an undefined standard that is not consistent with the income limitations that Assistance Fund purports to apply.

256.   Relator is aware of only one instance in which Assistance Fund declined to provide co-payment assistance to any APOKYN patient, who in that case was a medical doctor making over $600,000 per year.  Assistance Fund purports to limit its charity to those making substantially less.  *See* Kate Santich, *As Drug Costs Soar, Charity Offers Help with Covering Co-Pays*, Orlando Sentinel (Nov. 2, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/11/02/AR2010110207591.html (last visited Mar. 11, 2013).

257.   Assistance Fund receives its funding "mostly from large corporations, including drug manufacturers."  *Id.*  According to Assistance Fund's IRS Form

990s for the years 2009 through 2011, the purported charity received the vast majority of its donations from a handful of unnamed donors contributing over $1 million each.  In 2009, the top donor contributed 98% of the fund's $20,630,025 in contributions and grants; in 2010, the top donor contributed 97.8% of the total $21,389,658; and in 2011, the top donor contributed 73% of the total $41,208,735. In 2011, the number of donors reportable on Schedule B of the Form 990 increased from two or three to 10.  The Assistance Fund redacted the identities of its donors from all of its publicly filed Form 990s.  The amounts contributed by the top donors were:

| Schedule B Reported Donors to Assistance Fund 2011 | | |
|---|---|---|
| **2011** | **2010** | **2009** |
| $30,185,000 | $20,925,000 | $20,230,025 |
| $6,500,000 | $450,000 | $200,000 |
| $1,320,000 | | $200,000 |
| $1,278,000 | | |
| $905,000 | | |
| $865,000 | | |
| $60,000 | | |
| $50,000 | | |
| $25,000 | | |
| $5,000 | | |

258.   Given the peculiar nature of Assistance Fund's funding, the purported charity may be engaging in fraudulent co-pay assistance programs with other pharmaceutical companies.  Because Assistance Fund conceals the identities of its

donors, it is impossible to determine if they are all companies that benefit from Assistance Fund co-pay programs, like US WorldMeds.

259.   As to APOKYN patients who are not beneficiaries of government health care plans, US WorldMeds arranged for the specialty pharmacy filling their prescriptions to receive co-payment coverage directly from US WorldMeds.

260.   Thus, in its APOKYN marketing, US WorldMeds could reliably assure medical doctors that virtually every patient would have little or no co-payment related to the drug.  Indeed, Lee Warren of US WorldMeds advocated to the US WorldMeds sales team, in Relator's presence, that they should assure doctors that no patient would have any co-payment responsibilities for APOKYN, because the occasion on which US WorldMeds or Assistance Fund would reject any application was extremely rare.  That outcome was something US WorldMeds could predict only because of its influence over Assistance Fund's direct participation in the provision of kickbacks to induce sales of APOKYN to Medicare Part D beneficiaries, and the related conspiracy.

261.   In addition, because of the information collected by US WorldMeds and its Circle of Care nurses, as well as information given to US WorldMeds by Assistance Fund, US WorldMeds could estimate the amount of funding Assistance Fund would require to cover future APOKYN co-payments.  On that basis, at the time Relator was dismissed from Quintiles, US WorldMeds was prepared to

provide an additional $1 million to Assistance Fund, earmarked for APOKYN co-payment assistance, as directed by US WorldMeds.

262.   The scheme to cover nearly every patient's APOKYN co-payment also allowed US WorldMeds to protect from scrutiny by patients and their doctors the exorbitant APOKYN prices it put in place as of January 2012.  Because of fear that the inflated price of APOKYN would be scrutinized if medical professionals or patients knew the true cost of the medication, US WorldMeds sales representatives were instructed that they were not to answer any questions about the price of APOKYN and instead were to refer such questions to a public relations group hired by US WorldMeds.  Lee Warren also instructed Relator that he could not share APOKYN revenue data with sales representatives because it was important to "keep how much money" US WorldMeds was making on APOKYN "within a close group."

### B.   The Use of Additional Kickbacks to Induce Prescription of APOKYN

263.   The initiation of APOKYN must follow a protocol designed to ensure the safety of the patient.  The initiation should occur with the patient's M.D. and caregiver present and begins with administration of an initial dose of 0.2 ml of APOKYN.  The patient is then evaluated for severe orthostatic hypotension, in which case further APOKYN therapy is not indicated.  In addition, the patient's

blood pressure is to be monitored at 20, 40 and 60 minutes after administration of APOKYN.

264.   This administration protocol, which is required because of the dangerous nature of APOKYN, particularly in the first administration, requires the patient to remain in the M.D.'s office for a considerable period of time.  It also requires the M.D. to monitor the patient at various times throughout the process.

265.   Defendant US WorldMeds experienced issues with selling APOKYN to doctors because of the time required for the initial administration.  Doctors protested that the administration process took too long and tied up their schedules and offices.

### 1.     "Circle of Care" Kickbacks to Induce APOKYN Prescriptions & Sales

266.   To counteract that issue, US WorldMeds developed a plan to encourage doctors to (1) use nurses paid by US WorldMeds (at a cost of more than $500 per visit, but provided at no charge to the doctors and patients) to provide the initial APOKYN administration and titration, and (2) bill patients and their insurers, including Government Health Care Programs, as if the doctor (not the US WorldMeds nurse) had provided the service and the doctor had spent time with the patient sufficient to bill for a Level 3 or 4 visit, rather than just viewing the patient briefly during the administration.

267.   Specifically, US WorldMeds advised M.D.s prescribing APOKYN to enroll in a program called "Circle of Care," which included the provision of nurses to doctors prescribing APOKYN, free of charge.

268.   The Circle of Care nurses were contracted as independent contractors through EMpeccable meetings(run by Emily Becker), which supplied nurses to US WorldMeds for a fee.

269.   The Circle of Care nurses worked closely with US WorldMeds sales staff.  The nurses also would work closely with physician offices to schedule patients once the APOKYN had been provided to the patient after the M.D. filled out a statement of medical necessity for APOKYN administration.  In addition, the Circle of Care nurses were active in reviewing each APOKYN patient's insurance information to facilitate the patient's receipt of the medication with no out-of-pocket costs for virtually every patient.

270.   The Circle of Care nurses would thus participate in the process of scheduling patients for APOKYN administration for those medical practitioners who followed US WorldMeds' directive to participate in the Circle of Care program.  In addition, the nurses would conduct the initial administration and titration of APOKYN to a consenting M.D.'s patients, providing a service costing more than $500 to US WorldMeds, and valued much higher by the physicians, free of charge, to induce their prescription of APOKYN.  Further, US WorldMeds paid

the nurses to follow-up with patients monthly in order to promote the patients'

continued use of APOKYN.

271.   To engage the Circle of Care program, doctors had only to fill out a

"Statement of Medical Necessity" ("SMN") and submit it to Health Connections to

set the process in motion.  Upon receiving the SMN, Health Connections contacted

the patient and began a benefits investigation within two hours.  Within 24 hours of

receiving the SMN, the benefits investigation would be complete and Health

Connections would obtain any prior-authorizations required by the patient's

insurance and then submit the prescription to the specialty pharmacy and the co-

pay foundation, as well as the Circle of Care nurses.  Within two hours, Circle of

Care would contact the patient, schedule a nurse to visit the patient, and arrange for

the Specialty Pharmacy to contact the patient to coordinate delivery.  Within 24

hours of notice from Health Connections, the Circle of Care assigned nurse would

contact the patient.

272.   The Circle of Care nurse would then contact the patient after five days

and nine days to confirm delivery of the drug and schedule an office appointment

with the doctor, or if the drug did not arrive, contact Health Connections to in turn

contact the Specialty Pharmacy on behalf of the patient.  Upon delivery of the

drug, the Circle of Care nurse would attend the patient's office visit to provide

whatever services the doctor had selected, including injection training and/or injection education.

273.   At the doctor's office, the Circle of Care nurse would administer the patient's APOKYN injection, conduct continued orthostatic blood-pressure monitoring at 20, 40 and 60 minutes post-administration, instruct the patient on self-administration technique for subsequent treatments, document the patient's response and adverse effects, and provide the patient with written instructions.  The doctor had only to be present briefly at the outset to document that the patient was in an "off-state" and again at 20 and 60 minutes to verify a positive response and answer questions.

274.   In addition to the in-office administration and education service, the doctor could also elect for the Circle of Care nurse to perform pre-initiation counseling on the phone, post-initiation counseling on the phone, post-initiation education at the patient's home or any combination thereof.

275.   After providing injection services, the Circle of Care nurse had to fax paperwork to the Circle of Care manager, who would in turn contact Health Connections and the doctor's office regarding maintenance doses.

276.   The previous company marketing APOKYN, Ipsen, operated a nurse program as well, but concluded on the advice of legal counsel that to have nurses provide services to patients at home was an illegal inducement (kickback) and

ceased the practice.  During US WorldMeds' acquisition of the marketing rights to APOKYN, Ipsen informed US WorldMeds of this concern.  US WorldMeds ignored Ipsen's warning and provided Circle of Care nurse services to patients at home.  Additionally, US WorldMeds disregarded the limitation Ipsen placed on nurse services requiring that doctors or office staff themselves perform all blood pressure monitoring, and loading, priming and dialing of a patient's APOKYN injections.  US WorldMeds instead directed Circle of Care nurses to perform all of those functions in order to increase the service's value to doctors, who could then seek reimbursement for the initiation procedure without having even administered the drug.

### 2.    Other Kickbacks to Induce APOKYN Prescriptions & Sales

277.   As a key part of introducing potential prescribers to APOKYN and the "Circle of Care" benefits provided free by US WorldMeds, physicians throughout the country were paid by US WorldMeds to attend weekend seminars at luxury hotels in order to persuade them to order APOKYN for their patients.

278.   Although these seminars were described by US WorldMeds as relating to the provision of information to US WorldMeds from prescribers of APOKYN, in fact, the attendees were selected because of their potential to generate additional prescriptions for (and sales of) APOKYN.  Indeed, many of the attendees were invited to the seminars through efforts resembling standard direct marketing

techniques, such as by invitation based on information from mailing lists and directory searches, rather than based on the provider's ability to provide legitimate information to US WorldMeds.

279.   These seminars were led by individuals who were known by US WorldMeds to be major users of its products, including APOKYN.  US WorldMeds paid the presenters – thousands of dollars for speaking briefly and also over a thousand dollars for "attending" the meeting – far more than the industry norm.

280.   The meetings were also attended by US WorldMeds sales personnel, including Relator, as well as US WorldMeds executives such as Glenn Esgro, Breck Jones, Brian Broihier, Henry van den Burg, Cindy Padgett, and Lee Warren, as well as George Esgro from Quintiles and Emily Becker and various Circle of Care nurses.

281.   For example, one such meeting, which US WorldMeds called a "Parkinson's/APOKYN Key Opinion Leader" meeting was held at the Ritz Carlton, in Atlanta, Georgia, on February 25, 2012.  For that meeting, US WorldMeds paid Linda Sigmund, M.D., $5,000 to help organize the meeting plus another $5,000 to make a 45-minute presentation to 59 physicians who were each being paid $1500 plus all travel, lodging, and meal expenses to attend the meeting. Dr. Sigmund and each of the other speakers was also compensated $1500 for attending the meeting, all expenses paid, on top of their speaking fees.  Moreover,

US WorldMeds influenced the content of the presentations and slide-decks, and retained ultimate authority to decide what the presenters said. Dr. Sigmund's presentation, for example, included tips on how the prescribing doctor only needed to engage in a "[b]rief visit" with the patient being initiated on APOKYN, at 20 minutes and 60 minutes into the process, and "can continue to see other patients" at the same time, while a nurse actually administers the drug.

282.   The Atlanta meeting also included a presentation from Emily Becker about the "APOKYN Patient Program" ("APP") provided by US WorldMeds. She explained that APOKYN initiations could be scheduled and performed by the US WorldMeds "Circle of Care" nurses.

283.   Ms. Becker also discussed, among other things, that dealing with Medicare/Government reimbursement was a key part of the APP, which she described as a "Reimbursement Hub." The attendees were told that US WorldMeds would handle insurance issues and any co-payments, including through the "Assistance Fund Disease State Fund," which she stated "offers copay assistance for certain specialty products associated with Idiopathic Parkinson's disease," especially for Government Health Care Program beneficiaries. Indeed, US WorldMeds had defined the scope and name of that Assistance Fund to ensure that the vast majority of proceeds US WorldMeds paid to the fund would be used to

cover APOKYN co-payments for participants in Government Health Care Programs, such as Medicare and Medicaid.

284.   Glenn Esgro explained how the physician and patient should fill out the "APOKYN® Statement of Medical Necessity (SMN) Form" in order to participate in these activities, which were referred to as "APOKYN marketing programs" in his presentation powerpoint.

285.   The presentations made at the Atlanta meeting were designed to educate the attending physicians about ordering APOKYN, and taking advantage of US WorldMeds "APOKYN marketing programs" such as the Circle of Care nurses and Assistance Fund reimbursements, to stimulate the sales of APOKYN. Although the "Consulting Agreement for Key Opinion Leader Meetings" between US WorldMeds and the attending physicians stated that each physician "is experienced with the administration and use of APOKYN," and that US WorldMeds was holding the meeting "to obtain the benefit of the expertise, knowledge and experience of" the attending physician, the meetings were, in fact, sales promotions, at which attending physicians were provided items of value, including travel, lodging, gifts, and cash payments, in order to induce their purchase of APOKYN, including for patients who US WorldMeds and Quintiles knew would be submitting claims to Medicare and Medicaid programs.

286.   Indeed, almost 200 physicians from around the country were invited to the Atlanta meeting – despite the fact that US WorldMeds had no information about the specialty area of several of them and obtained their names from the prior company that had marketed APOKYN in the United States.

287.   The total cost to US WorldMeds for the Atlanta marketing program was more than $230,000.  That amount included $25,000 paid to speakers, including Linda Sigmund and Renee Pfeiffer, a Certified Nurse Practitioner, who were among the Top 10 prescribers of APOKYN in 2012.

288.   The following table summarizes the attendance and money provided by US WorldMeds to medical professionals at the Atlanta KOL meeting:

| Key Opinion Leader ("KOL") Meeting February 24-25, 2012 Ritz Carlton: Atlanta, GA | | |
|---|---|---|
| *Presenters* | *Credentials* | *Paid by US WorldMeds* |
| Linda Sigmund | Director, Movement Disorders Center Neurology Center of Fairfax Medical Director, Parkinson Foundation of the National Capitol Area | $10,000 |
| Renée Pfeiffer, CRNP | Allegheny General Hospital | $5,000 |
| Peter LeWitt | Professor of Neurology Wayne State University School of Medicine | $5,000 |

| William Ondo, M.D. | Professor<br>University of Texas Medical<br>Science Center | $5,000 |
| | | |
| *Attending Physician* | *Physician Location* | *Paid by US WorldMeds* |
| Mohammad Alsorogi | Norton Healthcare<br>5813 Laurel Lane<br>Prospect, KY 40059 | $1,500 |
| Vikki Alvarez | Center for Neurological Care and Research<br>6014 Noble Night<br>San Antonio, TX 78255 | $1,500 |
| Mark Baron | Virginia Commonwealth University<br>2315 West Grace Street<br>Richmond, VA 23220 | $1,500 |
| Taylor Bear | Mercy Clinic<br>2611 East 15th Street<br>Joplin, MO 64804 | $1,500 |
| Malcolm Berger | Neurology Associates of Western Pennsylvania<br>985 Penn Street, Suite A<br>Brackenridge, PA 15014 | $1,500 |
| Xabier Beristain | Neurology Indiana<br>242 Stratford Way<br>Danville, IN 46122 | $1,500 |
| Jacqueline Cristini | New Jersey Neuroscience Institute<br>65 James Street<br>Edison, NJ 08818 | $1,500 |
| Brenda Crum | Aysegul Soyer MD PLC<br>2840 Barrley Drive<br>Dumfries, VA 22191 | $1,500 |
| Thomas Davis | Vanderbilt<br>4852 Fredericksburg Drive<br>Nashville, TN 37215 | $1,500 |

| | | |
|---|---|---|
| Joy Antonelle Demarcaida | Eastern Connecticut Neurology Specialists<br>94 Mountain Road<br>Glastonbury, CT 06033 | $1,500 |
| Boyd Dwyer | Mid-Maryland Neurology<br>172 Thomas Johnson Drive #202<br>Frederick, MD 21702 | $1,500 |
| Nasrollah Eslami | Neurology Neurodiagnostic Lab<br>1004 First Street, North Suite 330<br>Alabaster, AL 35007 | $1,500 |
| Joseph Ferrara | Virginia Tech Carilion School of<br>   Medicine and Research Institute<br>1759 Fernwood Avenue<br>Louisville, KY 40205 | $1,500 |
| Stanley Fisher | Methodist Neurological Institute<br>6560 Fannin Street, Suite 802<br>Houston, TX 77030 | $1,500 |
| Alan Freeman | Emory University<br>1841 Clifton Road<br>Atlanta, GA 30329 | $1,500 |
| Bruno Vincenzo Gallo | ONS, Inc.<br>1581 Brickell Avenue, Suite 1107<br>Miami, FL 33129 | $1,500 |
| William Gaya | William Gaya, M.D., P.A.<br>801 S.W. First Avenue<br>Ocala, FL 34471 | $1,500 |
| Aneeta Gupta | Carolina Neurology Center, P.L.L.C.<br>50 Hospital Drive<br>Hendersonville, NC 28792 | $1,500 |
| Philip Hanna | New Jersey Neuroscience Institute<br>412 Plainfield Road<br>Edison, NJ 08820 | $1,500 |
| Chester Haworth | Cornerstone Healthcare<br>1814 Westchester Drive, Suite 401<br>High Point, NC 27262 | $1,500 |
| John Hennessey IV | Associated Neurologists P.C.<br>1401 Johnston Willis Drive<br>Richmond, VA 23235 | $1,500 |

| | | |
|---|---|---|
| Mechel Henry | Mechel M. Henry M.D. Inc.<br>1300 Clay Street, Suite 600<br>Oakland, CA 94612 | $1,500 |
| Stuart Isaacson | Parkinson's Disease and Movement<br>  Disorders Center of Boca Raton<br>951 N.W. 13th Street, Building 5-E<br>Boca Raton, FL 33486 | $1,500 |
| Linda Jaffe | Kaiser Permanente<br>5752 Bellevue Avenue<br>La Jolla, CA 92307 | $1,500 |
| Michael Jaffe | Kaiser Permanente<br>5752 Bellevue Avenue<br>La Jolla, CA 92307 | $1,500 |
| Allan Kirkland | Kirkland Family Medical Center<br>P.O. Box 700<br>Dardanelle, AR 72834 | $1,500 |
| William Knubley | Cooper Clinic<br>6801 Rogers Avenue<br>Fort Smith, AR 72903 | $1,500 |
| David L Kreitzman | Parkinson's Disease and Movement<br>  Disorders Center of Long Island<br>283 Commack Road, Suite 101<br>Commack, NY 11725 | $1,500 |
| Peter LeWitt | Henry Ford Hospital<br>4515 Walden Drive<br> Bloomfield Hills, MI 48301 | $1,500 |
| Padma Mahant | Padma R. Mahant<br>2610 North 3rd Street, Suite A<br>Phoenix, AZ 85004 | $1,500 |
| David Margolin | Margolin Brain Institute<br>1515 East Alluvial Avenue<br>Suite 101<br>Fresno, CA 93720 | $1,500 |
| Shyamal Mehta | Georgia Health Sciences<br>University<br>356 Heath Way<br>Augusta, GA, 30907 | $1,500 |

| | | |
|---|---|---|
| Elliot Michel | Valley Neurology, Inc.<br>102 Fawn Meadow Court<br>Pittsburgh, PA 15238 | $1,500 |
| Eric Molho | Albany Medical Center<br>103 Bender Lane<br>Delmar, NY 12054 | $1,500 |
| Rajiv Nanavaty | Neurology Associates of Suffolk<br>150 Burnetts Way, Suite 320<br>Suffolk, VA 2343 | $1,500 |
| William Ondo | UT Houston<br>3823 Gramercy Street<br>Houston, TX 77025 | $1,500 |
| Padraig O'Suilleabhain | Padraig O'Suilleabhain<br>5856 Bedrock Drive<br>Plano, TX 75903 | $1,500 |
| Stacey Panasci | Springfield Neurology Associate<br>72 North Circle Drive<br>East Longmeadow, MA 01028 | $1,500 |
| Dhruvkumar Patel | Neurology Center Inc.<br>31780 Leeward Court<br>Avon Lake, OH, 44012 | $1,500 |
| Renee Pfeiffer | Allegheny Neurological Associates<br>4966 Hardt Road<br>Gibsonia, PA 15044 | $1,500 |
| Richard Rhee | Jersey Shore Neurology P.A.<br>1900 Corlies Avenue<br>Neptune, NJ 07753 | $1,500 |
| Angela Russell | University of Miami<br>18433 S.W. 87 Place<br>Miami, FL 33157 | $1,500 |
| William Lawrence Severt | Beth Israel Medical Center<br>10 Union Square East Suite 5K<br>New York, NY 10003 | $1,500 |
| Syed Shah | Syed Shah, M.D.<br>1007 Martin Luther King Drive<br>Centralia, IL 62801 | $1,500 |
| Linda Sigmund | Neurology Center of Fairfax<br>5414 North 19th Street<br>Arlington, VA 22205 | $1,500 |

| | | |
|---|---|---|
| Sidney Spector | VA Medical Center, Phoenix<br>5441 East Kelton Lane<br>Scottsdale, AZ 85254 | $1,500 |
| John Steel | CCHC-Atlantic Neurology<br>2861 Trent Road<br>New Bern, NC 28562 | $1,500 |
| Paul Szwejbka | Cumberland Neurology, P.A.<br>4211 Ferncreek Drive<br>Fayetteville, NC 28314 | $1,500 |
| Harry Tamm | Phoenix Neurological Associates<br>5090 North 40th Street<br>Phoenix, AZ 85015 | $1,500 |
| Danette Taylor | Henry Ford Health Systems<br>45754 Fermanagh Drive<br>Northville, MI 48168 | $1,500 |
| Jennifer Theis | Freeman NeuroSpine<br>121 Jill Boulevard<br>Webb City, MO 64870 | $1,500 |
| Kimberly Trinidad | SUNY at Buffalo<br>200 Sterling Park, Suite 300<br>Orchard Park, NY 14157 | $1,500 |
| Michael Vickers | Neuroscience and Spine Associates<br>17010 Porta Vecchio Way #102<br>Naples, FL 34110 | $1,500 |
| Lawrence Weinberg | Northridge Neurological Center<br>18433 Roscoe Boulevard<br>Suite 108<br>Northridge, CA 91325 | $1,500 |
| Valerie Whitney | The Neurology Group, LLP<br>567 Oak Hill Road<br>Averill Park, NY 12018 | $1,500 |
| Steven Wolf | Neurology Specialist<br>9301 Golf Road<br>Des Plaines, IL 60016 | $1,500 |

289.   Notably, Michael Jaffe was paid to attend even though he does not

treat Parkinson's disease; rather, his wife does and was attending the KOL meeting,

and Dr. Michael Jaffe is a high prescriber of MYOBLOC.  US WorldMeds also

paid for the Jaffes to spend an extra night at the Ritz Carlton.

290.   Similar presentations were repeated for so-called "Key Opinion

Leader" meetings at the Loews Hotel in Philadelphia, PA on April 14, 2012, and at

the Palazzo Hotel, in Las Vegas, Nevada, on October 27, 2012.  In Las Vegas, 75

physicians also heard from Dr. Sigmund about how the prescribing doctor only

needed to engage in a "[b]rief visit" with the patient being initiated on APOKYN,

at 20 minutes and 60 minutes, and "can continue to see other patients" at the same

time, while a nurse actually administers the drug.   Dr. Sigmund received an

additional $5000 plus expenses for this 45-minute presentation plus an attendance

fee.

291.   The following table summarizes the attendance and money provided

by US WorldMeds to medical professionals at the Las Vegas KOL meeting:

| APOKYN Key Opinion Leader ("KOL") Meeting<br>October 27, 2012<br>Palazzo Hotel: Las Vegas, NV | | |
|---|---|---|
| *Presenters* | *Credentials* | *Paid by US WorldMeds* |
| Linda Sigmund, M.D. | Director, Movement Disorders Center Neurology Center of Fairfax<br><br>Medical Director, Parkinson Foundation of the National Capital Area | $8500 |

| | | |
|---|---|---|
| Mark Lew, M.D., F.A.A.N. | Professor of Neurology, Director, Division of Movement Disorders Keck/USC School of Medicine | $5,000 |
| Stuart Isaacson, M.D. | Associate Professor, Florida International University, Wertheim School of Medicine<br><br>Director, Parkinson's Disease and Movement Disorders Center of Boca Raton | $5,000 |
| Ray Chaudhuri, M.D. | Professor, National Parkinson Foundation International Centre of Excellence and King College/University Hospital Lewisham | $5,000 |

| Attending Physician | Physician Location | Paid by US WorldMeds |
|---|---|---|
| Patrick Grogan | Brooke Army Medical Center San Antonio, TX 78236 | $1,500 |
| William Lawrence Severt | Beth Israel Medical Center 10 Union Square East, Suite 5K New York, NY 10003 | $1,500 |
| Vikkia Alvarez | Center for Neurological Care and Research 9150 Huebner Road, #160 San Antonio, TX 78240 | $1,500 |
| Harry Kerasidis | Chesapeake Neurology Associates 130 Hospital Road, #101 Prince Frederick, MD 20678 | $1,500 |
| Dee Silver | Coastal Neurological Medical Group, Inc. 9850 Genesee Avenue, #740 La Jolla, CA, 92037 | $1,500 |
| Alan Freeman | Emory University 1841 Clifton Road Atlanta, GA 30329 | $1,500 |
| Fahd Amjad | Georgetown 10710 Muirfield Drive Potomac, MD 20854 | $1,500 |

| Peter LeWitt | Henry Ford Hospital<br>6777 West Maple Road<br>West Bloomfield, MI 48322 | $1,500 |
|---|---|---|
| Ricardo Pardo | Jacinto Medical Group<br>2800 Garth Road<br>Baytown, TX 77521 | $1,500 |
| Johan Samanta | Johan Samanta, M.D., P.C.<br>2610 N 3rd Street, Suite #A<br>Phoenix, AZ 85004 | $1,500 |
| Linda Jaffe | Kaiser Permanente<br>4650 Palm Avenue<br>San Diego, CA 92154 | $1,500 |
| Susan Imke | Kane Hall Barry Neurology<br>1305 Airport Freeway, #205<br>Bedford, TX 76021 | $1,500 |
| Kelvin Ma | Kelvin K Ma, M.D, Inc.<br>201 15th Avenue, S.W., Unit D,<br>Puyallup, WA, 98371 | $1,500 |
| Ray Chadhuri | Kings College Hospital,<br>Denmark Hill, London SE5 9RS, UK | $1,500 |
| Richard Trosch | Michigan Health Professionals, P.C.,<br>26400 West 12 Mile Road, Suite 110<br>Southfield, MI 48034 | $1,500 |
| Earl Wilson | Mountain Empire Neurological<br>Associates<br>3183 West State Street, Suite 1201<br>Bristol, TN  37620 | $1,500 |
| Virgilio Evidente | Movement Disorders Center of Arizona,<br>9590 E Ironwood Square Drive, #225<br>Scottsdale, AZ 85258 | $1,500 |
| Daniel Nieves | Neurology Associates, P.A.<br>301 North Maitland Avenue<br>Maitland, FL  32751 | $1,500 |
| Linda Sigmund | Neurology Center of Fairfax<br>5414 North 19th Street<br>Southfield, MI  48034 | $1,500 |
| Dung Nguyen | Neurology Consultants<br>1102 Orchard<br>Arlington, TX 76012 | $1,500 |

126

| Kenneth Levin | Neurology Group Of Bergen County, 1200 East Ridgewood Avenue Ridgewood, NJ 07450 | $1,500 |
|---|---|---|
| Linda Linda | Neurology Specialists of Jupiter, P.A. 601 University Boulevard, Suite 102 Jupiter, FL 33458 | $1,500 |
| Miran Salgado | New York Methodist Hospital 263 7th Avenue, #4A Brooklyn, NY 11215 | $1,500 |
| Guy Schwartz | NS-LIJ Health System 611 Northern Boulevard, #150 Great Neck, NY 11021 | $1,500 |
| Stuart Isaacson | Parkinsons Disease Movement Disorder Center 951 N.W. 13th Street Boca Raton, FL 33486 | $1,500 |
| Nicklesh Thankur | Sutter Medical Group 2800 L Street, #500 Sacramento, CA 95816 | $1,500 |
| Stephen Farmer | The Neurology Center of Wichita Falls, 1600 7th Street, Suite B Wichita Falls, TX 76301 | $1,500 |
| David Shprecher | University of Utah 729 Arapeen Drive Salt Lake City, UT 84108 | $1,500 |
| Theodore Faber | USC Neurology 8 Medical Park, Suite 420 Columbia, SC 29203 | $1,500 |
| Mark Lew | 1520 San Pablo Street, 3rd Floor Los Angeles, CA 90033 | $1,500 |

292.   US WorldMeds also paid medical professionals to attend more than one KOL meeting, although the same marketing information was presented at each one.  In addition, several of the individuals in attendance did not treat Parkinson's disease and, on at least one instance, US WorldMeds paid for a nonmedical office

assistant to attend a KOL Meeting.  Specifically, US WorldMeds paid $1,500 to

Anthony Chambers, an office assistant, to attend the KOL meeting in Las Vegas on

October 27, 2012, because Mr. Chambers has influence over the level of APOKYN

use by his employer.  Mr. Chambers has since submitted nine new patients for

APOKYN; the practice had only two before Mr. Chambers was paid to attend the

KOL Meeting.  US WorldMeds also paid Mr. Chambers to attend a speaker

training in Miami, even though he is neither a doctor nor a nurse who could

become a speaker on the APOKYN uses discussed at the speaker trainings.

293.   Linda Sigmund's presentation at the Las Vegas KOL meeting was

followed by a presentation from Cindy Padgett, Senior Director, Reimbursement &

Contract Compliance at US WorldMeds and Emily Becker, Circle of Care Program

Coordinator.  As Glenn Esgro had at the Atlanta meeting, Ms. Padgett and Ms.

Becker instructed the attendees that APOKYN initiations could be scheduled and

performed by the US WorldMeds "Circle of Care" nurses, and that the doctors

should order all such services available to them.

294.   Similarly, the doctors were told that US WorldMeds would handle

insurance issues and any co-payments, including through a "[d]onation driven

disease state copay program" for nonprivate (e.g., government) health care

programs.

295.   As with the attendees of the Atlanta meeting, the physicians in attendance at the Las Vegas and Philadelphia meeting were not invited because of their existing familiarity with APOKYN.  Rather, the meetings were tools to market APOKYN to additional doctors, and cost US WorldMeds more than $250,000.

296.   That the purpose of the Las Vegas KOL meeting was to push sales of APOKYN was made very clear by the conduct of Lee Warren at the meeting. Although he was no longer employed at US WorldMeds, Relator learned that Mr. Warren took the podium at the beginning of the Las Vegas KOL meeting and told attendees that US WorldMeds "loves" them and "to buy APOKYN."

297.   Similar statements were made at the KOL meeting in Philadelphia, PA, as at the other KOL meetings.  A list of attendees and funds provided by US WorldMeds follows:

| Key Opinion Leader ("KOL") Meeting April 14, 2012 Loews Hotel, Philadelphia, PA | | |
|---|---|---|
| *Presenters* | *Credentials* | *Paid by US WorldMeds* |
| Linda Sigmund, M.D. | Director, Movement Disorders Center Neurology Center of Fairfax<br><br>Medical Director, Parkinson Foundation of the National Capitol Area | $8,500 |
| William Ondo, M.D. | Professor, University of Texas Medical Science Center | $5,000 |

| Peter LeWitt, MD | Professor of Neurology<br>Wayne State University School of Medicine | $5,000 |
| Ray Chaudhuri, M.D. | Professor, National Parkinson Foundation<br>International Centre of Excellence and King College/University Hospital Lewisham | $5,000 |
| | | |
| *Attending Physician* | *Physician Location* | *Paid by US WorldMeds* |
| Rizwan Akhtar | University of Pennsylvania<br>330 South 9th Street, Second Floor<br>Philadelphia, PA 19146 | $1,500 |
| Vikki Alvarez | Center for Neurological Care and Research<br>9150 Huebner, Suite 160<br>San Antonio, TX 7820 | $1,500 |
| Ronald Aung-Din | Ronald Aung-Din, MD, PA<br>3501 Cattlemen Road<br>Sarasota, FL 34232 | $1,500 |
| Shaheda Azher | MidHudson Medical Group<br>30 Columbia Street<br>Poughkeepsie, NY 12601 | $1,500 |
| Laxman Bahroo | Georgetown University Hospital<br>6213 Loch Raven Drive<br>Mclean, VA 22101 | $1,500 |
| Wendy Besler-Panos | Michigan Neurology Associates<br>153 Ridgemont Road<br>Grosse Pointe Farms, MI 48236 | $1,500 |
| Debashis Biswas | Adult Neurology Clinic, PLLC<br>7900 Airways Boulevard, Building A Suite 4<br>Southaven, MS 38671 | $1,500 |

| | | |
|---|---|---|
| Lama Chahine | Parkinson's Disease and Movement Disorders Center Penn Medicine Neuroscience Center Pennsylvania Hospital 330 South 9th Street, 3rd Floor Neurology Philadelphia, PA 19107 | $1,500 |
| Mohammad Choudhary | Rolla Neurology 604 West 6th Street Rolla, MO 65401 | $1,500 |
| Amy Colcher | University of Pennsylvania 64 Raynham Road Merion Station, PA 19066 | $1,500 |
| Khashayar Dashtipour | Loma Linda University 2315 Dunes Tustin, CA 92782 | $1,500 |
| Eric Farbman | University of Nevada School of Medicine 269 Fortifying Crest Court Henderson, NV 89052 | $1,500 |
| Hubert Fernandez | Cleveland Clinic 9500 Euclid Avenue, U-2 Cleveland, OH 44195 | $1,500 |
| Mandeep Garewal | Neurology Associates of Ormond Beach 2 Spanish Pine Way Ormond Beach, FL 32174 | $1,500 |
| Ramon Gil | Parkinson's Disease Treatment Center of Southwest Florida 4235 Kings Highway, Suite 102 Port Charlotte, FL 33980 | $1,500 |
| Peter Hedera | Vanderbilt Neurology Group 4117 General Bate Drive Nashville, TN 37204 | $1,500 |
| Claire Henchcliffe | Weill Cornell Medical Center 400 East 59th Street, #2F New York, NY 10022 | $1,500 |
| Neng Huang | Valley Parkinson Clinic 800 Pollard Road, C30 Los Gatos, CA 95032 | $1,500 |

| | | |
|---|---|---|
| Zhigao Huang | University of Florida<br>8768 Harpers Glen Court<br>Jacksonville, FL 32256 | $1,500 |
| Prasad Kanneganti | Prevea<br>719 Edge Point Court<br>De Pere, WI 54115 | $1,500 |
| Daniel Kassicieh | Sarasota Neurology, PA<br>3501 Cattlemen Road, Suite B<br>Sarasota, FL 34232 | $1,500 |
| Brad Klein | Abington Neurological Associates, Ltd<br>102 Providence Drive<br>Richboro, PA 18954 | $1,500 |
| Peter Lewitt | 4515 Walden Drive<br>Bloomfield Hills, MI 48301 | $1,500 |
| Steven Lo | Georgetown University Hospital<br>3800 Reservoir Road NW, 7 PHC<br>Washington, DC 20007 | $1,500 |
| Manoj Malhotra | Harlem Hospital<br>13 Lydia Drive<br>Guttenberg, NJ 07093 | $1,500 |
| Zoltan Mari | Johns Hopkins University<br>600 North Wolfe Street<br>Baltimore, MD 21287 | $1,500 |
| Shyamal Mehta | Georgia Health Sciences University<br>1429 Harper Street, Building HF-1121<br>Augusta, GA 30912 | $1,500 |
| Gemma Mendoza | Kurtell Medical Office<br>787 37th Street  E 210<br>Vero Beach, FL 32960 | $1,500 |
| William Ondo` | 6550 Fannin Street<br>Houston, TX 77030 | $1,500 |
| Ciceron L. Opida | Advanced NeuroGeriatric Care<br>514 East Pleasant Valley Boulevard, Suite #3<br>Altoona, PA 16602 | $1,500 |
| Fernando Pagan | 3800 Resevoir Road, N.W.<br>Washington, D.C. 20007 | $1,500 |
| Renee Pfeiffer | 490 East North Avenue<br>Pittsburgh, PA 15212 | $1,500 |

132

| | | |
|---|---|---|
| Ronald Pfeiffer | University of Tennessee Health Science Center<br>University of Tennessee HSC<br>Department of Neurology<br>855 Monroe Avenue<br>Memphis, TN 38163 | $1,500 |
| Sumant Rawat | Pueblo Neurology<br>1925 East Orman Avenue, #G32<br>Pueblo, CO 81004 | $1,500 |
| Mustafa Siddiqui | Wake Forest University School of Medicine<br>Department of Neurology, 9th Floor<br>Wake Forest Baptist Health<br>Medical Center Boulevard<br>Winston-Salem, NC 27157 | $1,500 |
| Linda Sigmund | 3020 Hamaker Court, Suite 400<br>Fairfax, VA 22031 | $1,500 |
| Tanya Simuni | Northwestern University<br>392 Jackson Avenue<br>Glencoe, IL 60022 | $1,500 |
| Randolph Stephenson | Neurology Center of Fairfax<br>10022 Lochness Court<br>Vienna, VA 22181 | $1,500 |
| David Swope | Loma Linda University<br>266 East Crescent Avenue<br>Redlands, CA 92373 | $1,500 |
| Madhavi Thomas | North Texas Movement<br>   Disorders Institute, Inc<br>4604 Bill Simmons Road<br>Colleyville, TX 76034 | $1,500 |
| Alberto Vasquez | Central Neurology<br>2201 Central Avenue<br>Saint Petersburg, FL  33713 | $1,500 |
| Gwyn Vernon | University of Pennsylvania<br>Comprehensive<br>   Neuroscience Center<br>9 Byre Lane<br>Wallingford, PA 19086 | $1,500 |

| Benjamin Walter | Case Western Reserve University School of Medicine 3481 Trailview Court Brunswick, OH 44212 | $1,500 |
|---|---|---|
| Cheryl Waters | CU 55 Mamaroneck Road Scarsdale, NY 10583 | $1,500 |
| Valerie C. Whitney R-PAC | The Neurology Group 567 Oak Hill Road Averill Park, NY 12018 | $1,500 |
| Ronald Wilson | Brentwood Neurology 343 Franklin Road Brentwood, TN 37027 | $1,500 |
| Sanjay Yathiraj | Pinnacle Medical Group | LECOM 9222 13th Avenue Circle NW Bradenton, FL 34209 | $1,500 |
| Brandon Yehl | Louis H. Medved Neurology 948 Lothario Circle Webster, NY 15480 | $1,500 |

298.   US WorldMeds also held a similar meeting to educate 27 nurses on how they could stimulate APOKYN use as part of the "Circle of Care" nurse group, including a presentation on April 13, 2012, at the Loews Philadelphia Hotel, which included the same material on the APP Program from the Atlanta KOL meeting, a presentation from Renee Pfeiffer on how to motivate patients and caregivers to use APOKYN, and Linda Sigmund's instructions on how nurses could administer APOKYN.  Dr. ikki Alvarez also made a presentation on the "Experience of a New Customer" for APOKYN.  Nurses were paid to attend their own KOL meeting as well as the KOL meeting in Philadelphia the next day so that they could build a relationship with doctors in their area.

299. The Philadelphia nurses' meeting was scheduled for the day before the

KOL meeting in Philadelphia so that the attending nurses could stay for the KOL

meeting to meet physicians and encourage them to use COC services.

300. The following table summarizes attendance and payments made by

US WorldMeds at the nurses' meeting in Philadelphia, PA:

| Apokyn Nurse Meeting<br>April 12-13<br>Loews Hotel: Philadelphia, PA | | |
|---|---|---|
| *Presenters* | *Affiliation* | *Paid by US WorldMeds* |
| Christa Jones-Hooker, B.S.N., R.N. | Circle of Care | $2,000 |
| Renee Pfeiffer, C.R.N.P. | Allegheny General Hospital | $5,000 |
| Linda Sigmund, M.D. | Neurology Center of Fairfax; Parkinson Foundation of National Capitol Area | $2,500 |
| Vikki Alvarez, M.D. | | $2,000 |
| *Attending Nurse* | *Association* | *Address* | *Paid by US WorldMeds* |
| Heather Acuna | Circle of Care | 6012 Jackling Way, West Jordan, UT 84801 | $1,000 |
| Kristi Archer | Apokyn Nurse | 10705 North Arrowhead, Spokane, WA 99208 | $1,000 |
| Shannon Armstrong | EMpeccable Meetings | 412 Stonewater Bay, Mount Holly, NC 28120 | $1,000 |
| Emily Becker | Circle of Care | 1321 Stone Manor Drive, Raleigh, NC 27610 | $1,000 |

| Amy Borcherding | Apokyn Nurse | 7601 W. 147th Terrace, Overland Park, KS 66223 | $1,000 |
|---|---|---|---|
| Karyn Boyar | Circle of Care | 327 East 89th Street, New York, NY 10128 | $1,000 |
| Sonia Cantu | Center for Neurological Care and Research | 6333 Village Arbor, San Antonio, TX 78250 | $1,000 |
| Jeremy Clower | Circle of Care | 810 VZ County Road 4103, Canton, TX 75103 | $1,000 |
| Kelly L. DeVito | Apokyn Nurse Trainer | 335 Fielding Drive, Pittsburgh, PA 15235 | $1,000 |
| Amy Douglass | New England Nursing Solutions | 201 U.S. Route 1 #244, Scarbrough, ME 04704 | $1,000 |
| Carol Eickhorn | Ipsen | 4460 N.W. 16 Avenue, Oakland Park, FL 33309 | $1,000 |
| Phyllis Gallagher | Phyllis L. Gallagher, R.N. P.C. | 73 Hampshire Road, Rockville Center, NY 11570 | $1,000 |
| Andrea Hess | Circle of Care | 3835 Westwood Court, Brookfield, WI 53005 | $1,000 |
| Brett Holbert | Circle of Care | 420 Gunston Hall Drive, Milton, GA 30004 | $1,000 |
| Annette James | EMpecable Meetings | 374 Tradewind Court, Westerville, OH 43081 | $1,000 |
| Christa Julianne Jones-Hooker | Circle of Care | 4001 Glen Laurel Drive, Raleigh, NC 27612 | $1,000 |
| Marye D. Kellerman | Circle of Care | 1512 Glen Keith Boulevard, Towson, MD 21286 | $1,000 |

| Olivia Ann Knudsen | Circle of Care | 6747 Van Leuven Lane, Highland, CA 92346 | $1,000 |
|---|---|---|---|
| Linda Low | EMpeccable Meetings | 21 Harvington Road, Tonawanda, NY 14150 | $1,000 |
| Mildred Lore Mahon | EMpeccable Meetings | 5723 East Cherokee Drive, Canton, GA 30115 | $1,000 |
| Kimberly Martin | Colorado Neurological Institute | 880 Tenderfoot Drive, Larkspur, CO 80118 | $1,000 |
| Paula Moody | Independent Conractor | 1987 Glen Cove, Homewood, AL 35209 | $1,000 |
| Loretta Ninivaggi | Apokyn Nurse | 18 Princeton Drive, Howell, NJ 07731 | $1,000 |
| Therese Shaw Pineda | Circle of Care | 332 West Brisa Drive, Gilbert, AZ 85233 | $1,000 |
| Peggy Roberge | Circle of Care | 6400 Rock Run Road, Chesterfield, CA 23832 | $1,000 |
| Judith Slover-Zipf | Meridian Medical Associates | 1304 Berkeley Avenue, Ocean, NJ 07712 | $1,000 |
| Cherylene Whittington | Circle of Care | 5517 Amber Circle North, Benton, AR 72015 | $1,000 |
| Lori Worthington | Circle of Care | 11302 Muirfield Trace, Fishers, IN 46037 | $1,000 |
| Christy Zeegen | EMpeccable Meetings | 11824 Darlington Avenue #103, Los Angeles, CA 90049 | $1,000 |

**DEFENDANTS KNEW THEIR CONDUCT CAUSED FALSE CLAIMS**

301.   Defendants were aware that their conduct induced Medical Providers and Patients/Pharmacies to submit claims for off-label MYOBLOC use and APOKYN to Medicare, Medicaid, and other Government Health Care Programs.

302.   Among other things, Defendant US WorldMeds, with the knowledge of Quintiles personnel, including George Esgro, maintained detailed records of the number of patients receiving each drug, and the corresponding insurance coverage. This information supported that 60% of MYOBLOC sales and 70% of APOKYN sales involved the submission of claims to Medicare, and that 10% of the sales of each drug involved the submission of claims to Medicaid.  Additional sales involved claims submitted to other governmental health care programs.

**DEFENDANTS' CONSPIRACY TO
OFFER KICKBACKS TO MEDICAL PROVIDERS**

303.   By way of further example, Relator offers the following information about Defendants' activities in promoting the sale of MYOBLOC and APOKYN:

    a.   For example, as recently as February 2013, US WorldMeds sent the corporate jet to pick up Dr. Vikki Alvarez and Dr. Grogan, and their office assistant, in San Antonio, Texas, to fly them to a dinner in Dallas, with, among others, Mr. Warren and Mr. van den Berg. US WorldMeds also transported Anthony Chambers and others to

the dinner, which was intended to induce the individuals to continue to use MYOBLOC and APOKYN and to engage in further marketing efforts to induce other physicians to use MYOBLOC and APOKYN on behalf of US WorldMeds;

b. The dinner organized by US WorldMeds was in reaction to complaints from Dr. Vikki Alvarez and Dr. Grogan that they were not receiving sufficient attention and benefits from US WorldMeds.  Dr. Vikki Alvarez is one of the top five prescribers of APOKYN nationwide (and a paid US WorldMeds consultant) and her husband, Dr. Grogan, is the top prescriber of MYOBLOC nationwide as Head of Neurology at the Brooke Army Hospital.

## CLAIMS SUBMITTED AND DAMAGES CAUSED TO GOVERNMENT HEALTH CARE PROGRAMS

304.   Defendants' actions described above have caused the submission of false and fraudulent claims, and they have made and used, and/or caused to be made and used, false records and statements for the purpose of having false and fraudulent claims for MYOBLOC and APOKYN prescriptions submitted to, paid and/or approved by Government Health Care Programs including Medicare.

305.   Among other things, claims filed with the Government Health Care Programs because of Defendants' actions have contained false and fraudulent statements and material omissions.

306.   Defendants' actions have also caused medical providers who received benefits as a kickback to violate the conditions of their receipt of Medicare reimbursements, including the certification that they would comply with the Anti-Kickback Statute as a condition for the receipt of Medicare reimbursements.

307.   Defendants' actions have also caused medical providers who received benefits as a kickback to file false certifications with Government Health Care Programs, including pursuant to Forms CMS-855, that they were in compliance and/or would comply with the Anti-Kickback Statute.

308.   There is evidence that Defendants have caused many medical providers purchasing MYOBLOC and/or prescribing APOKYN to provide false certifications on Forms CMS-855A and CMS-855I during the time that Defendants were providing MYOBLOC and APOKYN to those medical providers and their patients.

309.   The Provider Enrollment Chain and Ownership System ("PECOS") is a mandatory national enrollment system administered by CMS.  It allows physicians and practice groups to enroll in Medicare or to make a change to their Medicare enrollment information online.

310.   Enrollment in PECOS requires a medical provider to recertify compliance with the Anti-Kickback Statute at that time.  Specifically, when enrolling in PECOS, a medical provider either must complete the paper Medicare

enrollment application and certification by completing the appropriate Form CMS-855A or CMS-855I (including certification of compliance with federal law and the Anti-Kickback Statute), or must complete an online enrollment, followed by submission of a two-page hard copy certification statement that requires the same certification as Form CMS- 855A and CMS-855I.

311.   CMS requires all medical providers that receive Medicare reimbursements, and who have not submitted a CMS-855 enrollment form since 2003, to enroll in PECOS through either of the processes described above, both of which require contemporaneous recertification by the medical provider of compliance with federal laws, including the Anti-Kickback Statute.

312.   The PECOS registration requirement is mandatory and governing regulations provide that medical providers not enrolled in PECOS will not receive Medicare reimbursements.  By 2010, most medical providers had enrolled in PECOS (and, in so doing, had recertified their compliance with federal law, including the Anti-Kickback Statute, as a condition of receiving Medicare reimbursements).

313.   Other common circumstances regularly require medical providers to submit Forms CMS-855A or CMS-855I, along with contemporaneous certification of compliance with federal law and the Anti-Kickback Statute.  For example, CMS

requires the submission of a new CMS-855A enrollment form in the event of an

acquisition, merger, or consolidation of a medical practice enrolled in Medicare.

314.   Further, in the event of a change of ownership of a practice enrolled in

Medicare, the new owner can either submit a new enrollment form (with

certification), or assume the obligations of the existing provider agreement through

an assignment process.  Where an agreement is assigned to the new owner, the new

owner specifically assumes the agreement subject to "all applicable statutes and

regulations and to the terms and conditions under which it was originally issued."

42 C.F.R. § 498.18.

315.   Institutional medical providers must also complete the CMS-855A

certification whenever they reactivate a Medicare enrollment, voluntarily terminate

a Medicare enrollment, revalidate their Medicare enrollment, or change any of

their Medicare information, including: identifying information, practice location

information, payment address and medical record storage information, ownership

interest and / or managing control information, chain home office information,

billing agency information, special requirements for home health agencies,

authorized officials, delegated officials, or information about adverse legal actions

/ convictions.

316.   Similarly, physicians and other practitioners must complete a version

of Form CMS-855I, including the certification of compliance with federal law

including the Anti-Kickback Statute, whenever they do any of the following: change any of their Medicare information, including identifying information, practice location information, payment address and medical record storage information, information about individuals having managing control, final adverse actions/convictions, and billing agency information.  Recertification of compliance is also required when physicians and other practitioners enroll with another fee-for-service contractor, reactivate their Medicare enrollment, voluntarily terminate their Medicare enrollment, or revalidate their Medicare enrollment.  Physicians and other practitioners are also required generally to notify the government if any of the certifications or statements on the Form change.

317.   As of November 2009, the majority – *i.e.*, on the order of 70% – of all Medicare-eligible medical providers (including physicians and medical practices) had re-enrolled in Medicare since 2003, including for the above reasons.

318.   Defendants have marketed MYOBLOC and APOKYN in a way that has compromised physicians' independent medical judgment and threatened patient safety through the use of kickbacks, including the promotion of billing for services not rendered, the payment of Novation "administrative fees" to customers, the kickbacks from Assistance Fund, and the travel, seminar payments, and other inducements offered by Defendants.

319.   The impact of Defendants' misconduct is all the more profound on Government Health Care Programs, such as Medicare, given that MYOBLOC's ASP has been artificially inflated by US WorldMeds, and US WorldMeds artificially inflated the APOKYN price to $995 per cartridge.

320.   Defendants' improper inducements caused medical providers to submit false provider certifications that they were in compliance with the federal and state Anti-Kickback laws.

321.   Compliance with the Anti-Kickback laws is a precondition to payment by the Medicare program, and by other Government Health Care Programs.  By virtue of Defendants' provision of kickbacks to medical providers, the Medicare program and other Government Health Insurance Programs: (1) reasonably and foreseeably paid medical providers for services provided based on US WorldMeds' misbranding of MYOBLOC; (2) reasonably and foreseeably paid medical providers for provider-administered and prescribed MYOBLOC and APOKYN that they would not have otherwise ordered or prescribed; (3) reasonably and foreseeably paid for renewed and continuing treatments of APOKYN for patients who might not have otherwise received that treatment; and (4) reasonably and foreseeably paid for the drug, MYOBLOC, which provided additional reimbursement as compared to other alternatives actually approved for uses other than the treatment of cervical dystonia.

## DEFENDANTS' UNLAWFUL
## RETALIATION AGAINST RELATOR

322.   Relator had 25 years of experience in pharmaceutical sales when he came to work for Quintiles at George Esgro' s request.  On September 18, 2010, he became the National Sales Director for the US WorldMeds contract sales team provided by Quintiles.

323.   During his employment in that position, he noticed the conduct discussed in this Complaint and made repeated efforts to stop Defendants Quintiles and US WorldMeds from engaging in such conduct.

324.   Defendants did not listen to Relator, and in fact, Relator was the subject of derision, personal insults, and ridicule during his employment, because of his efforts to convince Defendants Quintiles and US WorldMeds to refrain from engaging in conduct described in this Complaint.

325.   Relator was eventually terminated because of his efforts to speak out about the conduct described in this Complaint.

326.   Specifically, Relator was terminated after a conference call between George Esgro of Quintiles, Lee Warren of US WorldMeds, and Relator, around September 10, 2012, on which Relator insisted that the US WorldMeds sales force should not deliver or be involved in the invitation of physicians to US WorldMeds-sponsored Ad Boards that encouraged off-label use of MYOBLOC.  Relator

thereafter was abruptly told on September 24, 2012, while at a business meeting, that he was fired, effective immediately.

327.   It was made clear to Relator that he was being fired for being "insubordinate" and because he had acted "unprofessionally" on the call with Lee Warren.

328.   Quintiles, in coordination with US WorldMeds, thus threatened, harassed, and otherwise discriminated against Relator because of his lawful acts involving potential violations of the FCA by Defendants.  By these actions Quintiles and US WorldMeds violated the FCA, 31 U.S.C. § 3730(h).

329.   Relator has been damaged as a direct result of these illegal actions. Among other things, he has suffered great economic harm, loss of income and future earnings, and emotional injury.

330.   The conduct of Quintiles as alleged herein was undertaken knowingly, maliciously, oppressively, and with conscious disregard for Relator's rights. Therefore, Relator is entitled to recover exemplary and punitive damages against Quintiles, in an amount to be determined at trial.

331.   US WorldMeds also participated in the illegal actions taken against Relator, and shares liability and responsibility for the damages that Relator has suffered, to the extent to be determined at trial.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)

**False or Fraudulent Claims, Statements and Records, and Conspiracy**

332.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

333.    This is a civil action brought by Relator on behalf of the United States against Defendants under the Federal False Claims Act, 31 U.S.C. §§ 3729-33.

334.    Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated:

      a.    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

      b.    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim;

      c.    31 U.S.C. § 3729(a)(1)(G) as more fully described in Count II, *infra*, and incorporated herein by reference; and/or

      d.    31U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of subparagraph (A), (B), and/or (G).

335.    Government Payors, unaware of these violations of the FCA and the false or fraudulent nature of the claims and/or statements presented or caused to be

presented, or made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical services performed for patients insured by federally-funded health insurance programs, including Medicare, Medicaid and CHAMPUS/TRICARE. Had the United States known that the bills presented by Defendants were false and/or fraudulent, payment would not have been made for such claims.

336.   Through the acts and omissions described in this Complaint, Defendants with each other and with other persons known and unknown, knowingly agreed and conspired to violate the FCA. Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

## COUNT II:
## VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)

### Failure to Return Overpayments to the Government

337.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

338.   Through the acts described above, Defendants intentionally and knowingly failed to remit funds improperly paid by Government Payors. Defendant intentionally and improperly caused providers to charge Government Payors for drugs and procedures that were not reasonable and medically necessary, that were in some instances tainted by violations of the Anti-Kickback Act, and otherwise not properly reimbursable.

339.   Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  The term "obligation" means:

> "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. . . ."

31 U.S.C. § 3729(b)(3).

340.   Further, in the health care context, such as Medicaid, the term "obligation" is further defined as "Any overpayment retained by a person after the deadline for reporting and returning the overpayment…is an obligation (as defined [in the FCA])", and an overpayment must be reported "By the later of … 60 days after the date on which the overpayment was identified … or the date any corresponding cost report is due, if applicable."  Patient Protection and Affordable Care Act, Pub. L. 111-148, § 6402(d)(2), 124 Stat. 119, 755 (codified at 42 U.S.C. § 1128J9(d)).

341.   Defendants' fraudulent concealment and intentional failure to report funds that were improperly received from Government Payors for services that

were not reasonable and medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitutes an unlawful avoidance of an obligation to pay money owed to the United States.

342.   Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

## COUNT III:
## VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT

### Cal. Govt. Code § 12651, *et seq.*

343.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

344.   This count sets forth claims for treble damages and forfeitures under the California False Claims Act.

345.   Through the acts described above, Defendant knowingly caused to be presented to the California Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

346.   Defendants violated:

   a.  Cal. Govt. Code § 12651(a)(1) by knowingly presenting, or causing to be  presented, a false or fraudulent claim for payment or approval;

    b.  Cal. Govt. Code § 12651(a)(2) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim; and/or

    c.  Cal. Govt. Code § 12651(a)(7) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

347.  Furthermore, Defendants violated the California FCA through conspiracy.

348.  The State of California, unaware of the fraudulent conduct and the falsity of the claims, approved, paid and participated in payments made by the California Medicaid Program for claims that otherwise would not have been allowed.

349.  Defendants' unlawful conduct is continuing in nature and has caused the State of California to suffer damages.

## COUNT IV:
## VIOLATION OF THE COLORADO MEDICAID FALSE CLAIMS ACT

### Col. Rev. Stat. § 12.25.5-4-305, *et seq.*

350.  Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

351.    This count sets forth claims for treble damages and forfeitures under the Colorado Medicaid False Claims Act.

352.    Through the acts described above, Defendants knowingly caused to be presented to the Colorado Medicaid Program fraudulent claims, records and statements in order to obtain reimbursement.

353.    Defendants knowingly violated:

    a.  Col. Rev. Stat. § 12.25.5-4-305(a) by knowingly presenting, or causing to be  presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

    b.  Col. Rev. Stat. § 12.25.5-4-305(b) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim; and/or

    c.  Col. Rev. Stat. § 12.25.5-4-305(f) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act," or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act."

354.   Furthermore, Defendant violated the Colorado FCA through conspiracy.

355.   Defendants knowingly caused the presentation of false claims for payment to the State of Colorado. The State of Colorado, unaware of the unaware of the fraudulent conduct and falsity of these claims, approved, paid and participated in payments made by the State of Colorado Medicaid Program for claims that otherwise would not have been allowed.

356.   Defendants' unlawful conduct is continuing in nature and has caused the State of Colorado to suffer damages.

## COUNT V:
## VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT
### Ct. P.A. 09-5 § 17b-301, *et seq.*

357.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

358.   This count sets forth claims for treble damages and forfeitures under the Connecticut False Claims Act.

359.   Through the acts described above, Defendants knowingly caused to be presented to the Connecticut Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

360.   Defendants knowingly violated:

a. Ct. P.A. 09-5 § 17b-301b(1) by knowingly presenting, or causing to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

b. Ct. P.A. 09-5 § 17b-301b(2) by knowingly making, using, or causing to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services; and/or

c. Ct. P.A. 09-5 § 17b-301b(7) by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services.

361.   Furthermore, Defendant violated the Connecticut FCA through conspiracy.

362.   Defendants knowingly caused to be presented false claims for payment to the State of Connecticut. The State of Connecticut, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and

participated in payments made by the State of Connecticut Medicaid Program for claims that otherwise would not have been allowed.

363.   Defendants' unlawful conduct is continuing in nature and has caused the State of Connecticut to suffer damages.

## COUNT VI:
## VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT

### 77 Del. Laws c. 166 § 1201, *et seq.*

364.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

365.   This count sets forth claims for treble damages and forfeitures under the Delaware False Claims and Reporting Act.

366.   Through the acts described above, Defendants knowingly caused to be presented to the Delaware Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

367.   Defendants knowingly violated:

    a.   77 Del. Laws c. 166 § 1201(a)(1) by knowingly presenting, or causing to be presented to an officer or employee of the Government a false or fraudulent claim for payment or approval;

b.   77 Del. Laws c. 166 § 1201(a)(2) by knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government; and/or

c.   77 Del. Law c. 166 § 1201(a)(7) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

368.   Furthermore, Defendants violated the Delaware FCA through conspiracy.

369.   Defendants knowingly caused to be presented false claims for payment to the State of Delaware. The State of Delaware, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Delaware Medicaid Program for claims that otherwise would not have been allowed.

370.   Defendants' unlawful conduct is continuing in nature and has caused the State of Delaware to suffer damages.

## COUNT VII:
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

### Fla. Stat. § 68.082, *et seq.*

371.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

372.   This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act.

373.   Through the acts described above, Defendants knowingly caused to be presented to the Florida Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

374.   Defendants knowingly violated:

    a.   Fla. Stat. § 68.082(2)(a) by knowingly presenting, or causing to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

    b.   Fla. Stat. § 68.082(2)(b) by knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim allowed or paid; and/or

    c.   Fla. Stat. § 68.082(2)(g) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency.

375.   Furthermore, Defendants violated the Florida FCA through conspiracy.

376.   Defendants knowingly caused to be presented false claims for payment to the State of Florida. The State of Florida, unaware of the fraudulent

course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Florida Medicaid Program for claims that otherwise would not have been allowed.

377.   Defendants' unlawful conduct is continuing in nature and has caused the State of Florida to suffer damages.

## COUNT VIII:
## VIOLATION OF THE GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT

### O.G.C.A. 23-3-121, *et seq.*

378.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

379.   This count sets forth claims for treble damages and forfeitures under the Georgia Taxpayer Protection False Claims Act (prior to July 1, 2012, the Georgia False Medicaid Claims Act, O.G.C.A. 49-4-186, *et seq.*).

380.   Through the acts described above, Defendants knowingly caused to be presented to the Georgia Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

381.   Defendants knowingly violated:

   a.   O.G.C.A. 23-3-121(a)(1) by knowingly presented or causing to be presented a fraudulent claim for payment or approval;

    b.  O.G.C.A. 23-3-121(a)(2) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim; and/or

    c.  O.G.C.A. 23-3-121(a)(7) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or local government, or knowingly concealing, knowingly or improperly avoiding, or decreasing an obligation to pay or transmit money or property to the state or a local government.

382.   Furthermore, Defendant violated the Georgia FCA through conspiracy.

383.   Defendants knowingly caused to be presented false claims for payment to the State of Georgia. The State of Georgia, unaware of the fraudulent course of conduct and the  falsity of these claims, approved, paid and participated in payments made by the State of Georgia Medicaid Program for claims that otherwise would not have been allowed.

384.   Defendants' unlawful conduct is continuing in nature and has caused the State of Georgia to suffer damages.

## COUNT IX:
## VIOLATION OF THE HAWAII FALSE CLAIMS ACT

### Haw. Rev. Stat. § 661-21, *et seq.*

385.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

386.   This count sets forth claims for treble damages and forfeitures under the Hawaii False Claims Act.

387.   Through the acts described above, Defendants knowingly caused to be presented to the Hawaii Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

388.   Defendants knowingly violated:

a.   Haw. Rev. Stat. § 661-21(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

b.   Haw. Rev. Stat. § 661-21(a)(2) by knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State; and/or

c.   Haw. Rev. Stat. § 661-21(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

389.   Furthermore, Defendants violated the Hawaii FCA through conspiracy.

390.   Defendants knowingly presented false claims for payment to the State of Hawaii. The State of Hawaii, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Hawaii Medicaid Program for claims that otherwise would not have been allowed.

391.   Defendants' unlawful conduct is continuing in nature and has caused the State of Hawaii to suffer damages.

## COUNT X:
## VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

### 740 Ill. Comp. Stat. § 175/3, *et seq.*

392.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

393.   This count sets forth claims for treble damages and forfeitures under the Illinois Whistleblower Reward and Protection Act.

394.   Through the acts described above, Defendants knowingly caused to be presented to the Illinois Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

395.   Defendants knowingly violated:

a. 740 Ill. Comp. Stat. § 175/3(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

b. 740 Ill. Comp. Stat. § 175/3(a)(1)(B) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

c. 740 Ill. Comp. Stat. § 175/3(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the State.

396.   Furthermore, Defendants violated the Illinois FCA through conspiracy.

397.   Defendants knowingly caused to be presented false claims for payment to the State of Illinois.  The State of Illinois, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Illinois Medicaid Program for claims that otherwise would not have been allowed.

398.    Defendants' unlawful conduct is continuing in nature and has caused the State of Illinois to suffer damages.

## COUNT XI:
## VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

### IC 5-11-5.5, *et seq.*

399.    Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

400.    This count sets forth claims for treble damages and forfeitures under the Indiana False Claims and Whistleblower Protection Act.

401.    Through the acts described above, Defendants knowingly caused to be presented to the Indiana Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

402.    Defendants knowingly violated:

   a.  IC 5-11-5.5-2(b)(1) by knowingly or intentionally presenting a false claim to the state for payment or approval;

   b.  IC 5-11-5.5-2(b)(2) by knowingly or intentionally making or using a false record or statement to obtain payment or approval of a false claim from the state; and/or

c.   IC 5-1—5.5-2(b)(6) by knowingly or intentionally making or using a false record or statement to avoid an obligation to pay or transmit property to the state.

403.   Furthermore, Defendants violated the Indiana FCA through conspiracy.

404.   Defendants knowingly caused to be presented false claims for payment to the State of Indiana. The State of Indiana, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Indiana Medicaid Program for claims that otherwise would not have been allowed.

405.   Defendants' unlawful conduct is continuing in nature and has caused the State of Indiana to suffer damages.

## COUNT XII:
## VIOLATION OF THE IOWA FALSE CLAIMS ACT

### 2010 Acts, ch. 1031 § 685, *et seq.*

406.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

407.   This count sets forth claims for treble damages and forfeitures under the Iowa False Claims Act.

408.   Through the acts described above, Defendants knowingly caused to be presented to the Iowa Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

409.   Defendants knowingly violated:

   a.   2010 Acts, ch. 1031 § 685.2(1)(a) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

   b.   2010 Acts, ch. 1031 § 685.2(1)(b) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

   c.   2010 Acts, ch. 1031 § 685.2(1)(g) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the state.

410.   Furthermore, Defendants violated the Iowa FCA through conspiracy.

411.   Defendants knowingly caused to be presented false claims for payment to the State of Iowa. The State of Iowa, unaware of the fraudulent course of conduct and the  falsity of these claims, approved, paid and participated in

payments made by the State of Iowa Medicaid Program for claims that otherwise would not have been allowed.

412.   Defendants' unlawful conduct is continuing in nature and has caused the State of Iowa to suffer damages.

## COUNT XIII:
## VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

### La. Rev. Stat. Tit. 46 § 438, *et seq.*

413.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs  as though fully set forth herein.

414.   This count sets forth claims for treble damages and forfeitures under the Louisiana Medical Assistance Programs Integrity Law.

415.   Through the acts described above, Defendants knowingly caused to be presented to the Louisiana Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

416.   Defendants knowingly violated:

    a.   La. Rev. Stat. Tit. 46 § 438.3(A) by knowingly presenting or causing to be presented a false or fraudulent claim; and/or

    b.   La. Rev. Stat. Tit. 46 § 438.3(B) by knowingly engaging in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds.

417.    Furthermore, Defendants violated the Louisiana FCA through conspiracy.

418.    Moreover, the Louisiana False Claims Act, 46 La. Rev. Stat. c. 3 § 438.2A(1), specifically provides that:

> No person shall solicit, receive, offer or pay any remuneration, including but not limited to kickbacks, bribes, rebates, or … payments, directly or indirectly, overtly or covertly, in cash or in kind, for the following . . .
>
> (1)    In return for referring an individual to a health care provider, …for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs.

419.    Defendants knowingly caused to be presented false claims for payment to the State of Louisiana. The State of Louisiana, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Louisiana Medicaid Program for claims that otherwise would not have been allowed.

420.    Defendants' unlawful conduct is continuing in nature and has caused the State of Louisiana to suffer damages.

## COUNT XIV:
## VIOLATION OF THE MARYLAND FALSE HEALTH CLAIMS ACT

### Maryland Laws Ch. 4 (S.B. 279) 2-602 *et seq.*

421.    Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

167

422.    This count sets forth claims for treble damages and forfeitures under the Maryland False Health Claims Act.

423.    Through the acts described above, Defendants knowingly caused to be presented to the Maryland Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

424.    Defendants knowingly violated:

    a.  Maryland Laws Ch. 4 (S.B. 279) 2-602(a)(1) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval;

    b.  Maryland Laws Ch. 4 (S.B. 279) 2-602(a)(2) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

    c.  Maryland Laws Ch. 4 (S.B. 279) 2-602(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State.

425.    Furthermore, Defendants violated the Maryland FCA through conspiracy.

426.    Defendants knowingly caused to be presented false claims for payment to the State of Maryland. The State of Maryland, unaware of the

fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Maryland Medicaid Program for claims that otherwise would not have been allowed.

427.   Defendants' unlawful conduct is continuing in nature and has caused the State of Maryland to suffer damages.

**COUNT XV:**
**VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT**

**Mass. Gen. Laws Ch. 12 § 5B** *et seq.*

428.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

429.   This count sets forth claims for treble damages and forfeitures under the Massachusetts False Claims Act.

430.   Through the acts described above, Defendants knowingly caused to be presented to the Massachusetts Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

431.   Defendants knowingly violated:

    a.   Mass. Gen. Laws Ch. 12 § 5B(1) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

    b.   Mass. Gen. Laws Ch. 12 § 5B(2) by knowingly making, using, or causing to be made or used, a false record or statement to obtain

169

payment or approval of a claim by the commonwealth or any

political subdivision thereof; and/or

   c.  Mass. Gen. Laws Ch. 12 §5B(8) by knowingly making, using, or

causing to be made or used, a false record or statement to conceal,

avoid, or decrease an obligation to pay or to transmit money or

property to the commonwealth or political subdivision thereof.

432.  Furthermore, Defendants violated the Massachusetts FCA through

conspiracy.

433.  Defendants knowingly caused to be presented false claims for

payment to the Commonwealth of Massachusetts. The Commonwealth of

Massachusetts, unaware of the fraudulent course of conduct and the falsity of these

claims, approved, paid and participated in payments made by the Commonwealth

of Massachusetts Medicaid Program for claims that otherwise would not have been

allowed.

434.  Defendants' unlawful conduct is continuing in nature and has caused

the Commonwealth of Massachusetts to suffer damages.

## COUNT XVI:
## VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT

### 2008 P.A. 421, 400.607 *et seq.*

435.  Relator realleges and incorporates by reference the allegations of the

foregoing paragraphs as though fully set forth herein.

436.   This count sets forth claims for treble damages and forfeitures under the Michigan Medicaid False Claims Act.

437.   Through the acts described above, Defendants knowingly caused to be presented to the Michigan Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

438.   Defendants knowingly violated:

   a.   2008 P.A. 421, 400.607 § 7(1) by making or presenting or causing to be made or presented to an employee or officer of this state a claim under the social welfare act . . . upon or against the state, knowing the claim to be false; and/or

   b.   2008 P.A. 421, 400.607 § 7(3) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act.

439.   Furthermore, Defendants violated the Michigan FCA through conspiracy.

440.   Defendants knowingly caused to be presented false claims for payment to the State of Michigan. The State of Michigan, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and

participated in payments made by the State of Michigan Medicaid Program for claims that otherwise would not have been allowed.

441.   Defendants' unlawful conduct is continuing in nature and has caused the State of Michigan to suffer damages.

## COUNT XVII:
## VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT

### Minn. Sess. Laws, S.F. No. 2082, Ch. 101 § 24 *et seq.*

442.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

443.   257.    This count sets forth claims for treble damages and forfeitures under the Minnesota False Claims Act.

444.   Through the acts described above, Defendants knowingly caused to be presented to the Minnesota Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

445.   Defendants knowingly violated:

   a.   Minn. Sess. Laws, S.F. No. 2082, Ch. 101 § 25(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

   b.   Minn. Sess. Laws, S.F. No. 2082, Ch. 101 § 25(a)(2) by knowingly making, using, or causing to be made or used, a false record or

statement to get a false or fraudulent claim paid or approved by the state or a political subdivision; and/or

c.   Minn. Sess. Laws, S.F. No. 2081, Ch. 101 § 25(a)(7) by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

446.   Furthermore, Defendants violated the Minnesota FCA through conspiracy.

447.   Defendants knowingly caused to be presented false claims for payment to the State of Minnesota. The State of Minnesota, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Minnesota Medicaid Program for claims that otherwise would not have been allowed.

448.   Defendants' unlawful conduct is continuing in nature and has caused the State of Minnesota to suffer damages.

## COUNT XVIII:
## VIOLATION OF THE MONTANA FALSE CLAIMS ACT

### Mont. Code Ann. § 17-8-403, *et seq.*

449.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs  as though fully set forth herein.

450.   This count sets forth claims for treble damages and forfeitures under the Montana False Claims Act.

451.   Through the acts described above, Defendants knowingly caused to be presented to the Montana Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

452.   Defendants knowingly violated:

  a.   Mont. Code Ann. § 17-8-403(1)(a) by knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false or fraudulent claim for payment or approval;

  b.   Mont. Code Ann. § 17-8-403(1)(b) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the governmental entity; and/or

  c.   Mont. Code Ann. § 17-8-403(1)(g) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

453.   Furthermore, Defendants violated the Montana FCA through conspiracy.

454.   Defendants knowingly presented false claims for payment to the State of Montana. The State of Montana, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Montana Medicaid Program for claims that otherwise would not have been allowed.

455.   Defendants' unlawful conduct is continuing in nature and has caused the State of Montana to suffer damages.

## COUNT XIX:
## VIOLATION OF THE NEVADA FALSE CLAIMS ACT

### Nev. Rev. Stat. 357.010, *et seq.*

456.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

457.   This count sets forth claims for treble damages and forfeitures under the Nevada False Claims Act.

458.   Through the acts described above, Defendants knowingly caused to be presented to the Nevada Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

459.   Defendants knowingly violated:

    a.  Nev. Rev. Stat. 357.040(1)(a) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

b.  Nev. Rev. Stat. 357.040(1)(b) by knowingly making or using, or causing to be made or used, a false record or statement to obtain payment or approval of a false claim; and/or

c.  Nev. Rev. Stat. 357.040(1)(g) by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State or a political subdivision.

460.  Furthermore, Defendants violated the Nevada FCA through conspiracy.

461.  Defendants knowingly caused to be presented false claims for payment to the State of Nevada. The State of Nevada, unaware of the fraudulent course of conduct and the  falsity of these claims, approved, paid and participated in payments made by the State of Nevada Medicaid Program for claims that otherwise would not have been allowed.

462.  Defendants' unlawful conduct is continuing in nature and has caused the State of Nevada to suffer damages.

## COUNT XX:
## VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT

### N.S.J.A. § 2A:32C-1, *et seq.*

463.  Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

464.   This count sets forth claims for treble damages and forfeitures under the New Jersey False Claims Act.

465.   Through the acts described above, Defendants knowingly caused to be presented to the New Jersey Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

466.   Defendants knowingly violated:

   a.   N.S.J.A. § 2A:32C-3(3)(a) by knowingly presenting, or causing to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

   b.   N.S.J.A. § 2A:32C-3(3)(b) by knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State; and/or

   c.   N.S.J.A. § 2A:32C-3(3)(g) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

467.   Furthermore, Defendants violated the New Jersey FCA through conspiracy.

468.   Defendants knowingly caused to be presented false claims for payment to the State of New Jersey. The State of New Jersey, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of New Jersey Medicaid Program for claims that otherwise would not have been allowed.

469.   Defendants' unlawful conduct is continuing in nature and has caused the State of New Jersey to suffer damages.

## COUNT XXI:
## VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT

### N.M. Stat. Ann. § 27-14-1, *et seq.*

470.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

471.   This count sets forth claims for treble damages and forfeitures under the New Mexico Medicaid False Claims Act.

472.   Through the acts described above, Defendants knowingly caused to be presented to the New Mexico Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

473.   Defendants knowingly violated:

    a. N.M. Stat. Ann. § 27-14-4(A) by presenting, or causing to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

      b.  N.M. Stat. Ann. § 27-14-4(C) by making, using, or causing to be made or used, a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false; and/or

      c.  N.M. Stat. Ann. § 27-14-4(E) by making, using, or causing to be made or used a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false.

474.   Furthermore, Defendants violated the New Mexico FCA through conspiracy.

475.   Defendants knowingly caused to be presented false claims for payment to the State of New Mexico. The State of New Mexico, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of New Mexico Medicaid Program for claims that otherwise would not have been allowed.

476.   Defendants' unlawful conduct is continuing in nature and has caused the State of New Mexico to suffer damages.

## COUNT XXII:
## VIOLATION OF THE NEW YORK STATE FALSE CLAIMS ACT

### N.Y. St. Fin. Law § 187, *et seq.*

477.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

478.   This count sets forth claims for treble damages and forfeitures under the New York State False Claims Act.

479.   Through the acts described above, Defendants knowingly caused to be presented to the New York Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

480.   Defendants knowingly violated:

a.   N.Y. St. Fin. Law § 189(1)(a) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

b.   N.Y. St. Fin. Law § 189(1)(b) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

c.   N.Y. St. Fin. Law § 189(1)(g) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government . . . .

481.   Furthermore, Defendants violated the New York FCA through conspiracy.

482.   Defendants knowingly caused to be presented false claims for payment to the State of New York. The State of New York, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of New York Medicaid Program for claims that otherwise would not have been allowed.

483.   Defendants' unlawful conduct is continuing in nature and has caused the State of New York to suffer damages.

## COUNT XXIII:
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT

### N.C. Sess. Law 2010-96 § 1-605 *et seq.*

484.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

485.   This count sets forth claims for treble damages and forfeitures under the North Carolina False Claims Act.

486.   Through the acts described above, Defendants knowingly caused to be presented to the North Carolina Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

487.   Defendants knowingly violated:

a. N.C. Sess. Law 2010-96 § 1-607(a)(1) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval;

b. N.C. Sess. Law 2010-96 § 1-607(a)(2) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

c. N.C. Sess. Law 2010-96 § 1-607(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

488. Furthermore, Defendants violated the North Carolina FCA through conspiracy.

489. Defendants knowingly caused to be presented false claims for payment to the State of North Carolina. The State of North Carolina, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of North Carolina Medicaid Program for claims that otherwise would not have been allowed.

490.   Defendants' unlawful conduct is continuing in nature and has caused the State of North Carolina to suffer damages.

## COUNT XXIV:
## VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT

### 63 Okl. St. § 5053, *et seq.*

491.   Relator realleges and incorporates by reference the allegations of foregoing paragraphs as though fully set forth herein.

492.   This count sets forth claims for treble damages and forfeitures under the Oklahoma Medicaid False Claims Act.

493.   Through the acts described above, Defendant knowingly caused to be presented to the Oklahoma Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

494.   Defendant knowingly violated:

a.   63 Okl. St. § 5053.1(B)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the State of Oklahoma a false or fraudulent claim for payment or approval;

b.   63 Okl. St. § 5053.1(B)(2) by knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; and/or

c.   63 Okl. St. § 5053.1(B)(7) by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or

decrease an obligation to pay or transmit money or property to the state.

495.   Furthermore, Defendants violated the Oklahoma FCA through conspiracy.

496.   Defendants knowingly caused to be presented false claims for payment to the State of Oklahoma.  The State of Oklahoma, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Oklahoma Medicaid Program for claims that otherwise would not have been allowed.

497.   Defendants' unlawful conduct is continuing in nature and has caused the State of Oklahoma to suffer damages.

## COUNT XXV:
## VIOLATION OF THE RHODE ISLAND STATE FALSE CLAIMS ACT

### R.I. Gen. Laws § 9-1.1-1, *et seq.*

498.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

499.   This count sets forth claims for treble damages and forfeitures under the Rhode Island State False Claims Act.

500.   Through the acts described above, Defendants knowingly caused to be presented to the Rhode Island Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

501.   Defendants knowingly violated:

a.   R.I. Gen. Laws § 9-1.1-3(a)(1) by knowingly presenting, or

causing to be presented, to an officer or employee of the state or a

member of the guard a false or fraudulent claim for payment or

approval;

b.   R.I. Gen. Laws § 9-1.1-3(a)(2) by knowingly making, using, or

causing to be made or used a false record or statement to get a false

or fraudulent claim paid or approved by the state; and/or

c.   R.I. Gen. Laws § 9-1.1-3(a)(7) by knowingly making, using, or

causing to be made or used, a false record or statement to conceal,

avoid, or decrease an obligation to pay or transmit money or

property to the state . . . .

502.   Furthermore, Defendants violated the Rhode Island FCA through

conspiracy.

503.   Defendants knowingly caused to be presented false claims for

payment to the State of Rhode Island.  The State of Rhode Island, unaware of the

fraudulent course of conduct and the falsity of these claims, approved, paid and

participated in payments made by the State of Rhode Island Medicaid Program for

claims that otherwise would not have been allowed.

504.   Defendants' unlawful conduct is continuing in nature and has caused the State of Rhode Island to suffer damages.

## COUNT XXVI:
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT

### Tenn. Code Ann. § 71-5-181, *et seq.*

505.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

506.   This count sets forth claims for treble damages and forfeitures under the Tennessee Medicaid False Claims Act.

507.   Through the acts described above, Defendants knowingly caused to be presented to the Tennessee Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

508.   Defendants knowingly violated:

   a. Tenn. Code Ann. § 71-5-182(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

   b. Tenn. Code Ann. § 71-5-182(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim to get a false or fraudulent claim under the Medicaid program paid for or approved; and/or

186

    c.  Tenn. Code Ann. § 71-5-182(a)(1)(D) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program.

509.   Furthermore, Defendants violated the Tennessee FCA through conspiracy.

510.   Defendants knowingly caused to be presented false claims for payment to the State of Tennessee.  The State of Tennessee, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Tennessee Medicaid Program for claims that otherwise would not have been allowed.

511.   Defendants' unlawful conduct is continuing in nature and has caused the State of Tennessee to suffer damages.

## COUNT XXVII:
## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION ACT

### Tex. Hum. Res. Code § 36.001, *et seq.*

512.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

513.   This count sets forth claims for treble damages and forfeitures under the Texas Medicaid Fraud Prevention Act.

514.   Through the acts described above, Defendants knowingly caused to be presented to the Texas Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

515.   Defendants knowingly violated:

a.   Tex. Hum. Res. Code § 36.002(1) by knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit under the Medicaid program that is not authorized or that is greater than the benefit or payment authorized;

b.   Tex. Hum. Res. Code § 36.002(2) by knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; and/or

c.   Tex. Hum. Res. Code § 36.002(12) by knowingly making, using, or causing the making or using of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

516.   Furthermore, Defendants violated the Texas FCA through conspiracy.

517.   Defendants knowingly caused to be presented false claims for payment to the State of Texas.  The State of Texas, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Texas Medicaid Program for claims that otherwise would not have been allowed.

518.   Defendants' unlawful conduct is continuing in nature and has caused the State of Texas to suffer damages.

## COUNT XXVIII:
## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

### Va. Code Ann. § 8.01-216.1, *et seq.*

519.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

520.   This count sets forth claims for treble damages and forfeitures under the Virginia Fraud Against Taxpayers Act.

521.   Through the acts described above, Defendants knowingly caused to be presented to the Virginia Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

522.   Defendants knowingly violated:

a. Va. Code Ann. § 8.01-216.3(A)(1) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

b. Va. Code Ann. § 8.01-216.3(A)(2) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

c. Va. Code. Ann. § 8.01-216.3(A)(7) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth.

523. Furthermore, Defendants violated the Virginia FCA through conspiracy.

524. Defendants knowingly caused to be presented false claims for payment to the Commonwealth of Virginia.  The Commonwealth of Virginia, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the Commonwealth of Virginia Medicaid Program for claims that otherwise would not have been allowed.

525. Defendants' unlawful conduct is continuing in nature and has caused the Commonwealth of Virginia to suffer damages.

## COUNT XXIX:
## VIOLATION OF THE WASHINGTON MEDICAID
## FRAUD FALSE CLAIMS ACT,

### Chapter 74.66 RCW §§ 74.66.005-130

526.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

527.   This count sets forth claims for treble damages and forfeitures under the Washington Medicaid Fraud False Claims Act.

528.   Through the acts described above, Defendants knowingly caused to be presented to the Washington Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

529.   In particular, the Washington FCA provides for a violation if a person:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (c) Conspires to commit one or more of the violations in this subsection (1);
> … or
> (g) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or

530.   transmit money or property to the government entity.

531.   Defendants have violated each of these sections of the Washington FCA.

532.   Defendants knowingly caused to be presented false claims for payment to the State of Washington.  The State of Washington, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Washington Medicaid Program for claims that otherwise would not have been allowed.

533.   Defendants' unlawful conduct is continuing in nature and has caused the State of Washington to suffer damages.

## COUNT XXX:
## VIOLATION OF THE WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW

### 2007 Wis. Act 20.931, *et seq.*

534.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

535.   This count sets forth claims for treble damages and forfeitures under the Wisconsin False Claims for Medical Assistance Law.

536.   Through the acts described above, Defendants knowingly caused to be presented to the Wisconsin Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

537.   Defendants knowingly violated:

    a.  2007 Wis. Act 20.931(2)(a) by knowingly presenting or causing to be presented to any officer, employee, or agent of this state a false claim for medical assistance;

    b.  2007 Wis. Act 20.931(2)(b) by knowingly making, using, or causing to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance; and/or

    c.  2007 Wis. Act 20.931(2)(g) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid or decrease any obligation to pay or transmit money or property to the Medical Assistance program.

538.   Furthermore, Defendants violated the Wisconsin FCA through conspiracy.

539.   Defendants knowingly caused to be presented false claims for payment to the State of Wisconsin.  The State of Wisconsin, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State of Wisconsin Medicaid Program for claims that otherwise would not have been allowed.

540.   Defendants' unlawful conduct is continuing in nature and has caused the State of Wisconsin to suffer damages.

## COUNT XXXI:
## VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT

### D.C. Code § 2-308.02, *et seq.*

541.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

542.   This count sets forth claims for treble damages and forfeitures under the District of Columbia False Claims for Medical Assistance Law.

543.   Through the acts described above, Defendants knowingly caused to be presented to the District of Columbia Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

544.   Defendants knowingly violated:

    a.   D.C. Code § 2-308.02(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the District a false or fraudulent claim for payment or approval;

    b.   D.C. Code § 2-308.02(a)(2) by knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the District; and/or

    c.   D.C. Code § 2-308.02(a)(7) by knowingly making or using or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District.

194

545.   Furthermore, Defendants violated the District of Columbia FCA through conspiracy.

546.   Defendants knowingly caused to be presented false claims for payment to the District of Columbia.  The District of Columbia, unaware of the fraudulent course of conduct and the  falsity of these claims, approved, paid and participated in payments made by the District of Columbia Medicaid Program for claims that otherwise would not have been allowed.

547.   Defendants' unlawful conduct is continuing in nature and has caused the District of Columbia to suffer damages.

## COUNT XXXII:
## RETALIATORY DISCHARGE IN VIOLATION OF 31 U.S.C. § 3730(H)

548.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

549.   In violation of the False Claims Act § 3730(h), Defendant Quintiles, in conjunction with US WorldMeds, took negative employment action, including terminating Relator's employment, against Relator as a result of lawful actions taken by Relator to stop Defendants' violations of the False Claims Act.

550.   Defendants violated 31 U.S.C. § 3730(h) by the retaliatory acts against Relator. The facts show that: (1) his conduct was protected under the FCA; (2) Defendants knew that he was engaged in such conduct; and (3) Defendants discharged or discriminated against him because of his protected conduct. By these

actions, Defendants violated the False Claims Act, 31 U.S.C., § 3730(h). Defendants' conduct as alleged herein was done knowingly, maliciously, oppressively, and with conscious disregard for the rights of the Relator.

551.   As a result of Defendants' retaliatory and discriminatory conduct, Relator has suffered damages including, but not limited to, lost past and future earnings, lost employment benefits (e.g., health insurance benefits, and retirement contributions,  job-search expenses, humiliation, embarrassment, mental anguish, and severe emotional distress – all to his damage in an amount to be determined at trial.

## COUNT XXXIII:
## BREACH OF EXPRESS AND/OR IMPLIED CONTRACT

552.   Mr. Bennett realleges and incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

553.   Defendant Quintiles and Mr. Bennett agreed that he would be employed by Quintiles, and would provide services to US WorldMeds pursuant to a contract between Quintiles and US WorldMeds.

554.   Defendants Quintiles and US WorldMeds breached obligations to Mr. Bennett by forcing him to engage in illegal activity to misbrand MYOBLOC and to participate in the provision of kickbacks to induce sales of MYOBLOC and APOKYN.

555.   As a result, Mr. Bennett has been damaged in an amount to be determined at trial.

## COUNT XXXIV:
## WRONGFUL TERMINATION AND RETALIATION IN VIOLATION OF PUBLIC POLICY AND VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT

556.   Mr. Bennett realleges and incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

557.   Defendant Quintiles terminated Mr. Bennett because he would not engage in illegal actions and was engaged in protected conduct.

558.   Such action amounts to termination in violation of public policy and retaliation, and in violation of the Massachusetts FCA anti-retaliation provision contained in the Tennessee FCA, Tenn. Code Ann § 71-5-183(g).

559.   As a result, Mr. Bennett has been damaged in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, Relator Brian Bennett, on behalf of the United States and the Plaintiff States, and on his own behalf, requests that this Court enter an order:

a.     That Defendants violated the Federal and State False Claims Acts;

b.     That Defendants pay an amount equal to three times the amount of damages the United States and the Plaintiff States have sustained because of Defendants' actions, plus a civil penalty against Defendant

of not less than $5,500 and not more than $11,000 for each violation of the Federal and State False Claims Acts;

c.    That Defendants cease and desist from violating the Federal and State False Claims Acts;

d.    That Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to the federal and state False Claims Acts;

e.    That the Relator be awarded the maximum amount allowed as a relator share pursuant to 31 U.S.C. § 3730(d) and comparable provisions of the State FCAs;

f.    That Relator be awarded all available damages, prejudgment interest, fees and costs pursuant to his personal claims for retaliation and wrongful termination under the federal FCA, 31 U.S.C. § 3730(h), the Tennessee FCA, Tenn. Code Ann § 71-5-183(g) and common law, including, without limitation, two times back pay plus interest (and prejudgment interest), reinstatement or in lieu thereof front pay, and compensation for any special damages and/or exemplary or punitive damages, and litigation costs, and attorneys' fees.

g.    The United States, the Plaintiff States and Relator be granted all such other relief as the Court deems just and proper.

PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL

COUNTS.

Respectfully Submitted,

RELATOR BRIAN BENNETT

Suzanne Durrell*                    Ethan Levin-Epstein, D. Conn. #01566
DURRELL LAW OFFICE                  GARRISON, LEVIN-EPSTEIN,
180 Williams Avenue                   RICHARDSON, FITZGERALD &
Milton, MA 02186                      PIRROTTI, P.C.
Ph: (617) 333-9681                  405 Orange Street
Fx: (617) 333-0014                  New Haven, CT 06511
Suzanne.Durrell@Verizon.net         Ph: (203) 777-4425
                                    Fx: (203) 776-3965
                                    elevin-epstein@garrisonlaw.com
Robert Thomas *
THOMAS & ASSOCIATES
280 Summer Street, 5th Floor
Boston, MA 02210
Ph: (617) 371-1072
Fx: (888) 676-7420
RMT@ThomasandAssoc.net

*Pro hac vice admission pending

Counsel for Relator

March 15, 2013

199